## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

MARK LEVY
    5128 Bluebell Avenue
    Valley Village, California 91607,

MARC BRUH
    24 Lafayette Drive
    Woodmere, New York 11598,

and ELLIOT Y. SCHEIER,
    82 Second Avenue, Apt. #2
    New York, New York 10003,

       Plaintiffs,

    v.

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION
    100 F Street, NE
    Washington, D.C. 20549

       Defendant.

Case No. _____

### COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiffs Mark Levy ("Levy"), Marc Bruh ("Bruh"), and Elliot Y. Scheier ("Scheier" and collectively with Levy and Bruh, "Plaintiffs") by way of complaint, allege as follows:

### INTRODUCTION

1.      This case arises under the Administrative Procedure Act and challenges Rules 16b-3(d) and 16b-7, as amended on or about August 9, 2005 (the "New Rules") by the Securities and Exchange Commission (the "SEC" or the "Commission") pursuant to Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b) ("Section 16(b)"). Under Section 16(b), corporate insiders are strictly liable for the profits they realize from the purchase and sale of their

1

company's publicly traded securities within a six month period (commonly referred to as short-swing transactions) unless such transactions are exempted by the SEC through rule or regulation as outside the intended scope and purpose of Section 16(b). The purpose of Section 16(b) is to prevent the unfair use of inside information for speculative purposes by depriving corporate insiders of any profit realized by virtue of short-swing trading, which was judged by Congress to be rife with speculative abuse. Accordingly, the only short-swing transactions that are outside the scope of Section 16(b) and that may be exempt by the SEC are those transactions that do not provide insiders with the opportunity to use inside information for speculative purposes. As the New Rules seek to prospectively and retroactively exempt from Section 16(b) liability short-swing transactions that provide insiders with the opportunity to use inside information for speculative purposes, they are arbitrary, capricious and otherwise contrary to law.

2.      Instead of furthering the purpose of the Securities Exchange Act of 1934 (the "Exchange Act"), which seeks to insure the integrity of our securities markets and the protection of public investors, the SEC has promulgated the New Rules at the behest of lobbyists representing corporate insiders who are defendants in a pending Section 16(b) action styled *Levy v. Sterling Holdings Co.*, Case No. 00-00994 (D. Del.). Specifically, the New Rules were issued in response to a decision in that action by the U.S. Court of Appeals for the Third Circuit in *Levy v. Sterling Holding Co.*, 314 F.3d 106 (3d Cir. 2002), *cert. denied*, 124 S. Ct. 389 (2003) ("*Levy*") wherein the Third Circuit held that the insider-defendants were not exempt under existing Rules 16b-3(d) and 16b-7 and, therefore, could be subject to Section 16(b) liability for short-swing profits of more than $70 million realized in connection with the issuer's Initial Public Offering ("IPO"). *Levy* is currently pending on remand in the U.S. District Court for the District of Delaware.

2

3.    In promulgating the New Rules, the SEC is seeking to overturn the Third Circuit's decision by expanding existing Rules 16b-3(d) and 16b-7 to reach the transaction at issue in the *Levy* case as well as other transactions despite their obvious potential for speculative abuse. As the Commission's authority to exempt insider short-swing transactions from Section 16(b) liability is expressly limited to the exemption of transactions that are not comprehended within the purpose of the statute, the New Rules exceed the SEC's authority and therefore violate the Administrative Procedure Act.

4.    The SEC, which does not have retroactive rule-making authority with respect to Section 16(b), also seeks, at the explicit request of the *Levy* defendants, to have the new exemptions applied retroactively in excess of its limited grant of Congressional authority in the Exchange Act and in violation of the Administrative Procedure Act. The SEC's clear and stated purpose in seeking retroactive application of the New Rules is to shield the short-swing profits realized by the *Levy* defendants. Although, as instructed by the *Levy* defendants, the SEC has characterized the New Rules as "clarifying amendments," the New Rules are, in fact, legislative rules that have caused a significant and substantive change in the law and are therefore impermissibly retroactive. As such, the New Rules are arbitrary, capricious, and otherwise unlawful, regardless of whether they may be applied prospectively.

5.    Plaintiffs accordingly request that this Court enter an order declaring that new Rule 16b-3(d), 17 C.F.R. § 240. 16b-3(d) (2005) ("New Rule 16b-3(d)") and new Rule 16b-7, 17 C.F.R. § 240. 16b-7 (2005) ("New Rule 16b-7") are unlawful both for purposes of prospective and retroactive application as well as such other relief as may be appropriate.

## JURISDICTION AND VENUE

6.      This action arises under the Administrative Procedure Act, 5 U.S.C. §§ 701-706

("APA") and the Securities Exchange Act of 1934, 15 U.S.C. § 78d *et seq.* (the "Exchange

Act").

7.      Judicial review is sought pursuant to the APA, which authorizes review of agency

action, including rulemaking.  5 U.S.C. §§ 701-706.

8.      This Court has federal question jurisdiction over this action under 28 U.S.C. §

1331, and may grant declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201 and

2202.

9.      Venue in this Court is proper under 28 U.S.C. § 1391(e).

## PARTIES

10.     Mark Levy is the plaintiff in *Levy v. Sterling Holding Company,* Case No. 00-

00994 (D. Del.) (the "Levy Action"), an action he brought on or about November 28, 2000

pursuant to Section 16(b) as a shareholder of Fairchild Semiconductor International, Inc.

("Fairchild"), seeking disgorgement of short-swing profits allegedly realized by defendants

Sterling Holding Company LLC ("Sterling") and National Semiconductor Corporation

("National" and collectively the "Levy Defendants") from the purchase and sale of Fairchild

common stock in connection with Fairchild's IPO.

11.     Levy will be directly affected by the New Rules because as a shareholder of

Fairchild, he will be deprived of the protections afforded public investors by Section 16(b),

which was enacted to prevent market abuses by insiders.  The New Rules have caused Levy's

injuries as they seek to eviscerate those statutory protections by exempting insiders from Section

16(b), and Levy's injuries are redressable by the instant action because invalidation of the New

4

Rules would reinstate the protections that Congress intended to provide for investors in the public securities markets, including Levy. In addition, because the New Rules purport to apply retroactively and the Levy Action is a pending action, his rights as a litigant enforcing Section 16(b) in accordance with Congressional intent will be directly affected. During the course of the rulemaking, Levy, acting through his counsel, filed an extensive comment with the Commission objecting to the rule changes.

12.     Marc Bruh is the plaintiff in an action that he brought on or about September 18, 2003 pursuant to Section 16(b) against Bessemer Venture Partners III L.P. ("Bessemer") that is currently pending on appeal in the U.S. Court of Appeals for the Second Circuit and is styled *Bruh v. Bessemer Venture Partners III, L.P.*, Case No. 05-5271-cv (2d Cir.) (the "Bruh Action"). Bruh, a shareholder of VistaCare, Inc. ("VistaCare"), seeks disgorgement of short-swing profits allegedly realized by Bessemer from the purchase and sale of Vistacare common stock in connection with Vistacare's IPO. One of the affirmative defenses Bessemer has asserted in the Bruh Action is the exemption afforded by New Rule 16b-7.

13.     Bruh will be directly affected by the New Rules because as a shareholder of VistaCare, he will be deprived of the protections afforded public investors by Section 16(b), which was enacted to prevent market abuses by insiders. The New Rules have caused Bruh's injuries as they eviscerate those statutory protections by exempting insiders from Section 16(b). Bruh's injuries are redressable by the instant action because invalidation of New Rule 16b-7 would reinstate the protections that Congress intended to provide for investors, including Bruh. In addition, because the New Rules purport to apply retroactively and the Bruh Action is a pending action, his rights as a litigant enforcing Section 16(b) in accordance with Congressional

intent will be directly affected. During the course of the rulemaking, Bruh, acting through his counsel, filed an extensive comment with the Commission objecting to the rule changes.

14.     Elliot Y. Scheier is the plaintiff in an action brought on or about March 6, 2003 pursuant to Section 16(b) against Rite Aid Corporation ("Rite Aid") that is currently pending in U.S. District Court for the Southern District of New York and is styled *Scheier v. Rite Aid Corp.*, Case No. 03 Cv 1541 (KMW) (S.D.N.Y.) (the "Scheier Action" and collectively with the Levy Action and Bruh Action, the "Insider Trading Actions"). Scheier, a shareholder of AdvancePCS, which has subsequently merged with and into Caremark Rx, Inc., seeks disgorgement of short-swing profits allegedly realized by Rite Aid from the purchase and sale of AdvancePCS common stock in connection with a public stock offering. Rite Aid has asserted as affirmative defenses the exemptions afforded by New Rule 16b-3(d) and New Rule 16b-7.

15.     Scheier will be directly affected by the New Rules because as a shareholder of Caremark Rx, Inc., he will be deprived of the protections afforded public investors by Section 16(b), which was enacted to prevent market abuses by insiders. The New Rules have caused Scheier's injuries as they eviscerate those statutory protections by exempting insiders from Section 16(b). Scheier's injuries are redressable by the instant action because invalidation of New Rule 16b-7 would reinstate the protections that Congress intended to provide for investors, including Scheier. In addition, because the New Rules purport to apply retroactively and the Scheier Action is a pending action, his rights as a litigant enforcing Section 16(b) in accordance with Congressional intent will be directly affected. During the course of the rulemaking, Scheier, acting through his counsel, filed an extensive comment with the Commission objecting to the rule changes.

6

16.    The Commission's issuance of the New Rules seeks to deprive Plaintiffs of their statutory right to obtain disgorgement of the short-swing profits allegedly realized by the defendants in the Insider Trading Actions. Plaintiffs each have a pecuniary interest in the outcome of their respective action because they own shares in the respective issuers or their successors, which are the ultimate beneficiaries of any recovery.

17.    Defendant United States Securities and Exchange Commission has its principal office in the District of Columbia and is an agency of the United States government created by the Securities Exchange Act of 1934, 15 U.S.C. § 78d.

## FACTUAL BACKGROUND

### Section 16(b) of the Securities Exchange Act of 1934

18.    Section 16(b) is a strict liability statute seeking to prevent the unfair use of inside information by requiring the disgorgement of short-swing trading profits resulting from: (1) a purchase and (2) a sale of securities resulting in a profit (3) by an officer or director of the issuer or by a beneficial owner of more than ten percent of any one class of the issuer's securities (4) within a six month period. *See* 15 U.S.C. § 78p(b); *Feder v. Frost*, 220 F.2d 29, 32 (2d Cir. 2000). "Prohibiting short-swing trading by insiders with nonpublic information was an important part of Congress' plan in the 1934 Act to 'insure the maintenance of fair and honest markets' and to eliminate such trading." *Gollust v. Mendell*, 501 U.S. 115, 121 (1991) (quoting 15 U.S.C. §78b). "Congress thought that *all* short-swing trading by directors and officers was vulnerable to abuse because of their intimate involvement in corporate affairs." *Foremost-McKesson, Inc. v. Provident Secs. Co.*, 423 U.S. 232, 253 (1976) (emphasis added). "[T]he only method Congress deemed effective to curb the evils of insider trading was a flat rule taking the

7

profits out of a class of transactions in which the possibility of abuse was believed to be intolerably great." *Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422 (1972).

19.    Congress adopted Section 16(b) based upon evidence that "insiders actually manipulated the market price of their stock by causing a corporation to follow financial policies calculated to produce sudden changes in market prices in order to obtain short swing profits." *Interpretative Release on Rules Applicable to Insider Reporting and Trading*, Exchange Act Release No. 18114, 1981 SEC LEXIS 679 at *2 (Sept. 24, 1981) (the "1981 Release"). Section 16(b) destroys this incentive by depriving insiders of the ability to profit from short-term price fluctuations. *See* S. Thel, *The Genius of Section 16: Regulating the Management of Publicly Held Companies*, 42 Hastings L. J. 391, 433 &n.141 (1991). *See also Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 591 (1973).

**The Commission's Authority**

20.    Unlike its authority with respect to other statutory sections of the Exchange Act, the SEC's authority with respect to Section 16(b) is statutorily constrained. Specifically, the SEC lacks the authority either to adjudicate violations of that statute or to bring an enforcement action. *See Gollust*, 501 U.S. at 122. Moreover, the SEC may only exempt "by rules or regulations" those transactions "not comprehended within the purpose of [the statute]." 15 U.S.C. § 78p(b).

21.    "Guiding the Commission in the exercise of an actually limited authority is the quite adequate standard -- illustrated by two specific statutory exemptions -- that its regulations be consistent with the expressed purpose of the statute." *Smolowe v. Delendo Corp.*, 136 F.2d 231, 240 (2d Cir. 1943). *See also Perlman v. Timberlake*, 172 F. Supp. 246, 254 (S.D.N.Y.

1959) ("The Commission's authority was narrowly circumscribed by Congress in this field . . . .").

22.    In promulgating the New Rules, the Commission has exceeded this narrow grant of authority because the New Rules are: (1) inconsistent with the purpose of Section 16(b) as the transactions exempted provide the potential for speculative abuse, permit the unfair use of inside information, and under the seminal Section 16(b) case *Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 593 n.24 (1973), may not be exempt; (2) not guided by either of the specific exemptions that Congress enacted; and (3) inconsistent with and in derogation of the decision of the Third Circuit Court of Appeals in the Levy Action interpreting Rules 16b-3 and 16b-7 and holding that the transaction at issue presented an opportunity for speculative abuse and therefore, could not be exempt under SEC rules. *See Levy*, 314 F.3d at 118-19 (citing *Kern County*).

23.    Additionally, the SEC has exceeded its authority by seeking to make the New Rules apply retroactively in order to change the outcome of the pending Insider Trading Actions, including the Levy Action.

**Events That Precipitated The Rulemaking**

24.    On November 28, 2000, Levy brought an action on behalf of Fairchild pursuant to Section 16(b) seeking disgorgement of more than $70 million in short-swing trading profits obtained by defendants Sterling and National in connection with Fairchild's IPO. Fairchild's board of directors, consisting of several individuals appointed and controlled by Sterling and National, effectuated in conjunction with Fairchild's IPO a conversion of preferred stock held by Sterling and National into common stock at the IPO offering price. Sterling and National realized short-swing profits by selling their Fairchild common stock in Fairchild's secondary

9

offering, which occurred within six months of Fairchild's IPO. *See Levy*, 314 F.3d at 108-09. The Levy Defendants claimed, *inter alia*, that the conversion was a corporate stock "reclassification" and exempt under existing Rule 16b-7.

25.     The U.S. District Court for the District of Delaware granted the Levy Defendants' motion to dismiss. On appeal, the Third Circuit reversed the district court, holding that neither Rule 16b-3 nor 16b-7 exempted the transactions at issue, because, among other things, the facts surrounding the transaction demonstrated that there was a possibility of speculative abuse. *See Levy*, 314 F.3d at 119. One reason the court cited in support of this conclusion was that Sterling and National controlled at least three seats on Fairchild's board of directors, and therefore could work their will through the board. *Id.*

26.     In its thorough and well-reasoned decision, the Third Circuit conducted an exhaustive review of the relevant regulatory history of both rules and examined case law as well as other authorities. In addition to examining the Commission's positions contained in interpretive and adopting releases accompanying the rules, the Third Circuit considered Commission no-action letters issued after the adoption of those rules.

27.     Having considered all relevant materials, the Third Circuit ultimately concluded that the existing rules did not exempt the transactions at issue in *Levy*.

28.     The Levy Defendants petitioned the Third Circuit for rehearing, or, in the alternative, a rehearing *en banc* with respect to the *Levy* decision. The SEC sought and was granted leave to file an *amicus* brief in support of the Levy Defendants' petition. After extensive briefing, on April 30, 2003, both the original panel as well as the entire Third Circuit in an *en banc* vote of 7-3 denied the petition for rehearing. The U.S. Supreme Court subsequently denied certiorari review in *Sterling Holding Co. v. Levy*, 540 U.S. 947 (2003).

10

**The Levy Defendants Urge the SEC for Changes to the Rules in Order to Overturn the Levy Decision**

29.    Shortly after the denial of certiorari review, on October 15, 2003, Peter Romeo,

one of the attorneys previously appearing as counsel for defendant Sterling Holding Co. LLC,

and a former General Counsel of the SEC's Corporate Finance Department, wrote to Anne

Krauskopf, the primary staff member at the SEC responsible for the drafting of the New Rules,

stating that "the Supreme Court yesterday denied certiorari in Levy v. Sterling Holding Co." and

urging for the matter to be "mitigated through prompt rulemaking by the SEC." A true and

correct copy of that e-mail is attached hereto as **Exhibit A**.[1]

30.    Later that day, Mr. Romeo wrote once again to Ms. Krauskopf urging that the

SEC "take rulemaking action to blunt the rulings in the *Levy* case" and that "if styled by the SEC

as clarifications . . . [they] would effectively nullify the Third Circuit's rulings, and should result

in dismissal of any lawsuit based upon those rulings." A copy of that e-mail is attached hereto as

**Exhibit B**.

**The SEC Issues Proposed Rules 16b-3 and 16b-7 in Response to Pressure From the Levy Defendants**

31.    On June 21, 2004, the SEC disseminated a notice of proposed rulemaking entitled

*Proposed Rule: Ownership Reports and Trading by Officers, Directors and Principal Security*

*Holders*, Release Nos. 34-49895; 35-27861; IC-26471, 69 Fed. Reg. 122 (June 21, 2004) (the

"Proposals"). In reaction to the Proposals, Mr. Romeo wrote to Ms. Krauskopf offering "[o]ur

congratulations on a job well done." A true and correct copy of the e-mail is attached hereto as

**Exhibit C**. In addition, a true and correct copy of the Proposals is attached hereto as **Exhibit D**.

---

[1] The e-mails described herein were obtained by Levy's counsel through a Freedom of Information Act request and only after a subsequent federal action seeking SEC compliance.

32.    On September 27, 2004, in response to a motion made by the Levy Defendants, the Delaware District Court stayed proceedings in the *Levy* case pending SEC action on its proposed rules. *See Levy v. Sterling Holding Co.*, 2004 U.S. Dist. LEXIS 19180 (Sept. 27, 2004).

33.    Eighteen comments were submitted by interested parties in response to the Proposals. Fifteen comments were submitted by various parties in support of the proposed rules as requested by the Levy Defendants, including law firms representing corporate defendants in pending actions and industry groups in which such defendants were members. One such comment was submitted by the Business Law Section of the American Bar Association, a section of which Mr. Romeo was a prominent member and the former Chair of a task force relating to Section 16(b) matters. Three comments were submitted by law firms representing shareholders in securities fraud representative actions, including Levy's counsel, expressing strong opposition to the proposed rule changes based on, among other things, the language and intent of Section 16(b), as interpreted by well-settled case law, prior SEC interpretations of the scope of the rules, and evidence demonstrating that the transactions which the SEC was attempting to categorically exempt presented opportunities for speculative abuse. True and correct copies of the comments submitted in opposition to the Proposals are attached hereto as **Exhibit E, F, and G**.

34.    Although in its adopting release accompanying the New Rules, the SEC purports to address the points raised in the comments opposing the Proposals, in reality the adopting release ignores the majority of the objections raised and does not engage in a meaningful discussion of the remaining issues. Instead, the SEC claims that it is merely clarifying its intent regarding the scope of the rules as originally issued, a contention that is demonstrably contrary

to the holding of the Third Circuit interpreting the scope of Rules 16b-3 and 16b-7, and also

cannot be reconciled with the SEC's contemporaneous releases interpreting the rules, its no-

action letters, applicable case law, the statutory purpose, or the legislative intent. In fact, the

SEC has failed to identify any rational basis at all for promulgating the New Rules, which

represent a substantive change in the law and were issued by the Commission solely in response

to lobbying by the Levy Defendants.

**The New Rules Are Adopted**

35.    On August 3, 2005, the Commission adopted New Rules 16b-3 and 16b-7

substantially as proposed. The New Rules were published in the Federal Register on August 9,

2005 as *Ownership Reports and Trading by Officers, Directors and Principal Security Holders;*

*Final Rule*; 70 Fed. Reg. 46080 (Aug. 9, 2005) (the "Adopting Release"). A true and correct

copy of the Adopting Release is attached hereto as **Exhibit H**.

36.    On August 11, 2005, the Delaware District Court issued an Order requesting

briefing on whether the New Rules can apply retroactively to the Levy Action. As of the date of

this complaint, a decision on this issue is still pending.

**The Retroactivity Provisions of the New Rules**

37.    The Adopting Release seeks to give the New Rules retroactive effect. Adopting

Release, 70 Fed. Reg. at 46080. This represents an unlawful attempt by the SEC to engage in

retroactive rulemaking, which is prohibited under *Bowen v. Georgetown University Hospital*,

488 U.S. 204, 208 (1988) absent an express grant of Congressional authority to promulgate

retroactive rules. No such authority exists with respect to SEC rulemaking under Section 16(b).

38.     The issue of retroactive application will be of material significance to and thus directly affect the pending Insider Trading Actions because the defendants in each of those actions have asserted Rules 16b-3 and/or 16b-7 as affirmative defenses.

**The New Rules Are Legislative Rules That Have Caused a Substantive Change in the Law**

39.     It has long been recognized that the label given to a rule by an administrative agency is not determinative. *Columbia Broad. Sys., Inc. v. United States*, 316 U.S. 407, 416 (1942). This is particularly true where, as here, the New Rules are promulgated many years after the original rule is adopted. *Concerned Citizens of Bridesburg v. EPA*, 836 F.2d 777, 786 (3d Cir. 1987).

40.     The SEC purports to label the New Rules as "clarifications" of the original rules that "neither create[ ] nor remove[ ] any rights or duties." Adopting Release, 70 Fed. Reg. at 46084. However, in reality, both of the New Rules create new exemptions that deprive both the issuer and securities holder of substantive rights and thus represent a significant change in the law. Under New Rule 16b-3(d), a director or officer, or any entity with the right to appoint a director, may now acquire and dispose of an issuer's securities within six months as long as the acquisition has board or shareholder approval regardless of the potential for speculative abuse. Prior to the rule change, the exemption was limited to compensation-related transactions that did not involve the exercise of investment discretion or the contribution of assets on the part of the insider (*i.e.,* grants or awards) or compensation-related transactions that did not otherwise provide an opportunity for speculative abuse (*i.e.,* participant-directed compensation deferral programs). The existing exemptions did not include a discretionary acquisition of securities from an issuer in exchange for the contribution of assets that was solicited by large shareholders

14

with the right to appoint, and therefore control, members of the board of directors, and who were not performing any services for the issuer that required compensation or incentive.

41.    New Rule 16b-7 also constitutes a substantive change in the law as it now exempts an additional, separate and distinct category of transactions -- reclassifications -- in a manner that effectively provides for a *per se* exemption regardless of the potential for speculative abuse. Prior to the rule change, the rule itself did not explicitly exempt such transactions, and to the extent the title implied that some reclassifications may have been exempt, such exemptions were only available where the transaction did not cause a change in the insider's proportionate ownership interest in the issuer or a change in the nature of the risks and opportunities associated with the insider's investment thus depriving the insider of an opportunity to engage in speculative abuse.

## The New Rules Were Promulgated in Excess of the SEC's Statutory Authority

### New Rule 16b-3

42.    Existing Rule 16b-3(d) exempted "grants, awards and other acquisitions from the issuer" by a director or officer if the transaction was approved by the board of directors or by a majority of the issuer's shareholders. *See* 17 C.F.R. § 240.16b-3(d) (2004). Under the well-recognized rule of statutory construction known as *esjudem generis*, which requires that "the residual clause [*i.e.*, "other acquisition"] should be read to give effect to . . . [and] be controlled and defined by reference to the enumerated categories [*i.e.*, "grant and award"] which are recited just before it," *see Circuit City Stores v. Adams*, 532 U.S. 105, 115 (2001), the scheme of existing Rule 16b-3 in its entirety, the contemporaneous regulatory history, and in accordance with the statutory purpose of Section 16(b), the exemption contained in existing Rule 16b-3(d) was limited to those transactions such as grants and awards that were compensation-related, that

were intended to incentivize officer and director performance, and that did not provide an insider

with the opportunity to use inside information for speculative purposes. *See Levy*, 314 F.3d at

122-23 & 124 (reviewing adopting release and concluding that the "weight of the SEC's

pronouncements on Rule 16b-3, and particularly Rule 16b-3(d), suggest that the transaction

should have some connection to a compensation-related function."). New Rule 16b-3(d) now

exempts any acquisition of securities from an issuer by a director or officer as long as board or

shareholder approval has been obtained, regardless of whether the transaction has a

compensatory element and the potential for speculative abuse. New Rule 16b-3(d) reads in

pertinent part:

> Any transaction, other than a Discretionary Transaction, involving an acquisition
> from the issuer (including without limitation a grant or award), *whether or not*
> *intended for a compensatory or other particular purpose*, shall be exempt . . .

17 C.F.R. § 240.16b-3(d) (emphasis added).

43.     The Commission purports to premise its amendment to Rule 16b-3 by claiming

that: (1) the New Rule is consistent with the rule's prior regulatory history; (2) that the

"gatekeeping" board approval requirement functions as a safeguard against speculative abuse;

and (3) that where the issuer, rather than an investor, stands on the other side of the transaction,

the concerns that Congress expressed in enacting Section 16(b) are not implicated. *See* Adopting

Release, 70 Fed. Reg. 46080 at 46082-83. None of these justifications provide a rational basis

for the SEC's amendment.

44.     The Commission has never stated in any release contemporaneous with the

adoption of the existing Rule 16b-3(d) or its predecessors that the Rule provides a blanket

exemption for all acquisitions of securities by a director from an issuer. Nor does any such

statement appear in any of the Commission's releases discussing Rule 16b-3 going back to the

earliest version of the rule, continuing through 1991 when the rule was extensively revised, as

well as subsequent revisions in 1994, 1995 and 1996. *See Levy*, 314 F.3d 122 (citing *Ownership*

*Reports and Trading by Officers, Directors and Principal Security Holders*, Release Nos. 34-

37260, 35-26524, 61 Fed. Reg. 30376 at 30376 (June 14, 1996) ("1996 Adopting Release")).  To

the contrary, the regulatory history is extremely clear in that the intention of the Commission

was to create an exemption for certain compensation-related transactions intended to incentivize

officer and director performance and that did not provide an opportunity for speculative abuse.

45.    As the Third Circuit found, Rule 16b-3 "primarily is concerned with employee

benefit plans." *Levy*, 314 F.3d at 122; *see also Ownership Reports and Trading By Officers,*

*Directors and Principal Security Holders*, 56 Fed. Reg. 7242 at 81, 266 (Feb. 21, 1991) ("1991

Release") ("Employee benefit plans, the subject of Rule 16b-3, have been a traditional vehicle

through which employers have compensated and provided incentives to their employees."). *See*

*also, Interpretive Release on Rules Applicable to Insider Reporting and Trading*, 46 Fed. Reg.

48147 at 48163 (Oct. 1, 1981) ("1981 Release"); Exchange Act Release No. 12374, 1976 SEC

LEXIS 1831 at *3 (1976); Exchange Act Release No. 7723, 1965 SEC LEXIS 741 (1965);

*Notice of Proposed Amendment of Rule 16b-3 Under the Securities Exchange Act of 1934*,

Exchange Act Release No. 6111, 1959 SEC LEXIS 199 at *8-10 (Nov. 5, 1959).

46.    In promulgating a 1991 revision to the rule, the SEC articulated quite clearly the

issue the rule was designed to address:

> Since many plans provide for grants or awards at least every 12 months, if there
> were no acquisition exemption, any sale of equity security by participating
> officers or directors would necessarily occur within six months before or after an
> acquisition, and therefore result in short-swing liability. ***Rule 16b-3 is intended***
> ***to provide relief from this frustration of the legitimate use of employee benefit***
> ***plans as a method of executive compensation, where the nature of the***

17

*transaction and the safeguard imposed by the rule minimize the potential for abuse.*

1991 Release at 81,266 (emphasis added).

47.    Other portions of the regulatory history upon which the Commission focused in issuing the New Rules do not support the Commission's rulemaking. The Commission in the Adopting Release wrenches quotes from the regulatory history out of context because "the surrounding language is concerned with compensation." *Levy*, 314 F.3d at 123 n.13. One such quote from the 1996 Adopting Release, quoted also in the current Adopting Release, is that "[t]ypically, where the issuer rather than the trading markets, is on the other side of [a] . . . director's transaction in the issuer's equity securities, any profit obtained is not at the expense of uninformed . . . market participants . . . ." Adopting Release, 70 Fed. Reg. at 46083; 1996 Adopting Release, 61 Fed. Reg. at 30377.

48.    However, the Commission overlooked the fact that the same statement was made in 1995 when it put out for comment an earlier proposed version of the rule. *See Ownership Reports and Trading by Officers, Directors and Principal Security Holders*, 60 Fed. Reg. 53832 at 53833 (Oct. 11, 1995). In 1995, the statement was meant to serve as the rationale for exempting only "Grant or Award Transactions," at that time denominated as Rule 16b-3(c). *Id.* at 53840. *No mention at all was made of the term "other acquisition" in the 1995 Release. Id.* There is, therefore, no basis for concluding that this broadly worded rationale was intended to exempt all transactions between an issuer and its directors. Instead, the language of the draft rule was changed in the final version because some "participant-directed transactions (such as deferrals of bonuses into phantom stock and other deferred compensation programs) that are exempt under the current rule would lack an exemption under the new rule." *Levy*, 314 F.3d at

18

123-24 (quoting 1996 Adopting Release, 61 Fed. Reg. at 30380). Such transactions are compensation-related, however, and do not provide an opportunity for speculative abuse. *Id.* at 124 (quoting 1996 Adopting Release, 61 Fed. Reg. at 30380). Accordingly, the term "other acquisition" was not intended to refer to every transaction between an insider and an issuer.

49.     The Commission states that routine "gatekeeping" procedures requiring approval by an issuer's directors or shareholders are sufficient to protect against speculative abuse by insiders. The Commission's rationale is unpersuasive as it would permit *all* transactions involving an issuer to be exempt, not merely those involving directors and officers but also those involving ten percent beneficial owners. Nonetheless, under New Rule 16b-3(d), only directors and officers are exempt. The Commission did not identify nor even address this arbitrary distinction in its rulemaking.

50.     Moreover, New Rule 16b-3(d) applies to a person or entity deemed to be a director of an issuer by virtue of the principle of deputization, *i.e.*, where an individual or entity deputizes someone to serve as his representative on an issuer's board of directors. Thus, a large shareholder who obtains the right to appoint a board member through a shareholder agreement or in some other way has access to inside information through an individual director who reports to him, may, by working his will through the board, engage freely in short-swing transactions that would otherwise be prohibited under Section 16(b), with no attendant benefit to the issuer or public investors. Although such an application of Rule 16b-3(d) would present ample opportunities for speculative abuse and is therefore comprehended within the purpose of Section 16(b), it was not addressed by the Commission in its recent rulemaking.

51.     The transactions in the Levy Action and the Scheier Action present similar factual scenarios, in that the insiders who will benefit from New Rule 16b-3(d) are not even directors or

19

officers of the issuer, but simply large shareholders who appointed directors to work their will on the issuer's board and provide them with inside information. Exempting such entities from Section 16(b) is not within the Congressional intent to prevent speculative abuse and frustrates the stated statutory purpose of preventing the unfair use of inside information.

52.     The Commission also did not set forth in its Adopting Release any meaningful discussion concerning how New Rule 16b-3(d) furthers the legislative intent underlying the enactment of Section 16(b), which is predicated upon the principle that insiders are tempted and able to manipulate corporate affairs to their advantage. *See* 1981 Release, 46 Fed. Reg. at 48147 n.3. Placing approval power over issuer-insider transactions in the hands of the actors Congress sought to regulate is clearly contrary to the legislative intent. As the Third Circuit correctly recognized, allowing corporate directors to exempt transactions from the statute's coverage would be fundamentally inconsistent with Section 16(b)'s provision that limits the same directors from preventing the prosecution of a lawsuit -- a suit any shareholder is entitled to bring even if the directors ignore or reject his pre-suit demand. *See* 15 U.S.C. § 78p(b); *accord*, *Burks v. Lasker*, 441 U.S. 471, 484 n. 13 (1979) (Congress intended to prevent boards of directors from cutting off shareholder lawsuits brought pursuant to Section 16(b)).

53.     The Commission's claim that the risk of speculative abuse declines because the counter-party to the transaction is the issuer rather than a public shareholder trading at an informational disadvantage to the insider is faulty and unsubstantiated. There is no known suggestion in the legislative history or the statutory language of Section 16(b) that Congress' intent in adopting Section 16(b) was to only protect counter-parties to such transactions. To the contrary, the legislative history clearly indicates an intention to protect the maintenance and integrity of the securities markets, the national economy from the dislocation caused by insider

20

trading and the related mis-allocation of economic resources. *See, e.g.*, 15 U.S.C. § 78b(4).

*Accord, Gollust, supra.* Indeed, when Congress wished to provide a remedy for parties damaged

by such transactions it knew how to properly frame the statutory remedy. *See, e.g.*, 15 U.S.C. §

78t-1(a).

54.    Additionally, the identical risks of insider trading, the unfair use of inside

information, and the related manipulation of share prices, exist regardless of who is on the other

side of the transaction. "It is difficult to see how the opportunity for short-swing profits, present

when the insider equipped with inside information goes out in the market and buys, vanishes

because armed with the same information, he goes to the corporation and buys . . . ." *Perlman v.*

*Timberlake*, 172 F. Supp. 246, 256 (S.D.N.Y. 1959). This approach was adopted by the U.S.

Court of Appeals for the Second Circuit in *B. T. Babbitt, Inc. v. Lachner*, 332 F.2d 255, 259 (2d

Cir. 1964).

55.    Without addressing Congress' intent to protect the integrity of the securities

markets, the Commission in the Adopting Release nevertheless makes the unsubstantiated

statement without any further discussion or the presentation of empirical data that such

transactions do not "typically" or "generally" give rise to speculative abuse. In fact, this

rationale is simply incorrect. The most basic illustration of such speculative abuse is the not

uncommon scenario of an insider who purchases an issuer's securities, manipulates corporate

affairs to inflate the price of the stock, and then armed with this inside information, realizes a

short-swing profit by selling it on the open market within six months. This is insider trading,

pure and simple. It is precisely what Congress was concerned with when it stated that the

purpose of the statute was "to prevent the *unfair* use of information" 15 U.S.C. § 78p(b)

(emphasis added). This remains true, regardless of whether the issuer is on the other side of the transaction.

56.      This is in fact what is alleged to have happened in the *Levy* case in the context of an IPO, where the insiders conspired with the underwriters to underprice the stock to be offered. Insiders purchased the stock knowing it was underpriced and sold it once it skyrocketed as a result of the demand generated by the public offering. Armed with this information, and knowing that the stock would plummet once the underpricing became evident, they realized millions of dollars in short-swing profits by selling within six months, while the investing public - - not knowing the stock price would plummet because it was underpriced to begin with - - were the ultimate losers.

57.      Nowhere in its rulemaking did the Commission address the dangers of speculative abuse arising from "hot" initial public offerings such as the one conducted in the Levy Action, which are also implicated in the Bruh Action, although the Commission and other regulators have documented the multitude of potential abuses that arise from such conduct. *See generally In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 281 (S.D.N.Y. 2003). These abuses reached a fever pitch in the superheated IPO market of 1998 through 2000, when Fairchild's IPO occurred. *Id.* at 300-08. Insiders, buying at a severely discounted price necessary to make an offering "hot" with the goal of turning a quick profit by selling in the after-market -- *i.e.*, precisely what the Levy Defendants did -- comprises the sort of speculative abuse which Section 16(b) seeks to prevent. Indeed, CSFB First Boston, a co-lead underwriter for Fairchild's IPO,

22

has entered into a consent decree with the Commission with respect to exactly such conduct. *See http://www.SEC.gov/ litigation/complaints /judglr17327.htm.*[2]

58.    Thus, the Commission's conclusion in the Adopting Release that the new Rule 16b-3 exemption "[does] not impair the protection of investors" is demonstrably wrong and does not provide a rational basis for amending the Rule. Moreover, the new Rule 16b-3(d) exemption is directly inconsistent with the statute, which seeks to prevent insiders from having an unfair opportunity to profit through the use of inside information.

59.    The prevention of market manipulation associated with insider short-swing transactions is not merely a theoretical concept unworthy of the Commission's attention: it is precisely the type of manipulation that led to the stock market crash that caused the Great Depression as well as more recent turmoil in the U.S. securities markets, and which prompted Congress to enact the Exchange Act and to create the Securities and Exchange Commission to carry out its mandate. Yet, the Commission did not even once address such abuses during its recent rulemaking. Moreover, the risk of such abuses are compounded by the fact that the Commission does not even have administrative or enforcement authority over Section 16(b), *see Gollust*, 501 U.S. at 122, and thus would be powerless to stop rogue insiders from using the broad Rule 16b-3(d) exemption to engage in market abuses to the detriment of the investing public.

60.    In addition to failing to consider the potential for speculative abuse presented in transactions that are now exempt under New Rule 16b-3(d), including those in the *Levy* Action,

---

[2] Rule 201 of the Federal Rules of Evidence permits the Court to take judicial notice of documents that are of a public nature, such as court records. *See e.g.*, *United States ex rel. New v. Rumsfeld*, 350 F. Supp. 2d 80, 88-89 (D. D.C. 2004); *Fowler v. District of Columbia,* 122 F. Supp. 2d 37, 40 n.4 (D.D.C. 2000).

the Commission also failed to address public comments setting forth additional ways in which

the exempted issuer to insider transactions present opportunities for speculative abuse. For

instance, one comment posed the following, not uncommon hypothetical:

> An insider purchases a substantial amount of stock from the issuer in a board-
> approved transaction just prior to a merger. The stock price rises after the merger
> but the insider knows that the price is inflated because critical components of the
> issuer's business are failing. This information has not been disclosed to the
> public. Less than six months later, he sells, on the public market, the stock he
> bought from the issuer and reaps substantial profits. Two weeks later, the stock
> price plummets upon disclosure of the bad news.

Comment Letter of Sirianni Youtz Meier & Spoonemore at 5.

The hypothetical clearly demonstrates that issuer to insider transactions present insiders with an

opportunity to unfairly use inside information for speculative purposes and can undermine the

maintenance and integrity of the public securities markets.

61.     The Commission also attempts to justify New Rule 16b-3 by stating that

"transactions between an issuer and its officers and directors . . . are subject to fiduciary duties

under state law." Proposals, 2004 SEC LEXIS at *9-10; Adopting Release, 70 Fed. Reg. at

46082. This passing-the-buck rationale collapses when one realizes that Congress enacted

Section 16(b) *because* corporate insiders were violating their fiduciary duties to their companies

and their shareholders. The Commission itself acknowledges this fact in the New Rules.

Adopting Release, 70 Fed. Reg. at 46083 ("Among the most vicious practices unearthed at the

hearings before the subcommittee was the flagrant betrayal of their fiduciary duties by directors

and officers . . .") (quoting Stock Exchange Practices, S. Rep. No. 1455). Here again the

Commission's rationale frustrates stated Congressional intent, which was based on the belief that

state law was unequal to the task of preventing improper insider trading. *See, e.g., Kern County*,

411 U.S. at 592 n.3 (quoting S. Rep. No. 1455, 73 Cong. 2d Sess. 55 (1934)). Therefore, it is

24

apparent that Congress did not wish for the Commission to rely on the existence of possible state

law remedies as a means for displacing Section 16(b) liability. *Accord Adams Fruit v. Barrett*,

494 U.S. 494 U.S. 638, 644 & n.2 (1990).

62.    In addition, as several commentators pointed out during the rulemaking, the

Commission's justifications fail to consider the difficulties in maintaining state law shareholder

derivative actions. "[S]uch a suit is not as effective as a §16(b) claim because shareholders are

subject to the . . . more stringent standing requirements of Rule 23.1, and, in addition, the

complaint may be countered with subjective considerations of intent or good faith, such as a

business judgment defense." *Mendell, on behalf of Viacom v. Gollust*, 909 F.2d 724, 729 (2[nd]

Cir. 1990). In contrast, Section 16(b) was drafted by Congress as a strict liability statute. The

element of intent was purposely omitted from Section 16(b) because Congress felt that "it will be

absolutely impossible to prove the existence of such intention . . ." *Kern County*, 411 U.S. at

592.

63.    A blanket exemption of all issuer to insider transactions having board or

shareholder approval is directly contrary to the purpose of Section 16(b), which is aimed at

preventing the ***possibility*** of speculative abuse. *Reliance Elec. Co. v. Emerson Elec. Co.*, 404

U.S. 418, 422 (1972). Congress made a considered policy judgment when it determined that "all

short-swing trading by directors and officers was vulnerable to abuse because of their intimate

involvement in corporate affairs." *Foremost-McKesson*, 423 U.S. at 253. The Commission has

not demonstrated, through statistical data or other objective proof, that such transactions do not

give rise to speculative abuse. Accordingly, the promulgation of this blanket exemption is

contrary to the express purpose of Section 16(b) and therefore in excess of the Commission's

25

authority, which is limited to the exemption of transactions that are not "comprehended within the purpose" of Section 16(b). 15 U.S.C. § 78p(b).

### New Rule 16b-7

64.   Rule 16b-7 originally exempted certain mergers and consolidations from the ambit of Section 16(b) and was predicated on the notion that the acquisition and disposition of securities in connection with mergers or consolidations resulting in business entities whose business and assets essentially remain the same following the merger or consolidation are categories of transactions that do not present opportunities for speculative abuse. *See* 17 C.F.R. § 240.16b-7(a) (2004); *see also Levy*, 314 F.3d at 115 (citing 3D Harold Bloomenthal & Samuel Wolff, *Securities and Federal Corporate Law* § 21:74 (2d ed. & 2002 supp.)).

65.   New Rule 16b-7 adds the word "reclassification" to the body of the rule wherever mergers and consolidations are referenced as exempt transactions. *See generally* 17 C.F.R. § 240.16b-7 (2005). Additionally, New Rule 16b-7 contains a new subsection which was not present in the existing Rule and which states: "The exemption provided by this section applies to any securities transaction that satisfies the conditions specified in this section and is not conditioned on the transaction satisfying any other conditions." 17 C.F.R. § 240.16b-7(c).

66.   Reclassifications, however, can provide the opportunity for speculative abuse regardless of whether the assets of the entity remain the same, such as, for example, in transactions like the one in *Levy* in which the insiders acquired common stock in connection with Fairchild's IPO at the discounted IPO price and then sold within six months in the secondary offering, yielding an enormous short-swing profit. In situations similar to those found in *Levy*, where insiders can work their will through the board, reclassification transactions, particularly those timed to coincide with IPO's, are opportune vehicles for the unfair use of inside

information for speculative purposes. Thus, the categorical exemption of all reclassifications, where the assets of the entity essentially remain unchanged, regardless of whether the transaction has the potential for speculative abuse, is contrary to the purpose of Section 16(b).

67.    Until the Commission's adoption of the New Rule, the text of Rule 16b-7 has never contained the term "reclassification." In 1991, the Commission added the term "reclassifications" to the title - - but not the body - - of the rule, an addition which the Third Circuit observed was made "inexplicably" by the Commission. *See Levy*, 314 F.3d at 113. It therefore strains credulity that the Commission as it now claims intended from the time of the adoption of the original rule in 1952, or even at the time of the rule's amendment in 1991, for reclassifications to be exempt without any mention of the term in the rule.

68.    Prior to New Rule 16-7, the sole reference to reclassification transactions in any Commission statement concerning Rule 16b-7 was in a 1981 release, in which the Commission stated that "Rule 16b-7(a) *can* apply to transactions involving reclassifications." 1981 Release, 46 Fed. Reg. at 48177 (emphasis added). Through the use of the word "can," the rule -- assuming it existed at all -- would be permissive. *See Alloc, Inc. v. ITC*, 342 F.3d 1361, 1378 (Fed. Cir. 2003); *Central States Motor Freight Bureau, Inc., v. ICC*, 924 F.2d 1099, 1105 (D.C. Cir. 1991). Thus, as phrased, the interpretive release states only that where a merger or consolidation which otherwise falls within the ambit of Rule 16b-7(a) *also involves a reclassification*, the exemption *may* still apply. In that regard, it is particularly telling that Question 142, within which this discussion is contained, analyzes a series of hypothetical factual scenarios, none of which implicates a pure reclassification existing outside the context of a merger or a consolidation. *See* 1981 Release, 46 Fed. Reg. at 48177. The Third Circuit reached the same conclusion after a thorough analysis of the Commission's releases.

27

69.     To the extent that Rule 16b-7 previously provided an exemption for certain reclassifications, despite the fact that the language of the Rule itself did not provide for such an exemption, the exemption only applied where the possibility of speculative abuse did not exist, such as where the insider's proportionate and substantive ownership interests in the company were not altered as a consequence of the transaction. *See Levy*, 314 F.3d at 117.

70.     In justifying the new exemption for reclassification transactions, the Commission stated that Section 16(b) liability should not exist because there is "no change" in the company's business. This is not a reasonable basis for the rule change, however, as such is almost always the case in securities transactions subject to Section 16(b). There is rarely a change in the issuer's business; the only thing that changes is the economic interest of the statutory insider, which provides the insider with the potential for speculative abuse as in, for example, the *Levy* transaction, where there was no change in the issuer's business but where, as alleged, the insider's proportionate ownership interest in the issuer and the nature of the insider's investment (*i.e.*, the risks and opportunities associated with the investment) changed.

71.     Equally unreasonable is the Commission's contention that "an issuer also could effect a reclassification by forming a wholly-owned "shell" subsidiary, merging the issuer into the subsidiary, and exchanging subsidiary securities for the issuer's securities." Adopting Release, 70 Fed. Reg. 46080 at 46084. That is simply not true. Instead, the merger which the Commission describes would, in fact, be deemed a liquidation and *not* be eligible for the Rule 16b-7 exemption. *See* 1981 Release, Question 142, Illustration (2), 1981 SEC LEXIS 679 at *183-84.

72.     The Commission has not demonstrated, through statistical data or other objective proof, that the reclassification transactions exempt under New Rule 16b-7 do not give

28

rise to speculative abuse. Accordingly, the promulgation of this blanket exemption is contrary to the express purpose of Section 16(b) and therefore in excess of the Commission's authority, which is limited to the exemption of transactions that are not "comprehended within the purpose" of Section 16(b). 15 U.S.C. § 78p(b).

**CAUSES OF ACTION**

**COUNT I**
**The Commission Exceeded its Statutory Authority**
**(Exchange Act, 15 U.S.C. § 78p(b); APA, 5 U.S.C. § 706(2)(C))**

73.    Plaintiff repeats and incorporates by reference all the allegations contained above.

74.    Section 16(b) of the Securities Exchange Act of 1934 prohibits short-swing trading by insiders. The plain language of Section 16(b) establishes that Section 16(b) applies to "all" purchases and sales by insiders and that the SEC's exemptive authority is expressly circumscribed as being limited to transactions "not comprehended within the purpose of [Section 16(b)]." 15 U.S.C. § 78p(b). Moreover, such exemptions must be guided by the two exemptions contained in the statute. *Id.* A transaction is within the purpose of Section 16(b) if it has the potential for speculative abuse. Because the transactions exempted by the SEC in issuing the New Rules have the potential for speculative abuse, the SEC has exceeded its authority in exempting such transactions.

75.    The language of Section 16(b) represents a conscious and deliberate Congressional decision to impose strict liability for violations of the statute without proof of intent or actual abuse of inside information.

76.    In adopting New Rules 16b-3 and 16b-7, the Commission created two sweeping exemptions to Section 16(b), effectively repealing the strict liability statutory scheme established by Congress. Acting under the guise of clarifying the original rules issued decades earlier, the

Commission has in reality created exemptions that vastly exceed its statutory authority. The Commission's authority to provide limited exemptions in certain circumscribed and specific circumstances as set forth by Congress is not a license to expand rules that swallow the statutory prohibition against short-swing insider trading.

77.    Plaintiffs accordingly are entitled to a declaration that the Commission lacks the statutory authority under the Exchange Act to adopt New Rules 16b-3 and 16b-7. The New Rules should, therefore, be declared unlawful and set aside. 5 U.S.C. § 706(2)(C).

## COUNT II
### The Commission Failed to Justify Its Exercise of Rulemaking Authority
### (Exchange Act; APA)

78.    Plaintiffs repeat and incorporate by reference the allegations contained above.

79.    The Administrative Procedure Act requires federal agencies to provide a thorough explanation of the significant regulatory decisions and choices embodied in all final rules. This requires, among other things, that agencies consider all important aspects of a problem, that they do not rely on factors which Congress did not intend for them to consider, and that their final statement of reasons establish a rational connection between the facts found and regulatory choices made. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

80.    In deploying its interpretive authority as a pretext for effectuating sweeping exemptions from Section 16(b), the Commission wholly failed its obligation under the APA to provide a thorough and reasoned explanation for its action. The Commission amended two long-standing rules without any meaningful discussion of each rule's objective, of the reasons that amendment of each rule was necessary and reasonable in light of the statutory purpose, of how the newly exempt transactions do not pose a risk of speculative abuse, and of the prior regulatory

30

history and why the Commission departed from its contemporaneous interpretations of the rules and interpretations of the rules contained in decisional law.

81.      Plaintiffs are accordingly entitled to a declaration that the Commission failed adequately to justify or explain its adoption of New Rules 16b-3 and 16b-7 and that the New Rules are arbitrary, capricious, and otherwise unlawful. The New Rules should, therefore, be declared unlawful and set aside. 5 U.S.C. § 706.

**COUNT III**
**The Commission's Adoption of the New Rules is Otherwise Arbitrary, Capricious,**
**and Not in Accordance With Law**
**(Exchange Act; APA 5 U.S.C. § 706(2)(A))**

82.      Plaintiffs repeat and incorporate by reference the allegations contained above.

83.      Under the APA, the Commission was required to give full and adequate consideration to all comments and other evidence submitted in the rulemaking record.

84.      The Commission failed to respond adequately to commentators' objections to the New Rules. These shortfalls include, but are not limited to, (a) failing to consider as U.S. Courts of Appeals have recognized, that transactions with issuers and reclassifications can have the potential for speculative abuse; (b) failing to consider the fact that even if an issuer's business assets essentially remain unchanged following a reclassification, the potential for speculative abuse remains the same; (c) failing to consider the fact that the statute by its terms, the legislative history, and case law make clear that "gatekeeping" by the board of directors does not by itself remove the potential for speculative abuse from short-swing transactions or prevent the unfair use of inside information; and (d) failing to consider and address how the New Rules are inconsistent with the statutory purpose of Section 16(b).

31

85.    Plaintiffs are accordingly entitled to a declaration that the Commission failed adequately to justify or explain its adoption of New Rules 16b-3 and 16b-7 and that the New Rules are arbitrary, capricious, and otherwise unlawful. The New Rules should, therefore, be declared unlawful and set aside. 5 U.S.C. § 706(2)(A).

**COUNT IV**
**The Commission Improperly Promulgated Retroactive Legislative Rules**
**(Exchange Act; APA, 5 U.S.C. § 706(2)(A) and (C))**

86.    Plaintiffs repeat and incorporate by reference all the allegations contained above.

87.    The Commission purports to promulgate New Rules 16b-3 and 16b-7 on a retroactive basis. A federal agency, however, must have an express grant of authority from Congress to promulgate retroactive legislative rules. *Bowen,* 488 U.S. at 208.

88.    The Commission has no such retroactive rulemaking power, as Section 16(b) of the Exchange Act, pursuant to which the Commission has promulgated the New Rules, contains no express grant of authority for retroactive legislative rulemaking.

89.    To the extent the Commission attempts to justify its rulemaking on the basis of its opinion that *Levy* was wrongly decided by the Third Circuit, the Commission's rulemaking is arbitrary, capricious, and contrary to law, as well as in excess of its statutory authority, as it seeks to retroactively apply the New Rules to, among other, the Levy Action, the Bruh Action, and the Scheier Action, which will have the purpose and intended effect of altering the substantive rights of the parties in pending actions.

90.    Plaintiffs are accordingly entitled to a declaration that the Commission has unlawfully promulgated two retroactive legislative rules. To the extent the Commission seeks for New Rules 16b-3 and 16b-7 to apply retroactively, they should be declared unlawful and set aside. 5 U.S.C. § 706.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.     Enter judgment in Plaintiffs' favor;

B.     Declare that the Commission lacks legal authority to adopt the New Rules under the Exchange Act and APA;

C.     Declare that the Commission's failure to adequately justify the exercise of its rulemaking authority in adopting the New Rules violates the Exchange Act and the APA;

D.     Declare that the Commission's adoption of the New Rules is otherwise arbitrary, capricious and unlawful under the Exchange Act and the APA for failing to consider the comments and other evidence submitted to the SEC ;

E.     Declare that the Commission lacks the statutory authority to engage in retroactive rulemaking with respect to the New Rules;

F.     Declare that the New Rules are unlawful;

G.     Set aside the New Rules; and

H.     Grant such additional relief as the Court may deem appropriate.


Dated:         February __, 2006          By_____
               Washington, D.C.           Scott A. Hodes, Attorney At Law
                                          (D.C. Bar No. 430375)
                                          Post Office Box 42002
                                          Washington, D.C. 20015
                                          Tel: (301) 404-0502
                                          Fax: (413) 641-2833

                                          ABRAHAM FRUCHTER & TWERSKY LLP
                                          Jeffrey S. Abraham
                                          Mitchell M.Z. Twersky

33

Ximena Skovron
One Penn Plaza, Suite 2805
New York, NY 10119
Tel: (212) 279-5050
Fax: (212) 279-3655