# EXHIBIT E

SIRIANNI YOUTZ
MEIER & SPOONEMORE

August 9, 2004

Anne Krauskopf
Senior Special Counsel
Division of Corporate Finance
SECURITIES AND EXCHANGE COMMISSION
Washington D.C. 20549-0606

  RE: *Comments on Proposed Rules*
     *File No. S7-27-04*

Dear Ms. Krauskopf and other Commission counsel:

  Thank you for this opportunity to submit comments to the Commission's proposed amendments to Rule 16b-3. We are a small litigation firm that has recently represented the plaintiff in several Section 16(b) lawsuits.

  We focus on two issues. First, does Rule 16b-3, as interpreted by the Commission in *Levy v. Sterling Holding Co.*, 314 F.3d 106, 124 (3d Cir. 2002), *cert. denied*, 124 S. Ct. 389 (2003) and in the release accompanying the proposed amendments, permit short-swing insider trading and thus overstep the bounds of the Commission's statutory authority? Second, should the Commission clarify that Rule 16b-3 does not apply to directors by deputization because the theoretical justification for the rule applies only to conventional directors?

  We begin by reviewing the origins and policy basis of the current rule. We then illustrate how the rule, as interpreted by the Commission, invites speculative abuse and insider trading. We finish by detailing the reasons why the rule should not apply to directors by deputization.

## ORIGINS OF THE RULE

  When the Commission released its "Alternative Proposal" to amend Rule 16b-3 in October 1995, it embraced a radically different approach to regulating transactions between insiders and issuers. Noting that its prior rules had been criticized by the compliance community as unduly burdensome and intrusive, the Commission opted for simplicity—insider-issuer transactions would be exempted as long as the board, a committee of the board, or the shareholders approved of the purchase or sale.

  This remarkably broad exemption represented a trade-off between the desire to minimize compliance costs and simplify rules, on the one hand, and the statutory mandate of preventing speculative abuse, on the other. The 1996 adoption of the proposed rule changes tilted heavily in favor of the former: "When the effort to

SIRIANNI YOUTZ
MEIER & SPOONEMORE

August 10, 2004
Page 2

achieve simplicity could not be fully reconciled with the desire to keep all perceived loopholes closed, the SEC was forced to jettison many longstanding features of Rule 16b-3 and other rules which had provided protection against speculative abuse." Peter J. Romeo & Alan Dye, *Section 16 Updates*, Vol. VI, No. 2 (June 1996). The result was a "magic pill," a simple and failsafe mechanism that officers and directors could use to "cure nearly every concern under Section 16(b) that may arise in connection with a transaction with the issuer." *Id.*, Vol. IX, No. 1 (February 1999).

What justified this radical departure? The Commission's adopting release explained that an issuer's decision to compensate its insiders "generally" does not give rise to speculative abuse:

> The 1995 proposals presented a simplified, flexible approach based on the premise that transactions between an issuer and its officers and directors are intended to provide a benefit or other form of compensation to reward service or to incentivize performance. Generally, these transactions do not appear to present the same opportunities for insider profit on the basis of non-public information as do market transactions by officers and directors.

*Ownership Reports And Trading By Officers, Directors And Principal Security Holders*, Release No. 34-37260, 61 Fed. Reg. 30376, 1996 WL 290234 at *3 (May 31, 1996) (hereinafter "1996 Release").

This compensation-based rationale was consistent with the Commission's earlier 1995 release, which asserted that virtually all issuer-insider transactions would fall into the compensation category:

> Through the Alternative Proposal, the Commission has sought to craft a rule that, consistent with the statutory purpose of Section 16(b), erects meaningful safeguards against the abuse of inside information by officers and directors without impeding their participation in legitimate compensatory transactions that do not present the possibility of such abuse, and facilitates compliance. *In so doing, the Commission has recognized that most, if not all, transactions between an issuer and its officers and directors are intended to provide a benefit or other form of compensation to reward service or to incentivize performance.*

SIRIANNI YOUTZ
MEIER & SPOONEMORE

August 10, 2004
Page 3

*Ownership Reports and Trading by Officers, Directors, and Principal Security Holders*, Release No. 36356, 60 Fed. Reg. 53832, 53835, 1995 WL 597472 at *3 (Oct. 11, 1995) (emphasis added) (hereinafter "1995 Release").

The Commission's decision to emphasize a compensation-based rationale was not lost on the compliance community:

> At the time Rule 16b-3 was broadened in 1996 to reach beyond employee benefit plan transactions to all other types of transactions with the issuer, the SEC made it clear the extension in coverage was based on the notion that most transactions between an issuer and its directors and officers are meant to provide compensation to such persons for services rendered to the issuer.

Peter J. Romeo & Alan Dye, *Section 16 Updates*, Vol. IX, No. 1 (February 1999).

Given the emphasis on compensation-related transactions in the regulatory history, the Commission's present position that the rule may exempt any transaction between issuers and insiders merits special scrutiny.

### THEORETICAL UNDERPINNINGS OF THE RULE

The Commission's decision to broaden the Rule 16b-3 exemption was presumably based in part on the notion that decisions to compensate and reward individual performance are generally unilateral in nature. That is, an insider does not generally have a large say in when or how he is compensated. The Commission's position on this issue may be inferred from the stricter rules it issued governing volitional transactions in employee benefit plans. *See* Rule 16b-3(b) and (f) (imposing additional requirements on "Discretionary Transactions" in benefit plans).

But there are two additional, more explicit justifications offered by the Commission that would apply to *any* transaction between issuers and insiders. First is the notion that issuer-insider transactions do not give rise to speculative abuse (or at least "typically" do not do so). They do not, said the Commission, because the profits from these transactions do not come at the expense of uninformed participants in the public market. Here is how the Commission explained it in 1996:

> Typically, where the issuer, rather than the trading markets, is on the other side of an officer or director's transaction in the issuer's equity securities, *any profit obtained is not at*

SIRIANNI YOUTZ
MEIER & SPOONEMORE

August 10, 2004
Page 4

> *the expense of uninformed shareholders and other market*
> *participants of the type contemplated by the statute.* [FN17]

1996 Release at *3 (footnotes omitted) (emphasis added).

The Commission's second justification springs from its recognition that issuer-insider transactions present temptations for self-enrichment and self-dealing at the expense of shareholders or the public. To guard against this ever-present problem, the Commission concluded that traditional state fiduciary law, not Section 16(b), was the appropriate body of law to check director and officer avarice. This policy judgment first appears in the Commission's oblique reference to "objective gatekeeping conditions." 1996 Release at *3. These gatekeeping conditions are found in the approval requirements of Rule 16b-3(d), which include board approval, board committee approval, or shareholder approval of issuer-insider transactions. The Commission reasoned that directors and officers would not succumb to temptation because they would realize that these transactions are subject to traditional state law fiduciary obligations. 1996 Release at *10 (state law fiduciary duties are "effective prophylactics" against insider trading); *see id.* at note 17.

As explained below, the first justification fails to recognize that insider trading will occur despite the non-public nature of the purchase or sale end of an issuer-insider short-swing trade. The second justification is naïve, cannot be squared with the reasons Congress enacted Section 16(b), and does not apply to directors by deputization.

## AS CONSTRUED BY THE COMMISSION, RULE 16b-3(d) PERMITS SPECULATIVE ABUSE

According to the Commission, an issuer-insider trade will "generally" not give rise to short-swing profits because "any profit obtained is not at the expense of uninformed shareholders and other market participants of the type contemplated by the statute." 1996 Release at *3. The Commission does not elaborate on this reasoning. However, a commentator has explained the apparent basis for the distinction between issuer-insider transactions and transactions involving insiders and the trading market:

> Section 16(b) was enacted to prevent insiders from misusing
> inside information in their market activities, and most
> transactions between an issuer and its insiders do not
> involve market transactions. Thus, for example, if an issuer
> grants a stock option to an insider, at the time knowing that
> the market price of the stock is likely to rise because of some
> undisclosed, positive news, the only injury is to the issuer

SIRIANNI YOUTZ
MEIER & SPOONEMORE

August 10, 2004
Page 5

> itself which has elected, in essence, to sell to the insider at a discount. The same principle would apply if the issuer bought stock from an insider in the face of impending bad news. In both cases, no individual stockholder has been left on the losing end of the transaction.

Keith F. Higgins, *Rule 16b-3 "Lite": The SEC Offers a Trimmed-Down Version of Rule 16b-3*, 9 Insights No. 11 at 3 (November 1995).

These hypotheticals tell only half the story. They do not account for the following, not uncommon, scenario. An insider purchases a substantial amount of stock from the issuer in a board-approved transaction just prior to a merger. The stock price rises after the merger but the insider knows that the price is inflated because critical components of the issuer's business are failing. This information has not been disclosed to the public. Less than six months later, he sells, on the public market, the stock he bought from the issuer and reaps substantial profits. Two weeks later, the stock price plummets upon disclosure of the bad news.

Who is on the losing end of this transaction? Clearly, it is the public market into which the insider sold during his second short-swing transaction. In the words of the Commission, the insider's profits are "obtained at the expense of uninformed shareholders and other market participants." The fact that the insider's first transaction was with the issuer does nothing to prevent speculation or insider trading. This is precisely the type of market harm that Section 16(b) was enacted to prevent.

There is no principled reason why buying the shares from the company and profiting by unloading them on the public should be exempt when liability would attach if both the purchase and sale were made on the open market. The same point was made long ago by a federal judge:

> It is difficult to see how the opportunity for shortswing profits, present when the insider equipped with inside information goes out into the market and buys, vanishes because armed with the same information, he goes to the corporation and buys that which he is under no obligation to buy. We can see no logical or practical difference in the two situations.

SIRIANNI YOUTZ
MEIER & SPOONEMORE

August 10, 2004
Page 6

*Perlman v. Timberlake*, 172 F. Supp. 246, 256 (S.D.N.Y. 1959) (invalidating former Rule 16b-3 and concluding that Commission's authority to exempt short-swing trading was "narrowly circumscribed").

The U.S. Court of Appeals for the Third Circuit illustrated this point with a different hypothetical in *Levy v. Sterling Holding Co.*, 314 F.3d 106, 124 (3d Cir. 2002), *cert. denied*, 124 S. Ct. 389 (2003) (short-swing trading in connection with IPO of closely held corporation could result in "speculative abuse injurious to other market participants"). When the Commission sought rehearing in *Levy*, its *amicus* brief had this to say about the *Levy* court's "policy reasons" for narrowly reading the exemption: "Although the panel voiced policy reasons for its decision, reasons urged by the plaintiff as well, they are not policy reasons evidenced in the rule or the Commission's releases. The panel's decision countermands the Commission's intention to make application of Rule 16b-3 simpler." SEC *Amicus* Brief at 8-9.

Regulatory simplicity is a laudable goal. It is not, however, a goal that can override a statute that permits the Commission to create exemptions only for trading that is "not comprehended within the purpose" of the statute. 15 U.S.C. § 78p(b). The Commission's *amicus* brief in *Levy* never responded to the merits of the hypothetical laid out by the Third Circuit. In effect, the Commission took the position that abusive short-swing trading must be tolerated in the name of easing compliance. That simply isn't persuasive.

Nor is it within the Commission's authority. It is not for the Commission to determine that some categories of insider trading are permissible. The statute is aimed at preventing the *possibility* of speculative abuse. The Commission may have made a considered judgment when it chose to emphasize regulatory "simplicity" and "flexibility," but it cannot ignore the considered judgment that Congress made in concluding that "all short-swing trading by directors and officers was vulnerable to abuse because of their intimate involvement in corporate affairs." *Foremost-McKesson, Inc. v. Provident Secs. Co.*, 423 U.S. 232, 253 (1976).

Consistency with the statute demands that the Commission exempt only conduct that truly falls outside the realm of speculative abuse. That is what "comprehended within the purpose" of the statute means. *See* 15 U.S.C. § 78p(b) ("This subsection shall not be construed to cover any transaction ... which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection[;]" i.e., "[f]or the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship with the issuer. . . .").

SIRIANNI YOUTZ
MEIER & SPOONEMORE

August 10, 2004
Page 7

The Commission tacitly acknowledges that Rule 16b-3 will relieve some insiders of all liability for statutorily-prohibited trading. Why else would the Commission qualify its rationale for exempting issuer-insider transactions by stating that, "generally," these transactions do not "appear" to present opportunities for speculative abuse? 1996 Release at *3. It is not good enough to conclude that short-swing profits exempted by the rule will "typically" not result in the harm the statute seeks to prevent. *Id.* If cogent arguments demonstrate that certain prohibited short-swing trading will be exempted under the Commission's interpretation of the rule, there is but one conclusion: the Commission has overstepped its statutory authority.

Rule 16b-3 as currently interpreted by the Commission truly is a "magic pill," exempting abusive short-swing trading from the reach of Section 16(b). It is not too late to adopt an interpretation of the rule that will prohibit and deter preventable short-swing trading. We urge the Commission to reject its proposed amendments and adopt the *Levy* court's reading of the statute.

## RULE 16b-3 SHOULD NOT APPLY TO DIRECTORS BY DEPUTIZATION

We now turn to a narrow issue that, to our knowledge, has never been addressed by the Commission: whether Rule 16b-3 applies to directors by deputization.

We are aware of no court that has held that Rule 16b-3 applies to directors by deputization. The *Levy* court necessarily assumed, in the context of a FRCP 12(b) motion to dismiss, that deputization had occurred in order to reach its decision regarding the breadth of Rule 16b-3. But its substantive analysis of the rule was not dependent in any way on the deputization issue. The Third Circuit simply did not consider the question of whether the rule applies to directors by deputization.

Commentator Alan Dye has recognized that the issue of Rule 16b-3's application to directors by deputization is an open question, most recently in connection with the Commission's proposed amendments to the rule. *See* www.section16.net/member/blogs/adye/archive/000018.htm.

Regardless of whether the Commission adopts the proposed amendments, it now has the opportunity to consider and articulate a clear policy with regard to this special class of insiders. We assume familiarity with the deputization concept. *See generally Blau v. Lehman*, 368 U.S. 403, 408-409 (1962); *Feder v. Martin Marietta Corp.*, 406 F.2d 260, 263 (2d Cir. 1969).

SIRIANNI YOUTZ
MEIER & SPOONEMORE

August 10, 2004
Page 8

1. *Directors by deputization are different.*

The exemptions in Rule 16b-3 assume that a "director" is a conventional director, i.e., a human being elected to the issuer's board of directors. The many references in the 1995 and 1996 Releases to compensation, grants, awards, self-dealing, and employee benefit plans all make clear that the Commission had real directors in mind when fashioning the rule.

Deputized directors, of course, are almost always corporate entities or partnerships. They are not elected to the board. They do not receive compensation for their service to the board or their performance as employees or consultants. To the extent that a director by deputization enters into a transaction with the issuer, the transaction will almost always result from the entity's status as a stockholder (or simply an investor in the public market) and not its status as a director by deputization.

In fact, the board of directors does not even have to know that a deputized director is functioning in that capacity. *See Feder*, 406 F.2d at 265. In *Feder*, the Second Circuit found that deputization could occur "even in the absence of factors indicating an intention or belief on the part of both companies that he was so acting." *Id.*

Functionally, directors by deputization are more analogous to another category of Section 16(b) insider: ten percent owners. Rule 16b-3 does not apply to ten percent owners. Romeo and Dye explain why: "Because ten percent owners do not have the sort of relationship with the issuer that warrants compensation, their transactions with the issuer are not covered by Rule 16b-3." Romeo & Dye, *Section 16 Updates*, Vol. IX, No. 1 (February 1999). This reasoning applies equally well to directors by deputization.

In clarifying that ten percent owners were not subject to the rule, the Commission explained another difference between ten percent owners and conventional officers and directors that goes to the heart of its reason for exempting conventional directors:

> Like current Rule 16b-3, new Rule 16b-3 does not provide an exemption for persons who are subject to Section 16 solely because they beneficially own greater than ten percent of a class of an issuer's equity securities. *Officers and directors owe certain fiduciary duties to a corporation. See n. 17, above. Such duties, which act as an independent constraint on self-dealing, may not extend to ten percent holders. The lack of other constraints argues against making new Rule 16b-3 available to ten percent holders.*

SIRIANNI YOUTZ
MEIER & SPOONEMORE

August 10, 2004
Page 9

> However, new Rule 16b-3 is available to such a person who is also subject to Section 16 by virtue of being an officer or director with respect to transactions with the issuer.

1996 Release at *6 n.42 (emphasis added). This reasoning applies equally well to directors by deputization—like ten percent owners, these entities are not subject to traditional state law fiduciary duties governing named directors.

Thus, on the face of it, two of the principal reasons advanced by the Commission for exempting conventional directors under Rule 16b-3—that most issuer-director transactions will involve compensation and that traditional state fiduciary law will deter insider trading in any event—do not apply to directors by deputization.

### 2. *Gatekeeping does not work with directors by deputization.*

There is another problem with extending the exemption to directors by deputization: a board of directors cannot perform a gatekeeping function with unnamed and possibly unknown directors. In the words of the Commission, the purpose of board approval is to "ensure acknowledgment and accountability on the part of the company when it makes such grants or awards." 1995 Release at *7. The board's accountability function is satisfied when it approves specific transactions with specific directors or officers involving specific types and numbers of securities. *See* Rule 16b-3(d) and Note 3; *see generally Skadden, Arps, Slate, Meagher & Flom*, SEC No-Action Letter, 1999 WL 11540 (Jan. 12, 1999). In particular, the Commission has stated that any board approval under Rule 16b-3(d) must specify the name of each officer or director and the number of securities to be acquired or disposed by for each person. *See id.* If, however, the board is not even aware that it is dealing with a director by deputization, it can hardly perform these requirements or fulfill the larger accountability purpose.

There is another problem with accountability. It is well-known that directors by deputization rarely file reports under Section 16(a) since acknowledging director-by-deputization status exposes an entity to potential Section 16(b) liability. The probable lack of any Section 16(a) report—and the resulting negligible risk of being caught by plaintiffs' counsel who monitor such reports—increases the incentive among all participants (or at least the director by deputization) to engage in short-swing trading through issuer transactions.

### 3. *Reliance on state law does not work with directors by deputization.*

As noted above, traditional state fiduciary laws relating to insider trading and self-dealing do not apply to unnamed directors. The Commission, however, has

SIRIANNI YOUTZ
MEIER & SPOONEMORE

August 10, 2004
Page 10

made it clear that reliance on state law lies at the heart of its decision to exempt conventional officers and directors under Rule 16b-3. If this theoretical justification for the exemption is lacking, it makes no sense to exempt directors by deputization.

The deputization doctrine has evolved in the federal Section 16(b) arena to prevent entities that effectively function as directors from retaining profits in transactions that are deemed inherently susceptible of abuse. The doctrine has seen little or no application outside of Section 16(b). Traditional state fiduciary law will do nothing to deter directors by deputization from engaging in short-swing transactions.

This point alone should end debate with respect to the application of Rule 16b-3 to directors by deputization. It is imprudent to rely on state law for other reasons. Section 16(b) was enacted as a strict liability statute precisely because it was so difficult to prove intent to trade on inside information under existing (state) law. *See Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 591-92 (1973). The Commission cannot rely on state law as a back-up when Congress enacted the statute to overcome the very deficiencies embodied in state law. State law also presents formidable substantive and procedural hurdles, most of which have been examined in comments to the proposed regulations by other counsel.

The Commission's 1996 Release suggests that federal Rule 10b-5 could also work as an "effective prophylactic" to deter the insider trading that Rule 16b-3(d) encourages. 1996 Release at *3 n. 17. This suggestion suffers from the same flaws noted above. Rule 10b-5 requires a showing of scienter, the materiality of inside information, reliance by the plaintiff on a misrepresentation or omission, and damages. In addition, plaintiff has standing only if he or she is a purchaser or seller. None of these hurdles are faced by Section 16(b) plaintiffs. Many traders are not deterred by Rule 10b-5 right now. The beauty of Section 16(b) is that its strict liability scheme permits virtually no wiggle room. Rule 10b-5 will never deter insider short-swing trading as effectively as Section 16(b). Other state and federal laws should complement, not substitute for, the flat prohibition on short-swing trading intended by Congress.

4.  *Conclusion: The Commission should clarify the rule.*

We urge the Commission to clarify that Rule 16b-3 does not apply to directors by deputization. Short-swing trading by this unique, court-created class of directors presents very different concerns than trading by conventional officers and directors. In particular, the reasons offered by the Commission for exempting conventional officers and directors—that compensation-related transactions generally do not present the potential for speculative abuse; that state law will deter transactions that do present such a possibility; and that corporate boards will fulfill a gatekeeping

SIRIANNI YOUTZ
MEIER & SPOONEMORE

August 10, 2004
Page 11

role—simply do not apply to directors by deputization. To exempt such directors from potential Section 16(b) liability would exceed the Commission's rulemaking authority.

   We recognize that the Commission has generally left development of the deputization doctrine to the courts. See *Ownership Reports And Trading By Officers, Directors And Principal Security Holders*, Release No. 34-28869, 56 Fed. Reg. 4272 at n. 27 (1991) (deputization theory not affected by 1991 rule revisions "and will be left to case law" for further development). But there is no reason to dodge an issue that is acknowledged to be an open question and that directly implicates a Commission rule. Without clarification, courts may erroneously conclude that corporate entities are immunized from otherwise prohibited short-swing transactions despite the inapplicability of every reason proffered by the Commission for exempting conventional directors. We urge the Commission to directly and explicitly address this important issue.

   Thank you again for your consideration of these issues. We appreciate the time and effort that goes into issuing and amending regulations. If you have any questions, please do not hesitate to contact us.

                Very truly yours,

                SIRIANNI YOUTZ
                MEIER & SPOONEMORE


                Jonathan P. Meier
                Richard E. Spoonemore

JPM:
cc: Thomas R. Dreiling