# EXHIBIT G





RECEIVED

AUG 0 5 2004

OFFICE OF THE SECRETARY

# Comments With Respect to the
## *Proposed Rule: Ownership Reports and Trading*
*by Officers, Directors and Principal Security Holders,*
### Release Nos. 34-49895; 35-27861; IC-26471 (June 21, 2004)

File Number S7-27-04

Jeffrey S. Abraham
Mitchell M.Z. Twersky
**ABRAHAM FRUCHTER & TWERSKY LLP**
One Penn Plaza, Suite 2805
New York, N.Y. 10119
Tel: (212) 279-5050
Fax: (212) 279-3655

INTRODUCTION ........................................................... 1

I.  THE PROPOSED AMENDMENTS TO RULES 16b-3(d)
    AND RULE 16b-7 CONTAINED IN THE PROPOSALS
    SHOULD NOT BE ADOPTED BY THE SEC ......................... 1

    A.  Section 16(b) is a Remedial Statute Designed to Prevent
        *All* Short Swing Trading by Insiders Because of the
        *Potential* for Speculative Abuse ................................ 1

    B.  Any Rules Adopted by the Commission Exempting
        Transactions from §16(b) Liability Must be Consistent
        With the Statutory Purpose of §16(b) ........................... 2

        1.  The New Proposed Rule 16b-7 Fails to Follow the Limitations
            for Exemptions Imposed by §16(b) ........................ 4

        2.  The New Proposed Rule 16b-3(d) Fails to Follow the
            Limitations on Exemptions Imposed by Section 16(b) ........ 5

    C.  Principles of *Chevron* Deference Can Not Rescue the *Proposals*
        From Failing to Honor the Statutory Purpose of Section 16(b) ...... 9

II. THE *PROPOSALS* INCORRECTLY CLAIM THAT THE
    THIRD CIRCUIT COURT OF APPEALS FAILED TO
    PROPERLY INTERPRET THE RELEVANT RULES .................. 10

    A.  *Levy* Correctly Interpreted Rule 16b-3(d) ........................ 11

        1.  The Plain Meaning of Rule 16b-3(d) Supports
            the Court of Appeals' Interpretation ....................... 11

        2.  The Regulatory Context of Rule 16b-3(d) Further
            Supports *Levy*'s Interpretation of Rule 16b-3(d) ........... 12

        3.  The Statutory Policies of Section 16(b) Support
            *Levy*'s Interpretation of Rule 16b-3(d) ..................... 13

        4.  The Regulatory History of Rule 16b-3(d) Also
            Supports *Levy*'s Interpretation of Rule 16b-3(d)(1) ......... 13

B.   The Third Circuit Properly Interpreted Rule 16b-7 ............... 19

1.   Rule 16b-7 Contains No Language Exempting
     Reclassifications ........................................ 20

2.   SEC No-Action Letters Are Irrelevant to the Correct
     Interpretation of Rule 16b-7 and, in any Event do not
     Support the Existence of an Exemption of the Scope
     Currently Claimed by the Commission ..................... 21

3.   The SEC's Failure to Explicitly State That it was
     Overruling Prior Judicial Decisions Further
     Demonstrates That it had no Such Intention ............... 22

III.   THE *PROPOSALS'* DESCRIPTION OF THE PROPOSED
       NEW RULES AS "CLARIFYING" REPRESENTS AN
       UNLAWFUL AND UNCONSTITUTIONAL ATTEMPT BY
       THE SEC TO ENGAGE IN RETROACTIVE RULEMAKING .......... 23

A.   The Commission Lacks the Authority to Engage in
     Retroactive Rulemaking ..................................... 24

B.   Even Though the *Proposals* Refer to the Amended Rules
     as "Clarifying," They are, in Fact, Legislative Rules .............. 24

C.   *Stare Decisis* is an Absolute Barrier to the SEC's Efforts to
     Obtain Retroactive Effect for its Proposed New Rules ............ 26

D.   The SEC's Actions Represent a Blatant Effort to Interfere
     in the Actions of the Judiciary in Violation of the Separation
     of Powers Doctrine ............................................ 29

IV.   THE *PROPOSALS* ARE PROCEDURALLY INADEQUATE
      FOR FAILING TO PROVIDE PROPER NOTICE OF THEIR
      EFFECT UPON PASSAGE ........................................ 30

CONCLUSION ........................................................ 31

This comment is addressed to the proposed amendments to Rule 16b-3(d)(1), 17 C.F.R. §240.16b-3(d)(1) and Rule 16b-7, 17 C.F.R. §240.16b-7 contained in *Proposed Rule: Ownership Reports and Trading by Officers, Directors and Principal Security Holders*, Release Nos. 34-49895; 35-27861; IC-26471 (June 21, 2004) (the "*Proposals*").

## INTRODUCTION

The *Proposals* should not be adopted because they exceed the scope of authority granted to the Securities and Exchange Commission ("SEC" or the "Commission") by Congress to promulgate rules exempting certain transactions from liability under Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78p(b) ("Section 16(b)") and are contrary to the clearly expressed statutory policies of Section 16(b). In addition, the attempt to characterize the *Proposals* as "clarifying" rules represents an unlawful attempt to interfere in existing Court proceedings in violation of the U.S. Constitution and other governing principles of law. Adopting the *Proposals*, would represent a betrayal of the SEC's statutory mandate and its position, in the words of the former SEC Chairman and later Supreme Court Justice William O. Douglas, of being "the investor's best friend."

## I.  THE PROPOSED AMENDMENTS TO RULES 16b-3(d) AND RULE 16b-7 CONTAINED IN THE PROPOSALS SHOULD NOT BE ADOPTED BY THE SEC

The proposed amendments to Rules 16b-3(d) and 16b-7 exceed the scope of the limited mandate given to the Commission for adopting rules exempting transactions from Section 16(b) liability. Therefore, the Commission should act in accordance with its lawful duties and decline to adopt the proposed amendments contained in the *Proposals*.

### A.  Section 16(b) is a Remedial Statute Designed to Prevent *All* Short Swing Trading by Insiders Because of the *Potential* for Speculative Abuse

"Prohibiting short-swing trading by insiders with nonpublic information was an important part of Congress' plan in the 1934 Act to 'insure the maintenance of fair and honest markets' and to eliminate such trading." *Gollust v. Mendell*, 501 U.S. 115, 121 (1991) (quoting 15 U.S.C. §78b). "Congress thought

that *all* short-swing trading by directors and officers was vulnerable to abuse because of their intimate involvement in corporate affairs." *Foremost-McKesson, Inc. v. Provident Secs. Co.*, 423 U.S. 232, 253 (1976) (emphasis added).

Congress adopted Section 16(b) based upon evidence that "insiders actually manipulated the market price of their stock by causing a corporation to follow financial policies calculated to produce sudden changes in market prices in order to obtain short swing profits." *Interpretative Release on Rules Applicable to Insider Reporting and Trading*, Exchange Act Release No. 18114, 1981 SEC LEXIS 679 at *2 (Sept. 24, 1981) (the "1981 Release"). Section 16(b) destroys this incentive by depriving insiders of the ability to profit from short-term price fluctuations. *See* S. Thel, *The Genius of Section 16: Regulating the Management of Publicly Held Companies*, 42 Hastings L. J. 391, 433 &n.141 (1991). *See also Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 591 (1973).

However, Congress believed that it would be difficult, if not impossible to prove such actual speculative abuse by insiders in the trading of the issuer's stock. Instead, "the only method Congress deemed effective to curb the evils of insider trading was a flat rule taking the profits out of a class of transactions in which the *possibility of abuse* was believed to be intolerably great." *Reliance Electric Co. v. Emerson Electric Co.*, 404 U.S. 418, 422 (1972) (emphasis added). It is for that reason that §16(b) liability attaches *"without proof of actual abuse of insider information, and without proof of intent to profit on the basis of such information."* *Kern County*, 411 U.S. at 596 (emphasis added).

**B.    Any Rules Adopted by the Commission Exempting Transactions from §16(b) Liability Must be Consistent With the Statutory Purpose of §16(b)**

Article I, §1, of the United States Constitution vests "all legislative Powers herein granted . . . in a Congress of the United States." Therefore, the Constitution requires that "when Congress confers decision making authority upon agencies *Congress* must 'lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform.'" *Whitman v. American Trucking Ass'n*, 531 U.S. 457, 472 (2001) (quoting *J. W. Hampton, Jr., & Co.* v.

*United States*, 276 U.S. 394, 409 (1928)).[1] If Congress provides no guidance for the exercise of regulatory discretion then the agency may not promulgate any regulations. *Whitman*, 531 U.S. at 474.

In the case of Section 16(b), the "intelligible principle" is that "the transactions the SEC exempts are 'not comprehended within the purpose' of §16(b)." *Feder v. Martin Marietta Corp.*, 406 F.2d 260, 268 (2d Cir. 1969) (quoting 15 U.S.C. §78p(b)). This is a limited grant of authority.  "Guiding the Commission in the exercise of an actually limited authority is the quite adequate standard -- illustrated by two specific statutory exemptions -- that its regulations be consistent with the expressed purpose of the statute." *Smolowe v. Delendo Corp.*, 136 F.2d 231, 240 (2d Cir. 1943). *See also Perlman v. Timberlake*, 172 F. Supp. 246, 254 (S.D.N.Y. 1959) ("The Commission's authority was narrowly circumscribed by Congress in this field . . . .")

The two statutory exemptions contained in Section 16(b) are (1) "unless such security or security-based swap agreement was acquired in good faith in connection with a debt previously contracted" and (2) "where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase . . . ." 15 U.S.C. §78p(b). This delegation of authority to the SEC, instead, "serves no other than the commendable functions of relieving the statute from imposing undue hardship and of giving it flexibility in administration." *Smolowe v. Delendo Corp.*, 136 F.2d 231, 240 (2d Cir. 1943). "[I]n the first -- the case of a good faith stock acquisition in connection with a prior debt, -- the element of voluntary purchase is absent." *Perlman*, 172 F. Supp. at 255. "[I]n the second, -- where the beneficial owner was not such both at time of purchase and of sale -- the element of ownership at one of the critical times is absent." *Perlman*, 172 F. Supp. at 255; *see also Foremost-McKesson, Inc. v. Provident Securities Co.*, 423 U.S. 232 (1976).

---

[1]Justice Thomas, in a concurring opinion joined in by Justices Stevens and Breyer, noted that: "I am not convinced that the intelligible principle doctrine serves to prevent all cessions of legislative power. I believe that there are cases in which the principle is intelligible and yet the significance of the delegated decision is simply too great for the decision to be called anything other than 'legislative.' . . . On a future day, however, I would be willing to address the question whether our delegation jurisprudence has strayed too far from our Founders' understanding of separation of powers." *Whitman*, 531 U.S. at 487.

Here, the proposed amendments to Rules 16b-3(d) and 16b-7 contained in the *Proposals* exceed the scope of these two Congressional exemptions as well as the statutory policies which lie at the heart of Section 16(b). Therefore, and as discussed below, the proposed rule amendments exceed the limited mandate of authority given to the Commission by Congress to adopt rules exempting transactions from Section 16(b) liability.

### 1.    The New Proposed Rule 16b-7 Fails to Follow the Limitations for Exemptions Imposed by §16(b)

Section 16(b) clearly applies to "any purchase." 15 U.S.C. §78p(b). Purchases by way of reclassifications would fall within the ambit of the word "any." *Accord, Fleck v. KDI Sylvan Pools, Inc.*, 981 F.2d 107, 115 (3d Cir. 1992) ("The word 'any' is generally used in the sense of 'all' or 'every' and its meaning is most comprehensive.") *(quoting Leach v. Phila.Sav. Fund Soc'y*, 340 A.2d 491, 493 (Pa. 1975)); *see also Barseback Kraft AB v. U.S.*, 121 F.3d 1475, 1481 (Fed. Cir. 1997). Surely, reclassifications existed at the time Section 16(b) and the rest of the Securities Exchange Act of 1934 was enacted. If Congress had intended to exempt *all* reclassifications they were quite capable of accomplishing that goal by inserting such an exemption into the statutory text of Section 16(b). A contrary intent can clearly be gleaned from the definition of the word "purchase" used in Section 16(b) being extraordinarily broad. *See* 15 U.S.C. §78c(a)(13). Congress did *not* exclude reclassifications from the definition of "purchase" and did not provide for a blanket exemption of reclassifications from Section 16(b) liability. Therefore, the Commission is not free to do so on its own. *Accord, Securities Industry Ass'n v. Board of Governors of the Federal Reserve System*, 468 U.S. 137, 152 (1984) ("Had Congress intended so fundamental a distinction, it would have expressed that intent clearly in the statutory language or the legislative history.") (quoting *American Tobacco Co. v. Patterson*, 456 U.S. 63, 72 n.6 (1982)).

The *Proposals* seek to justify the proposed amendment to Rule 16b-7 by asserting that there is no potential for speculative abuse in connection with a reclassification because "the issuer owns all assets involved in the transaction and remains the same, with no change in its business or assets." *Proposals*, 2004 SEC LEXIS 1278 at *20. However, that is also true of cash for stock transactions and, indeed, just about every case in which the Courts have imposed §16(b) liability.

-4-

Indeed, if a change in the corporate form of were required for Section 16(b) liability to attach, there would never be any such liability. Instead, the main element in determining whether a purchase (or sale) has taken place is whether the interests of the statutory insider in the common stock of the issuer has increased (or decreased). *See Ownership Reports and Trading by Officers, Directors and Principal Security Holders*, Exchange Act Release 28869, 1991 SEC LEXIS 171, [1991] Fed. Sec. L. Rep. (CCH) ¶84,709 ("1991 Release") at 81,258 (Feb. 8, 1991).

Equally meritless is the *Proposals'* contention that "an issuer also could effect a reclassification by forming a wholly-owned "shell" subsidiary, merging the issuer into the subsidiary, and exchanging subsidiary securities for the issuer's securities." *Proposals*, 2004 SEC LEXIS at *20-21. That is simply not true. Instead, the merger which the *Proposals* describes would, in fact, be deemed a liquidation and *not* be eligible for the Rule 16b-7 exemption. *See* 1981 Release, Question 142, Illustration (2), 1981 SEC LEXIS 679 at *183-84. Also, even if it were true -- which it is not -- it would be more of a reason for refining any exemption provided for merger transactions than engaging in the wholesale exemption of any transaction which could possibly be characterized as a reclassification.

## 2.    The New Proposed Rule 16b-3(d) Fails to Follow the Limitations on Exemptions Imposed by Section 16(b)

The proposed amendment to Rule 16b-3(d) contained in the *Proposals* seeks to exempt every single transaction between an issuer; on the one hand, and its officers and directors, on the other hand, from §16(b) liability. It is hard to understand how such a blanket exemption could possibly mesh with the statutory purpose of Section 16(b). Surely, as was the case with reclassifications, Congress knew of the existence of transactions between issuers and their directors and officers. Nonetheless, the statute is silent on the subject and does not provide for such a blanket exemption. That fact standing alone evidences Congress' intent to avoid granting such a blanket exemption. *Accord, Securities Industry Ass'n, supra*.

In addition, the statutory purpose of Section 16(b), as discussed above in Point I.A., is to prevent even the possibility of misuse of inside information by

corporate insiders through short-swing trading. The Third Circuit was cognizant of this statutory purpose and specifically aligned its decision in *Levy* with that purpose by stating that:

> The result we reach is sensible. We think that adopting National's and Sterling's view would result in any transaction between the issuer company and an officer or director that meets the remaining requirements of Rule 16b-3(d) -- approval of the transaction by the board of directors or a majority of shareholders, or holding of the securities by the officer or director for more than six months -- being immunized from section 16(b) liability. *The potential for self-dealing could be great: in a closely held corporation, directors or a majority of shareholders could arrange for the acquisition of stock in advance of an IPO, and turn around and sell shares shortly after the IPO. Because of their insider status, there would be a concern.*

*Levy*, 314 F.3d at 124 (emphasis added).

The *Proposals* ignore these well-settled and well-reasoned analyses of the statutory purposes of Section 16(b). Instead, the primary rationale for amending Rule 16b-3(d) proffered by the *Proposals* is that there is purportedly no need to hold directors and officers trading with an issuer liable under Section 16(b) because "transactions between an issuer and its officers and directors, . . . are subject to fiduciary duties under state law." *Proposals*, 2004 SEC LEXIS at *9-10.

However, in making such a statement, the *Proposals* ignore that Congress adopted Section 16(b) because it believed that state law was unequal to the task of preventing improper insider trading. *See, e.g., Kern County*, 411 U.S. at 592 n.3 (quoting S. Rep. No. 1455, 73 Cong. 2d Sess. 55 (1934)). Therefore, it is apparent that Congress did not wish for the SEC to rely on the existence of possible state law remedies as a means for displacing §16(b) liability. *Accord Adams Fruit v. Barrett*, 494 U.S. 494 U.S. 638, 644 & n.2 (1990).

This stated rationale also fails to consider the difficulties in maintaining state law shareholder derivative actions. "[S]uch a suit is not as effective as a §16(b) claim because shareholders are subject to the . . . more stringent standing

requirements of Rule 23.1, and, in addition, the complaint may be countered with subjective considerations of intent or good faith, such as a business judgment defense." *Mendell, on behalf of Viacom v. Gollust*, 909 F.2d 724, 729 (1989). *Accord In re Pacific Enterprises Sec. Litig.*, 47 F.3d 373, 378 & n.4 (9th Cir. 1995) (citing Thomas M. Jones, *An Empirical Examination of the Resolution of Shareholder and Class Action Lawsuits*, 60 B. U. L. Rev. 542, 544-45 (1980) (finding that derivative lawsuits which were not settled resulted in judgment for plaintiff in less than one percent of cases)).

The *Proposals* also ignore that such state law remedies require proof of intent or knowledge on the part of the insider. *See, e.g., Guttman v. Jen-Hsun Huang*, 823 A.2d 492, 505 (Del. Ch. 2003) (citing *Brophy v. Cities Service, Inc.*, 70 A.2d 5 (Del. 1949)). In contrast, Section 16(b) is a strict liability statute. *See, e.g., Foremost-McKesson*, 423 U.S. at 251; *see also Heli-Coil Corp. Webster*, 352 F.2d 156, 165 (3d Cir. 1965) (en banc) ("It was the intention of Congress in enacting §16(b) to obviate any necessity for a search of motives of the insider . . . .") The element of intent was purposely omitted from §16(b) because Congress felt that "it will be absolutely impossible to prove the existence of such intention . . . ." *Kern County*, 411 U.S. at 592.

In addition, the *Proposals* fail to acknowledge the procedural hurdles involved in proceeding with state law shareholder derivative lawsuits and how Section 16(b) eliminates those hurdles. Specifically, §16(b) contains a universal demand requirement and if that demand is refused, the plaintiff can proceed to filing a complaint without inquiring as to whether the issuer's board of directors properly fulfilled their fiduciary duties in declining to initiate the lawsuit. *See* 15 U.S.C. §78p(b). In contrast, a plaintiff making a demand to sue under state law must abide by the decision of the board of directors as to the wisdom of a lawsuit. "Absent an abuse of discretion, if the requirements of the traditional business judgment rule are met, the board of directors decision not to pursue the derivative claim will be respected by the courts." *Spiegel v. Buntrock*, 571 A.2d 767, 777 (Del. 1990).

Suing based upon allegations of demand futility also imposes a high procedural hurdle on a plaintiff seeking to commence a lawsuit. In a recent decision the Delaware Supreme Court affirmed the dismissal of a shareholder derivative action for failure to make pre-suit demand despite the fact that the

defendant, Martha Stewart, controlled a majority of the voting stock of the company and had a variety of personal and business relationships with other members of the board of directors. *See, e.g., Beam v. Stewart*, 845 A.2d 1040 (Del. 2004). In ruling in this fashion, the Delaware Supreme Court specifically rejected a "structural bias" analysis, *i.e.*, that the board of directors is inherently incapable of suing one of its own members. *See Beam*, 845 A.2d at 1050-51 & n.29. However, Section 16(b) seemingly adopts precisely such a structural bias assumption as there is no need under the statute to allege bias or malfeasance on the part of the directors who are not the subject of the enforcement action.

Also, the *Proposals* never confront the issue of issuers traded on U.S. securities exchanges but incorporated in foreign domiciles such as Bermuda (*i.e.*, Tyco).[2] The law of that state of incorporation applies in determining the scope of fiduciary duties and the availability of remedies. *See Kamen v. Kemper*, 500 U.S. 90 (1991). However, Bermuda does not appear to have a remedy for breaches of fiduciary duty. *See Kemper v. Ocean Drilling & Exploration Co.*, 876 F.2d 1138, 1145 (5th Cir. 1989).

It is quite understandable that the *Proposals* have gone so far afield on the issue of state law remedies because the Commission lacks any expertise in litigating state law breach of fiduciary duty claims and shareholder derivative lawsuits. The Commission, as a federal agency, lacks the statutory authority to engage in such litigation, a fact which both accounts for and demonstrates its lack of expertise in that area of the law. *Accord* 15 U.S.C. §78u.

Any suggestion that the risk of speculative abuse declines because the counter-party to the transaction is the issuer rather than a public shareholder trading at an informational disadvantage to the insider also lacks merit. There is no known suggestion in the legislative history or the statutory language of Section 16(b) that Congress' intent in adopting Section 16(b) was to only protect counter-parties to such transactions. To the contrary, the legislative history clearly indicates an intention to protect the securities markets and the national economy

---

[2]According to published reports reincorporating in jurisdictions like Bermuda has become increasingly popular in recent years for tax purposes. *See, e.g.*, Lou Dobbs, *Dereliction of Duty*, U.S. News and World Report, June 14, 2004, at 70; Richard W. Rahn, *Voting with Their Feet*, National Review, February 23, 2004.

from the dislocation caused by insider trading and the related mis-allocation of economic resources. *See, e.g.,* 15 U.S.C. §78b(4). *Accord, Gollust, supra.* Indeed, when Congress wished to accomplish such goals it knew how to properly frame the statutory remedy. *See, e.g.,* 15 U.S.C. 78t-1(a).

Instead, the identical risks of insider trading, and related manipulation of share prices, exist regardless of who is on the other side of the transaction. "It is difficult to see how the opportunity for short-swing profits, present when the insider equipped with inside information goes out in the market and buys, vanishes because armed with the same information, he goes to the corporation and buys . . . ." *Perlman v. Timberlake,* 172 F. Supp. 246, 256 (S.D.N.Y. 1959).

Finally, the *Proposals* premises the proposed amendment on the need to "eliminate the uncertainty . . . ." surrounding potential Section 16(b) liability. *Proposals,* 2004 SEC LEXIS 1278, at *14. However, this stated rationale ignores that all any statutory insider needs to do in order to avoid liability is to refrain from selling stock within six months of a purchase (or refrain from purchasing stock within six months of a sale) at a profit.[3]

## C.  Principles of *Chevron* Deference Can Not Rescue the *Proposals* From Failing to Honor the Statutory Purpose of Section 16(b)

In the event that the drafters of the *Proposals* believe that the Supreme Court decision in *Chevron U.S.A., Inc. v. Natural Resource Defense Council,* 467 U.S. 837, 842-43 (1984), vests the Commission with the discretion to decide whether an exemption conforms to the statutory purpose of Section 16(b), they are badly mistaken. Instead, "any deference is constrained by our obligation to honor the clear meaning of the statute, as revealed by its language, purpose and history." *Int'l Brotherhood of Teamsters v. Daniel,* 439 U.S. 551, 556 n.20 (1979). "If a court, employing traditional tenets of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Chevron,* 467 U.S. at 843 n.9. *Accord General Dynamics Land Systems, Inc. v. Cline,* 540 U.S. ___, 124 S. Ct. 1236, 1248 (2004) ("Even for an agency able to claim all the authority possible under *Chevron,*

---

[3]The other sub-sections of Rule 16b-3 prevent any unfairness by providing an exemption for non-volitional and compensation-related transactions.

deference to its statutory interpretation is called for only when the devices of judicial construction have been tried and found to yield no clear sense of congressional intent."); *West v. Bowen*, 879 F.2d 1122, 1132 (3d Cir. 1989).

Section 16(b), as well as the entire Securities Exchange Act of 1934, is precisely such a statutory scheme in which the policies and goals of Congress are well understood from both the body of the statute (*see* 15 U.S.C. §§78b, 78p(b)) as well as the clear legislative history accompanying enactment of the statute. *See* Point I.A, above. In addition, the SEC lacks enforcement or adjudicative authority over Section 16(b) which eliminates the need for the Courts to give the SEC's positions any deference whatsoever in its proposed interpretations of Section 16(b) beyond their ability to persuade. *See, e.g., CFTC v. Zelener*, 2004 U.S. App. LEXIS 13471 at 817 (7th Cir. June 30, 2004) ("When, however, the problem is to be resolved by the courts in litigation – which is how this comes before us – the agency does not receive deference.") (citing *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 649-50 (1990)).

Therefore, it comes as no surprise that the Supreme Court has consistently *rejected* the views of the SEC when it comes to interpreting the proper scope of Section 16(b) liability. *See Gollust, supra;*[4] *Reliance Electric*, 404 U.S. 418, 426-27 (1972); *Blau v. Lehman*, 386 U.S. 403, 413 (1962); *accord, Foremost-McKesson*, 423 U.S. 232, 259-60 (1976).[5] This is what will inevitably occur if the Commission ever acts to adopt the *Proposals*.

---

[4] *Gollust* rejected a proposed SEC rule to govern standing to sue in Section 16(b) actions. *See* A. S. Jacobs, *Section 16 of the Securities Exchange Act*, §3:36 at 3-301 (July 2002) (SEC proposed a Rule 16a-1(h) with a different rule of standing than the one adopted in *Gollust*).

[5] In addition, even if *Chevron* deference were to apply here – which it does not – such deference is not endless. As the Supreme Court subsequently observed:

> Agency deference has not come so far that we will uphold regulations whenever it is possible to conceive a basis for administrative action. To the contrary, the presumption of regularity afforded an agency in fulfilling its statutory mandate is not equivalent to the minimum rationality a statute must bear in order to withstand analysis under the Due Process Clause.

*Bowen v. American Hospital Ass'n*, 476 U.S. 610, 626 (1986). Here, the *Proposals* clearly do not satisfy this standard.

-10-

## II. THE *PROPOSALS* INCORRECTLY CLAIM THAT THE THIRD CIRCUIT COURT OF APPEALS FAILED TO PROPERLY INTERPRET THE RELEVANT RULES

The Third Circuit in *Levy* held that: (a) Rule 16b-3(d) only applies to transactions having a clearly compensatory purpose; and (b) Rule 16b-7 only acts to exempt those reclassifications in which both the statutory insiders proportionate interest in the issuer's common stock did not change and the risks and opportunities available from the securities which were reclassified did not change. These rulings were a correct statement of law.

### A. *Levy* Correctly Interpreted Rule 16b-3(d)

The Third Circuit's decision in *Levy* was correct because it conformed to: (1) the plain meaning of the language of the rule; (2) the statutory policies of Section 16(b); (3) the rule's regulatory history; and (4) the limits of the SEC's authority as reflected in cases rejecting prior efforts of the SEC to exempt certain transaction from §16(b) liability under predecessor rules of the current Rule 16b-3.

#### 1. The Plain Meaning of Rule 16b-3(d) Supports the Court of Appeals' Interpretation

Rule 16b-3(d) allows for the exemption of "a grant, award or other acquisition from the issuer" from Section 16(b) liability. *See* 17 C.F.R. §240.16b-3(d). The Supreme Court adheres to the principle of statutory interpretation known as *esjudem generis*, which requires that "the residual clause [*i.e.*, "other acquisition"] should be read to give effect to . . . [and] be controlled and defined by reference to the enumerated categories [*i.e.*, "grant and award"] which are recited just before it." *Circuit City Stores v. Adams*, 532 U.S. 105, 115 (2001). *See also Norton v. Utah Wilderness Alliance*, 542 U.S. ___, 124 S. Ct. 2373, 2379 (June 14, 2004).

The terms "grant" and "award" involve compensation. The Commission's adopting release accompanying its promulgation of Rule 16b-3 states: "'grant and award' transactions provide issuer securities to participants on a basis that does not require either the contribution of assets or the exercise of investment discretion by the participants." *Ownership Reports and Trading by Officers, Directors and*

*Principal Security Holders*, Release No. 34-37260, 61 FR 30376, 30380 (May 31, 1996) ("Adopting Release"). Construing Rule 16b-3(d) under this principle of statutory construction, the term "other acquisition" must be understood as denoting a form of compensation consistent with the use of words "grant" and "award" as the Commission has defined them, and construed " to embrace only objects similar in nature to those objects enumerated in the preceding specific words." *Adams*, 532 U.S. at 114-15.

## 2. The Regulatory Context of Rule 16b-3(d) Further Supports *Levy*'s Interpretation of Rule 16b-3(d)

Other fundamental principles of statutory construction provide that: (i) statutes (and rules) must be read in context; and (ii) statutes (and rules) should be read to avoid rendering any portion of the rule superfluous. *See, e.g., Hibbs v. Winn*, ___ U.S. ___, 124 S. Ct. 2276, 2285-86 (2004). These fundamental principles reveal the inherent illogic of the Commission's claims that Rule 16b-3(d) was intended to exempt *all* transactions between an issuer, on the one hand, and an officer or director, on the other hand, without regard to the purpose or circumstances of the transaction.

The *Proposals* correctly recite the text of Rule 16b-3(a) the first sub-paragraph of the same Rule 16b-3 in which the subject Rule 16b-3(d) is found. It provides that: "A transaction between the issuer (including an employee benefit plan sponsored by the issuer) and an officer or director of the issuer that involves issuer equity securities shall be exempt from section 16(b) of the Act *if the transaction satisfies the applicable conditions set forth in this section*." 17 C.F.R. §240.16b-3(a) (quoted in *Proposals*, 2004 SEC LEXIS 1278 at *10) (emphasis added).

The interpretation of Rule 16b-3(d) advocated by the *Proposals* could more easily have been implemented if the language of Rule 16b-3(a) had simply left out the last clause of the rule which appears in bold above and states "if the transaction satisfies the applicable conditions set forth in this section." Then the rule would read "A transaction between the issuer (including an employee benefit plan sponsored by the issuer) and an officer or director of the issuer that involves issuer equity securities shall be exempt from section 16(b) of the Act ." That would accomplish precisely what the *Proposals* intend to accomplish through its

proposed amendment to Rule 16b-3(d). There would also be no need for any of the other remaining sub-paragraphs of Rule 16b-3. It would be the world's most simple rule.

### 3.    The Statutory Policies of Section 16(b) Support *Levy*'s Interpretation of Rule 16b-3(d)

*Ejusdem generis* is given effect when it is in accord with other sound considerations. *Adams*, 532 U.S. at 115. Here, those sound considerations are the statutory policies underlying Section 16(b) and the regulatory history of Rule 16b-3(d), which support *Levy*'s interpretation.

The statutory policies of Section 16(b) are designed to prevent speculative abuse by statutory insiders. *See* Point I.A, above. The *Proposals* fail to provide a plausible explanation of how speculative abuse in securities trading would be curbed if Rule 16b-3(d) were read to encompass *all* transactions with the issuer rather than only those that are compensation-related. In doing so, the *Proposals* seek to ***turn Section 16(b) on its head*** by arguing that the statute's purpose is to exempt compliant insiders from liability because its imposition is disruptive to the free functioning of the securities markets. This argument overlooks the fact that §16 (b) embodies Congress' judgment that certain types of insider trading are so fraught with the risk of speculative abuse that, like horizontal price fixing, they are subject to a *per se* rule, *i.e.*, they should not be allowed under any circumstances. See Point I.A, above. Although the authors of the *Proposals* at the Division of Corporate Finance may differ with respect to the wisdom of that legislative judgment, the Commission lacks authority to unilaterally repeal the statute. Instead, as stated in §16(b) itself, the Commission may exempt only transactions that are "not comprehended within the purpose of this subsection." *See* 15 U.S.C. §78p(b). *Accord Blau v. Lehman*, 368 U.S. 403, 413 (1962) ("Congress can and might amend § 16 (b) if the Commission would present to it the policy arguments it has presented to us, but we think that Congress is the proper agency to change an interpretation of the Act unbroken since its passage, if the change is to be made.")

### 4.    The Regulatory History of Rule 16b-3(d) Also Supports *Levy*'s Interpretation of Rule 16b-3(d)(1)

The regulatory history of Rule 16b-3(d) further supports the conclusion that it is concerned solely with compensation-based transactions. Indeed, Rule 16b-3 has long been understood to be concerned with allowing the use of issuer stock and stock options in compensation plans. *See* 1991 Release, at 81266 ("Employee benefit plans, the subject of Rule 16b-3, have been a traditional vehicle through which employers have compensated and provided incentives to their employees.") *See also*, 1981 Release, 46 FR at 48163; Exchange Act Release No. 12374, 1976 SEC LEXIS 1831 at *3 (1976); Exchange Act Release No. 7723, 1965 SEC LEXIS 741 (1965); *Notice of Proposed Amendment of Rule 16b-3 Under the Securities Exchange Act of 1934*, Exchange Act Release No. 6111, 1959 SEC LEXIS 199 at *8-10 (Nov. 5, 1959).

Certain provisions of Rule 16b-3 exempting transactions of officers over which they had discretionary control became controversial relatively quickly. In *Greene v. Dietz*, the Second Circuit openly questioned the authority of the SEC to exempt such transactions. This was followed by the complete rejection by a Judge in New York of that portion of the rule allowing officers to act with discretion in making transactions (*see*, *Perlman*, *supra*), a decision subsequently adopted by the Second Circuit. *See B.T. Babbit, Inc. v. Lachner*, 332 F.2d 225 (2d Cir. 1964).

The decisions in *Greene v. Dietz* and *Perlman* are well known decisions which have always loomed large in subsequent Commission releases concerning Rule 16b-3. One commentator observed that the SEC amendments to Rule 16b-3 in 1960 was "[e]xplicitly reacting to these two decisions . . . ." Merritt B. Fox, *Insider Trading Deterrence Versus Managerial Incentives: A Unified Theory of Section 16(b)*, 92 Mich. L. Rev. 2088, 2187 (1994) (citing *Notice of Proposed Amendment of Rule 16b-3 Under the Securities Exchange Act of 1934*, Securities Exchange Act Release No. 6111, 24 FR 9272, 9273, 1959 SEC LEXIS 199 (Nov. 5, 1959)).

Rule 16b-3's extensive revision in 1991 included a rather complex and detailed set of rules governing the availability of the compensation-related exemption. Those revisions articulate quite clearly the problem which the rule was designed to address by stating that:

Since many plans provide for grants or awards at least every 12 months, if there were no acquisition exemption, any sale of equity security by participating officers or directors would necessarily occur within six months before or after an acquisition, and therefore result in short-swing liability. ***Rule 16b-3 is intended to provide relief from this frustration of the legitimate use of employee benefit plans as a method of executive compensation, where the nature of the transaction and the safeguard imposed by the rule minimize the potential for abuse***.

1991 Release at 81,266 (emphasis added). No mention was made of an intention to engage in a regulatory overruling of the *Greene v. Dietz* line of cases.

The rule's complexity, however, caused "unanticipated practical difficulties." *Ownership Reports and Trading by Officers, Directors and Principal Security Holders*, Release No. 34-34514, 59 FR 42449 at 42449 (Aug. 17, 1994) ("1994 Release"). Indeed, the effective date of the new rule 16b-3 was postponed twice, and did not become effective until September 1, 1994, which was more than three years after its adoption. *See* 1991 Release, at 84,709 at n.205 (providing a 16-month phase-in period, until Sept. 1, 1992); *Employee Benefit Plan Exemptive Rules Under Section 16 of the Securities Exchange Act of 1934*, Exchange Act Release No. 30,850, 1992 SEC LEXIS 1478, at *3, [1992 Transfer Binder] Fed. Sec. L. Rep. (CCH) 85,004, at 82,888 (June 23, 1992) (extending the phase-in period until Sept. 1, 1993, and stating that "the Commission intends to engage in further rulemaking in order to streamline the reporting requirements and exemptions applicable to employee benefit plan transactions"); at 84,709 at n.205 (providing a 16-month phase-in period, until Sept. 1, 1992); *Employee Benefit Plan Exemptive Rules Under Section 16 of the Securities Exchange Act of 1934*, Exchange Act Release No. 32,574, 58 FR 36866 (July 2, 1993) (stating that "further Section 16 rulemaking remains under consideration" and extending the phase-in period until Sept. 1, 1994, or an earlier date as set in such rulemaking).

New revisions to Rule 16b-3 proposed in 1994 were designed to "address these practical problems and further streamline the rules, to the extent consistent with the purposes of Section 16." *Id.*, 59 FR at 42449. The proposal sought to amend Rule 16b-3(d) to "exempt, without conditions as to timing, any purchase transaction arising under a broad-based nondiscriminatory tax-qualified plan,

-15-

other than an intra-plan transfer to or from an employer securities fund." *Id.* 59 FR at 42450. The 1994 Release contains no mention of any intent to provide a blanket exemption for all transactions between an issuer and its directors.

Reacting to further comment, the Commission sought to expand the scope of the proposed new Rule 16b-3(d) to allow "any acquisition or disposition of issuer equity securities . . . [to] be exempt without condition if made pursuant to a plan . . . ." *Ownership Reports and Trading by Officers, Directors and Principal Security Holders*, Release No.34-36356, 60 FR 53832, 53834 (Oct. 17, 1995) ("1995 Release"). Nonetheless, the 1995 Release evinced the Commission's intent to avoid exempting ordinary volitional transactions between an issuer and a director. *Id.* & nn. 30 & 31. *Accord*, 1981 Release, 46 FR at 48163 (Rule 16b-3 exemption unavailable where employee retains an element of volition over the timing of his purchase of securities).

The 1995 Release also explained that the purpose of the alternative proposal, later adopted as the Rule, was to facilitate ***compensation-related transactions*** between an issuer and its officers and directors. Thus, the 1995 Release stated:

> Through the Alternative Proposal, the Commission has sought to craft a rule that, consistent with the statutory purpose of Section 16(b), erects meaningful safeguards against the abuse of inside information by officers and directors ***without impeding their participation in legitimate compensatory transactions*** that do not present the possibility of such abuse, and facilitates compliance. In so doing, the Commission has recognized that ***most, if not all, transactions between an issuer and its officers and directors are intended to provide a benefit or other form of compensation to reward service or to incentivize performance.***

1995 Release, 60 FR at 53833 (emphasis added).

The final release issued by the SEC with respect to Rule 16b-3 confirms that the concept of compensation lay at the core of the regulatory changes to Rule 16b-3(d). In connection with the decision to insert the words "other acquisitions" the Adopting Release states:

-16-

> [The] [p]urpose is to exempt some participant directed transactions
> (such as deferral of bonuses into phantom stock and other deferred
> ***compensation programs***) that are exempt under the current rule but
> would lack the exemption under the new rule.

Adopting Release, 61 FR at 30380 (emphasis added).

The Commission has never stated in any release contemporaneous with the
adoption of the rule that Rule 16b-3(d) provides a blanket exemption for all
acquisitions of securities by a director from an issuer. Nor does any such
statement appear in any of the Commission's releases discussing Rule 16b-3 going
back from the very first time such a rule was adopted and continuing through 1991
when the previous form of the rule ultimately refined in the current rule 16b-3(d)
was first proposed and then through its various incarnations in 1994, 1995 and
1996. To the contrary, the regulatory history is extremely clear that the intention
of the SEC was to create an exemption for certain compensation related
transactions.

Other portions of the regulatory history upon which the Commission
previously focused on in its *amicus* submission to the Third Circuit do not detract
from Rule 16b-3(d)'s intent as unequivocally expressed in the regulatory history
through, *inter alia*, the 1994 Release, the 1995 Release, and the Adopting Release.
This is because the SEC in its *amicus* brief wrenched those quotes out of context
because "the surrounding language is concerned with compensation." *Levy*, 314
F.3d at 123 n.13.

One such quote from the Adopting Release is that "[t]ypically, where the
issuer rather than the trading markets, is on the other side of [a]. . . director's
transaction in the issuer's equity securities, any profit obtained is not at the
expense of uninformed . . . market participants . . . ." SEC *Amicus* Brief at 6
(quoting Adopting Release, 61 FR at 30377). However, the Commission
overlooked the fact that the same statement was made in 1995 when it put out for
comment an earlier proposed version of the rule. *See* 1995 Release, 60 FR at
53833. In 1995, the statement was meant to serve as the rationale for exempting
only "Grant or Award Transactions," at that time denominated as Rule 16b-3(c).
*Id.* 60 FR at 53840. ***No mention at all was made of the term "other acquisition"
in the 1995 Release. Id.***

There is, therefore, no basis for concluding that this broadly worded rationale was intended to exempt *all* transactions between an issuer and its directors. Instead, the language of the draft rule was changed in the final version because some "participant-directed transactions . . . that are exempt under the current rule would lack an exemption under the new rule." 314 F.3d at 123-24 (quoting Adopting Release, 61 FR at 30380).

The Commission in its *amicus* also misleadingly focused on the statement in the Adopting Release that transactions "that satisfy [certain] objective gate-keeping conditions, are not vehicles for the speculative abuse that Section 16(b) was designed to prevent" (Adopting Release, 61 FR at 30377 (quoted in SEC *Amicus* at 6-7)). However, if that rationale were the rule -- which it is not -- *all transactions involving an issuer would be exempt, not merely those involving directors and officers but also those involving 10% beneficial owners.*

Rationales are not coextensive with rules or statutes. *See, e.g., U.S. v. 1990 Toyota 4Runner*, 9 F.3d 651, 653 (7th Cir. 1993); *U.S. v. Holzer*, 848 F.2d 822, 824 (7th Cir. 1988); *Nat'l Industrial Sand Ass'n v. Marshall*, 601 F.2d 689, 711-12 (3d Cir. 1979). Even the Commission has not argued that Rule 16b-3(d) exempts transactions between a 10% beneficial owner and an issuer. Nor are all transactions between a director and an issuer exempt if approved by the directors. Instead, as the Third Circuit correctly concluded, the rule means what both its text and regulatory history say: only compensation-related transactions similar to "grants" and "awards," and no other, are eligible for the Rule 16b-3(d) exemption.

In any event, the Commission's suggestion that routine "gatekeeping" procedures requiring approval by an issuer's directors or shareholders are sufficient to protect against speculative abuse by insiders is irrational and inconsistent with the statutory purpose of Section 16(b). To the contrary, Section 16(b) is predicated on the principle that insiders are tempted and able to manipulate corporate affairs to their advantage. 1981 Release, 46 FR at 48147 fn. 3. As the Third Circuit correctly recognized, allowing corporate directors to exempt transactions from the statute's coverage would be fundamentally inconsistent with §16 (b)'s provision that limits the same directors from preventing the prosecution of a lawsuit -- a suit any shareholder is entitled to bring

even if the directors ignore or reject his pre-suit demand.[6] *See* 15 U.S.C. § 78p(b); *accord, Burks v. Lasker*, 441 U.S. 471, 484 n. 13 (1979) (Congress intended to prevent boards of directors from cutting off shareholder lawsuits brought pursuant to §16(b).)

Finally, the suggestion that all transactions between an issuer's officers and directors, on the one hand, and the issuer, on the other hand, represents a radical break with previous pronouncement of the regulatory intent of Rule 16b-3 and the precedents which limited the scope of that rule beginning with *Greene v. Dietz, supra*. It is inconceivable that the Commission could have attempted to do so without making an explicit statement of that intent or specifically mentioning that it was entirely disregarding *Greene v. Dietz* and its progeny. The case was always on the Commission's mind whenever the Commission revised its rules including the Commission's decision in the aftermath of *Perlman* to exclude transactions of the type encountered in that case from the scope of the Rule 16b-3 exemption. *See Adoption of an Amendment of Rule 16b-3 Under the Securities Exchange Act of 1934*, Securities Exchange Act of 1934 Release No. 6275, 1960 SEC LEXIS 92 (May 26, 1960). In the 1981 Release, the Commission specifically stated that its rules did not run afoul of the decision. *See* 1981 Release at *119-120 and n.130. Indeed, almost 35 years after *Greene v. Dietz* being decided, the 1991 Release makes a specific mention of the case and of *Perlman* and distinguishes those decisions from a new rule adopted rather than attempting to argue, as it did in other places in that very same 1991 Release, that the Courts had erred in their interpretation of Section 16(b). *Compare* 1991 Release at *54-55 with 1991 Release at *55-56.

Thus, given the historical context of Rule 16b-3 exemptions, the background limitations imposed by *Greene v. Dietz* and the actual history of the different permutations of rules and proposed rules beginning in 1991 and continuing through 1994, 1995 and 1996, it is impossible to believe that the Commission's intention at the time was to exempt ***all*** transactions between an issuer and its officers and directors without regard to the connection of the

---

[6] The Commission itself appeared to be retreating from its reliance on the "gatekeeping" fiction. *See Ownership Reports and Trading by Officers, Directors and Principal Security Holders*, Exchange Act Release No. 46421, 2002 SEC LEXIS 2227 at *28-29 (Aug. 27, 2002) (requesting comment as to whether Rules 16b-3(d) should require a six-month holding period as a mandatory condition).

transactions to compensation.

**B.      The Third Circuit Properly Interpreted Rule 16b-7**

The Third Circuit faced a more difficult task in interpreting Rule 16b-7 because of the nature of the Commission's alleged rulemaking in this area which only includes the word "reclassification" in the caption, but not the body, of Rule 16b-7. Nonetheless, through traditional devices of judicial construction *Levy* arrived at a correct interpretation of the circumstances under which reclassifications would be exempt from Section 16(b) liability.

**1.      Rule 16b-7 Contains No Language Exempting Reclassifications**

Rule 16b-7 does not contain the term "reclassification." *See* 17 C.F.R. §240.16b-7. The word is found only in the title of the rule exempting only transactions that are "mergers" and "consolidations." The heading of a statute (or regulation) is not utilized in interpreting the plain meaning of a statute and can only be used to "shed light on some ambiguous word or phrase in the statute itself." *Whitman*, 531 U.S. at 483 (quoting *Carter v. U.S.*, 530 U.S. 255, 267 (2000)). *See also Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206, 213 (1998) (quoting *Trainmen v. Baltimore & Ohio R. Co.*, 331 U.S. 519, 528-29 (1947)).

The terms "merger" and "consolidation" have well-understood common law meanings, neither of which includes anything resembling the "reclassification" which Petitioners seek to exempt. *See* 15 *Fletchers Cyclopedia of Corporations* §7041 at 8-12 (1999). The Commission's authority does not extend to reinterpreting the common law meaning of those terms absent an explicit rule specifically seeking to do so. *Accord, Jicarella Apache Tribe v. FERC*, 578 F.2d 289, 292-93 (10th Cir. 1978). There is, therefore, no exemption for reclassifications outside the context of mergers and consolidations. *Cf. Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994) (no cause of action for aiding and abetting a violation of Section 10(b) of the Exchange Act exists because the statute does not expressly provide for such a claim).

To the extent any rule on the topic exists it is that "Rule 16b-7(a) *can* apply to transactions involving reclassifications." 1981 Release, 46 FR at 48177 (emphasis added).   Through the use of the word "can," the rule -- assuming it exists -- would be permissive. *See Alloc, Inc. v. ITC*, 342 F.3d 1361, 1378 (Fed. Cir. 2003); *Central States Motor Freight Bureau, Inc., v. ICC*, 924 F.2d 1099, 1105 (D.C. Cir. 1991). Thus, as phrased, the interpretive release states only that where a merger or consolidation which otherwise falls within the ambit of Rule 16b-7(a) *also involves a reclassification*, the exemption *may* still apply.  In that regard, it is particularly telling that Question 142, within which this discussion is contained, analyzes a series of hypothetical factual scenarios, none of which implicates a pure reclassification existing outside the context of a merger or a consolidation. *See* 1981 Release, 46 FR at 48177.

**2.     SEC No-Action Letters Are Irrelevant to the Correct
Interpretation of Rule 16b-7 and, in any Event do not
Support the Existence of an Exemption of the Scope
Currently Claimed by the Commission**

As the Commission has expressly stated in the past, "Commission no-action and interpretive letters are not official expressions of the Commission's views and do not have the force of law."  Brief of the Securities and Exchange Commission, Amicus Curae, in Support of Appellant and Issues Addressed, *Morales v. Quintel Entertainment, Inc.,* 99-9374 (2d Cir.) at p.15 n.9 (citing *New York City Employees' Retirement System v. Securities and Exchange Commission*, 45 F.3d 7, 12-13 (2d Cir. 1995)); *see also Christensen v. Harris County*, 529 U.S. 576, 587 (2000). Instead, "SEC no-action letters constitute neither  agency rule-making nor adjudication and thus are entitled to no deference beyond whatever persuasive value they might have." *Gryl v. Shire Pharmaceuticals Group, PLC,* 298 F.3d 136, 145 (2d Cir. 2002) (citing cases).

In any event, the no-action letters upon which the Commission seeks to rely do not support their position. *Monk-Austin, Inc.*, SEC No-Action Letter, [1992] Fed. Sec. L. Rep. (CCH) ¶76,296 (Nov. 19, 1992), is inapposite because it involved preferred stock which was always convertible into common stock. *Id.* at *1.  The recapitalization there eliminated only different classes of common stock, changing the common stock into which the preferred stock was convertible from Class B common to ordinary common stock. *Id.*  No change in the proportionate

interests of the shareholders was effected. *Id.* at *6 and *8.

In contrast, the Preferred Stock in *Levy* was *not* originally convertible into Common Stock. Thus, at issue in *Levy* is not the reclassification of one type of common stock into an another economically equivalent class of common stock, but rather the change from the fixed contractual rights of preferred shareholders to those of complete residual equity ownership embodied by common stock. In other words, Defendants acquired an equity interest they did not own prior to the conversion of the Preferred Stock.

*St. Charles Acquisition Ltd. Partnership*, SEC No-Action Letter, [1992] Fed. Sec.. L. Rep. (CCH) ¶76,223 (June 25, 1992), is similarly inapposite. In *St. Charles*, the economic interests of a limited partnership were to be converted to corporate form with no change in proportionate ownership interests. *Id.* at *5   In *Levy*, however, as demonstrated above, there was a very real change in the economic substance of the investments that petitioners previously held in the form of Fairchild preferred stock.[7]

### 3.    The SEC's Failure to Explicitly State That it was Overruling Prior Judicial Decisions Further Demonstrates That it had no Such Intention

As the Commission acknowledged in the *amicus* brief it filed with the Third Circuit, the interpretation it sought to advance for the benefit of the defendants in *Levy* with respect to  Rule 16b-7's scope greatly exceeds the rulings in *Kern County, supra*, and *Roberts v. Eaton*, 212 F.2d 82 (2d Cir. 1954).  *See* Memorandum of the Securities and Exchange Commission, *Amicus Curiae*, In

---

[7] Furthermore, the term "recapitalization," which the Commission at times appears to use interchangeably with "reclassification," is contained in Rule 144(d)(3)(I) of the Securities Act. *See* 17 C.F.R. §230.144 (d)(3)(I). Defendants' transactions in Common Stock, however, would not fit within the meaning of the term as used in that portion of the federal securities laws. *See, e.g., Cable TV Industries*, 1981 SEC No-Act. LEXIS 3958 (Aug. 31, 1981) (request for no-action refused because of  "a shift of the economic risks involved" resulting from less than 1½% of the new company's stock being owned by people who were not shareholders of the predecessor company.) *Accord William S. Smith*, 1993 SEC No-Act. LEXIS 455 (March 16, 1993) (rejecting request for no action letter); *Capital Bancorp*, 1983 SEC No-Act. LEXIS 1710 (July 31, 1983) (same).

Support of Appellee's Petition for Rehearing or Rehearing *En Banc* at p. 10. Yet, if that had been the Commission's true intent – as opposed to the *post hoc* rationalization it, in fact, represented – the Commission was required to have stated so explicitly in the 1991 Release which adopted the new rule. Indeed, in the very same 1991 Release, when the SEC intended to overrule existing cases it made an explicit statement of its intentions. *See, e.g.*, 1991 Release at 81,261-81,263 & nn. 116 and 117 (stating its intention to overrule cases holding that an exercise of an option, rather than its acquisition, is the Section 16(b) purchase of an equity security). *Accord, Hillsborough County v. Automated Med. Lab., Inc.*, 471 U.S. 707, 718 (1985) (agencies must make clear any intention to displace existing state law).

Similarly, the *Proposals* assertion that if the subject transaction had been structured as a merger rather than a reclassification there would be no liability (*see Proposals* at *20-21) is incorrect. The transaction described would, in fact, be deemed a liquidation, and therefore *not* be eligible for the Rule 16b-7 exemption. *See* 1981 Release, Question 142, Illustration (2), 46 FR at 48177. As discussed above, that is more of a reason to refine the exemption for mergers than to engage in a wholesale exemption for all reclassifications.

This rationale proffered by the Commission is also flawed because it ignores that in matters relating to the federal securities laws, form does matter. Thus, in *Landreth Timber Co. v. Landreth*, 471 U.S. 681(1985), the Supreme Court held that the sale of a privately owned business accomplished through the sale of all its stock was subject to the provisions of the federal securities laws even though the same economic effect could have been accomplished through the alternative method of simply selling all the assets. *See CFTC v. Zelener*, 2004 U.S. App. LEXIS 13471 at *13 (7th Cir. June 30, 2004).

There is also no merit to the *Proposals* suggestion that §16(b) liability should not exist because there is no change in the "company's business." *Proposals*, 2004 SEC LEXIS 1278 at *20. Such is always almost the case in securities transactions subject to §16(b). There is rarely a change in the issuer's business; the only thing that changes is the economic interest of the statutory insider. Indeed, if a change in business were the *sine qua non* of §16(b) liability there would likely never be any §16(b) liability.

### III.   THE *PROPOSALS'* DESCRIPTION OF THE PROPOSED NEW RULES AS "CLARIFYING" REPRESENTS AN UNLAWFUL AND UNCONSTITUTIONAL ATTEMPT BY THE SEC TO ENGAGE IN RETROACTIVE RULEMAKING

Even if the Commission decides to proceed in erroneously amending Rule 16b-3(d) and Rule 16b-7 in accordance with the *Proposals*, the Commission must still act in accordance with the limitations imposed by settled principles of administrative and Constitutional law.  If the Commission adopts the *Proposals* description of the proposed amended rules as "clarifying rules," it will be badly overstepping these well-settled boundaries with respect to the powers of the Commission to make retroactive law.

### A.   The Commission Lacks the Authority to Engage in Retroactive Rulemaking

In order for the *Proposals* to apply to *Levy* and any other action commenced prior to their adoption, the *Proposals* would have to be retroactive.  However, rules can only be applied retroactively where an agency has received an express grant of authority from Congress to promulgate such retroactive rules. The Supreme Court has explicitly held that:

> [A] statutory grant of legislative rulemaking authority, will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless the power is conveyed by Congress in express terms.

*Bowen v. Georgetown University Hospital*, 488 U.S. 204, 208 (1988) (citing *Brimstone R. Co. v. U.S.*, 276 U.S. 104, 122 (1928) ("The power to require adjustments for the past is so drastic.  It . . . ought not to be extended to permit unreasonably harsh action without very plain words.")

Here, of course, Section 16(b) of the Securities Exchange Act of 1934, pursuant to which the SEC is making its proposed rule, contains no such express grant of authority for retroactive rulemaking. *See* 15 U.S.C. §78p(b).  Therefore, as a matter of law, the SEC's proposed rule would not apply to this case. *Accord Jahn v. 1-800-Flowers.com, Inc.*, 284 F.3d 807, 810 (7th Cir. 2002) ("Federal

-24-

regulations do not, indeed cannot, apply retroactively unless Congress has authorized that step explicitly.")

Indeed, we have been unable to locate a single previous circumstance in which the Commission has attempted to retroactively apply a rule amendment particularly in an attempt to overrule a previous appellate court decision or where such an effort has been endorsed by the Courts.

**B.    Even Though the *Proposals* Refer to the Amended Rules as "Clarifying," They are, in Fact, Legislative Rules**

The Corporate Finance Division of the Commission, seemingly acting at the behest of Peter Romeo of the Hogan & Hartson firm and his clients at Citicorp Venture Capital, has crafted the *Proposals* in a manner designed to avoid the explicit and controlling holding of *Bowen v. Georgetown University Hospital*, *supra*. The method the Commission's staff seeks to employ in order to expand its statutory grant of authority is to assert that the *Proposals* reflect a "clarification" rather than a substantive change to the law.

That labeling given by an agency such as the Commission to a particular rule is not determinative as "both the United States Supreme Court and this Court have rejected the argument that the label given to a rule by an administrative agency is determinative." *Continental Oil Co. v. Burns*, 317 F. Supp. 194, 197 (D. Del. 1970) (citing *Columbia Broad. Sys., Inc. v. United States*, 316 U.S. 407 (1942); *Pharmaceutical Mfrs. Ass'n v. Finch*, 307 F. Supp. 858 (D. Del. 1970)). Courts have, therefore, refused to adhere to efforts of federal agencies to designate rules as clarifying when they obviously effected substantial changes. *See, e.g., Concerned Citizens of Bridesburg v. EPA*, 836 F.2d 777, 786 (3d Cir. 1987) (citing *Detroit Edison Co. v. EPA*, 496 F.2d 244, 248-49 (6th Cir. 1974)).

This refusal to defer to a federal agency's designation of the particular form of its rules is consistent with controlling principles of law governing the limits of agency deference. The provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. §501, *et seq.*, determine whether a rule issued by an administrative agency is legislative or interpretive. It is axiomatic that the Courts, rather than the SEC, administer the APA. Therefore, the Commission is not entitled to any deference beyond their powers of persuasion in characterizing the nature of a rule

under the APA. *See Professional Reactor Operator Society v. The United States Nuclear Regulatory Authority*, 939 F.2d 1047, 1051 (D.C. Cir. 1991) (cited in *Ardestani v. INS*, 502 U.S. 129, 148 (1994)).

*Concerned Citizens* is particularly on point here. In *Concerned Citizens*, as here, the underlying rules which the federal agency was purporting to "clarify" were many years old. This led the Third Circuit to observe that "[a] change after 13 years is *a fortiori* a revision." *Concerned Citizens, supra.* Here, the portion of Rule 16b-7 which the SEC is seeking to address through the *Proposed Rules* is, coincidentally, also 13 years old. *See Proposed Rules*, 2004 SEC LEXIS 1278 at *19 & n.34 (citing Exchange Act Release No. 28869, 56 FR 7242 (Feb. 8, 1991)). Rule 16b-3(d), a relative youngster by comparison, is still eight years old. *See Proposed Rules*, 2004 SEC LEXIS 1278 at *5 &n.13 (citing Exchange Act Release No. 37260, 61 FR 30376 (May 31, 1996)). Nonetheless, Rule 16b-3(d) is old enough that any suggestion that it is a mere "clarification" strains credulity.

Also, the changes contemplated -- though not yet adopted -- are not mere "typographical errors." *Concerned Citizens, supra.* Instead, they are proposed substantive changes to the underlying rules. That the SEC has put the *Proposals* forward for public notice and comment pursuant to the provisions of the APA further demonstrates the essential reality of the situation that the *Proposals*, in fact, represent a major substantial proposed change in existing law. As we are certain the Commission well knows, no such notice and comment procedures are required for interpretive releases. *See* 5 U.S.C. §553(b).

## C.    *Stare Decisis* is an Absolute Barrier to the Commission's Efforts to Obtain Retroactive Effect for its Proposed New Rules

There are limits to agency power. Thus, the Supreme Court has explicitly held that: "Once we have determined a statute's meaning, we adhere to our ruling under the doctrine of *stare decisis*, and we assess an agency's later interpretation of the statute against that settled law." *Neal v. U.S.*, 516 U.S. 284, 294-95 (1996). Here, the Third Circuit has conclusively determined the meaning of Rule 16b-3(d)(1) and Rule 16b-7. *See Levy v. Sterling Holding Co.*, 314 F.3d 106 (3d Cir. 2002). Therefore, the Commission has no right to instruct this Court otherwise. *See, e.g., Brand X Internet Services v. Federal Communications Commission*, 345 F.3d 1120 (9th Cir. 2004) (rejecting FCC attempt to create regulations contrary to

settled law in the Ninth Circuit); *Bankers Trust New York Corp. v. U.S.*, 225 F.3d 1368, 1375 (Fed. Cir. 2000).

These principles were also well analyzed an summarized by the relatively recent decision by the D.C. Circuit in *Nat'l Mining Ass'n v. Department of Labor*, 292 F.3d 849 (D.C. Cir. 2002). There the Circuit Court held that even where an administrative agency's rules could be considered clarifying in nature they could not operate to overrule existing precedent within a Circuit where the issue had already been decided. *Id.* at 860.

The controlling nature of the decision of *Levy* is also well demonstrated by *Allegheny Gen'l Hospital v. NLRB*, 698 F.2d 965, 970 (3d Cir. 1979), in which an agency's efforts to administratively set aside an earlier controlling decision issued by the Third Circuit Court of Appeals was rejected in a decision stating that:

> A decision by this court, not overruled by the United States Supreme Court, is a decision of the court of last resort in this federal judicial circuit. Thus our judgments . . . are binding on all inferior courts and litigants in the Third Judicial Circuit, and also on administrative agencies when they deal with matters pertaining thereto. We express no personal criticism of an independent federal agency that refuses to accept a judicial determination of this court. We attribute no ulterior motives to the distinguished members of the Board who have publicly, although respectfully, expressed disagreement with this court. But the Board is not a court nor is it equal to this court in matters of statutory interpretation. Thus, a disagreement by the NLRB with a decision of this court is simply an academic exercise that possesses no authoritative effect. It is in the court of appeals and not in an administrative agency that Congress has vested the power and authority to enforce orders of the NLRB. 29 U.S.C. § 160(e). It is in this court that Congress has vested the power to modify or set aside an order of the NLRB. 29 U.S.C. § 160(f). In 1803, Chief Justice John Marshall, speaking for a unanimous Court, concisely stated the fundamental principle on which we rely: "It is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule. If two laws conflict with each other,

the courts must decide on the operation of each." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L. Ed. 60 (1803). Thus, it is in this court by virtue of its responsibility as the statutory court of review of NLRB orders that Congress has vested a superior power for the interpretation of the congressional mandate. Congress has not given to the NLRB the power or authority to disagree, respectfully or otherwise, with decisions of this court. *See Volkswagenwerk Aktiengesellschaft v. FMC*, 390 U.S. 261, 272, 88 S. Ct. 929, 19 L. Ed. 2d 1090 (1968). ***For the Board to predicate an order on its disagreement with this court's interpretation of a statute is for it to operate outside the law. Such an order will not be enforced.***

*Id.*, 698 F.2d 965, 970 (3d Cir. 1979) (emphasis added). *Accord U.S. v. Robinson*, 2001 U.S. Dist. LEXIS 10555 at *20-22 (D. Del. July 20, 2001) (Farnan, J.).

Here, the Commission has an even weaker claim for deference. In *Allegheny*, the administrative agency, the NLRB, had adjudicative authority over the statute in issue. In contrast, as the Commission is undoubtedly aware, it lacks any such authority. *See Gollust*, 501 U.S. at 122. Instead, enforcement of §16(b) exists solely in the issuer or, alternatively, a security holder of the issuer (*i.e.*, my client in the *Levy* action). Therefore, the Commission can not act to overrule the Third Circuit's decision in *Levy*.

### D.    The SEC's Actions Represent a Blatant Effort to Interfere in the Actions of the Judiciary in Violation of the Separation of Powers Doctrine

Any rational and fair-minded person would, knowing the facts of the *Levy* case, have a visceral revulsion at the blatant efforts of the Commission to interfere in that action following the denial of the petition for re hearing *en banc* and the denial of the petition for a writ of certiorari. As the Supreme Court has expressly stated, "[one] type of unconstitutional restriction upon the exercise of judicial power identified by past cases is exemplified by *Hayburn's Case*, 2 U.S. 409, 2 Dall. 409, 1 L. Ed. 436 (1792), which stands for the principle that Congress cannot vest review of the decisions of Article III courts in officials of the Executive Branch." *Plaut v. Spendthrift Farms, Inc.*, 514 U.S. 211, 217 (1995) (citing *Chicago & Southern Air Lines, Inc.* v. *Waterman S. S. Corp.*, 333 U.S. 103

-28-

(1948)).

This rests on sound principles of public policy which lay at the heart of the Rule of Law so important to fairness and justice in our society that it was embedded in our Constitution. The problem with allowing the Commission under the false guise of rulemaking to decide this case is well-known. There are systems of government which do allow for such interference. Thus, as one well-known commentator observed about ancient Roman law:

> When any doubts arose upon the construction of the Roman laws, the usage was to state the case to the emperor in writing, and take his opinion upon it. This was certainly a bad method of interpretation. To interrogate the legislature to decide particular disputes is not only endless, but it affords great room for partiality and oppression.

1 William Blackstone, Commentaries *58 (quoted in J.F. Manning, *Constitutional Structure and Judicial Deference to Agency Interpretation of Agency Rules*, 96 Colum. L. Rev. 612, 613 (1996)). The Roman system was a system of laws, but it is not our system of laws. The Founding Fathers, in adopting the U.S. Constitution, soundly rejected such a system having experienced the follies of such a system first hand. *See Plaut*, 514 U.S. at 219-224.

Here, the Commission is blatantly attempting to restrict Judicial power as exercised by the Third Circuit in *Levy* and instruct the Courts as to how they should rule in a specific case. The *Proposals* mention *Levy* repeatedly and even go so far as to mention the amount of damages alleged in the Complaint in this action. *See Proposals*, 2004 SEC LEXIS 1278, at *30. The intent of the SEC's Corporate Finance Division, under the obvious sway of the defendants in the *Levy* action, is clear – they intend to interfere in the right of the Judiciary as an independent and co-equal branch of the federal government, or perhaps even a super-court, to decide individual cases and controversies. That is, however, something which the Commission may not do and, indeed, should not even attempt to do so long as the current U.S. Constitution remains in effect.

## IV. THE *PROPOSALS* ARE PROCEDURALLY INADEQUATE FOR FAILING TO PROVIDE PROPER NOTICE OF THEIR EFFECT UPON PASSAGE

The APA requires that any notice of proposed rule changes adequately inform interested persons of the potential impact of the proposed new rules. *See* 5 U.S.C. § 553 (2004). The Commission in issuing the *Proposals* has failed to properly perform its statutory duty.

The language to the proposed amendment to Rule 16b-7 is so confusing that is difficult to understand when exactly it would apply. If the Commission intends to exempt all reclassifications it should state so clearly. Alternatively, if the Commission intends to exempt only certain types of reclassifications it should, once again, state so clearly and in a manner that can be understood by someone other than a member of the staff at the Commission.

However, the proposed language of the proposed amended Rule 16b-7(a) and 16b-7(b) is, at best, confusing and, at worst, utterly meaningless. Reclassifications and consolidations, on the one hand, and mergers, on the other hand, are entirely different types of transactions. Mergers and consolidations involve the securities of two separate companies. Reclassifications, in contrast, involve the securities of a single issuer. The Commissions attempt to jumble the two concepts is a drafting failure.

As for proposed Rule 16b-7(c), is it the *Proposals* intent to cause Rule 16b-6 to be overruled or displaced by the new proposed amended Rule 16b-7 through the operation of Rule 16b-7(c). The Commission in the *Proposals* fails to provide a definition of the transactions that would be considered "reclassifications" and many transactions which are currently considered "conversions" within the ambit of Rule 16b-6 could theoretically be considered reclassifications as well. Is it the Commission's intention to set aside the careful analysis and construction of rules governing conversions of derivative securities and the setting of conversion terms contained in Rule 16b-6 as articulated in the 1991 Release? If it is the Commission's intention to overrule any of those rules, including Rule 16b-6, through the operation of the new Rule 16b-7, it would be appropriate to state so clearly in the new rule.

## CONCLUSION

The *Proposals* represent an outrageous and ill-advised attempt to: (i) exempt transactions which Congress believed should be covered by the remedial provisions of Section 16(b); and (ii) act in violation of the U.S. Constitution and other governing principles of law to unlawfully extend the jurisdiction of the Commission to ongoing Court proceedings in an attempt to buy peace for the clients of a powerful and well-connected lobbyist. Therefore, the *Proposals* should not be adopted by the Commission.

Date: August 5, 2004

Respectfully submitted,

Jeffrey S. Abraham
Mitchell M.Z. Twersky
**ABRAHAM FRUCHTER & TWERSKY LLP**
One Penn Plaza, Suite 2805
New York, N.Y. 10119
Tel: (212) 279-5050
Fax: (212) 279-3655