# EXHIBIT A

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2005

(Argued: September 15, 2005)                    Last Papers Submitted: February 3, 2006
                                                Decided: June 1, 2006)

Docket No. 04-5295-cv

_____

GREGORY SCHILLER,

*Plaintiff-Appellant,*

PHILIPPE DE VRIES, JULIA FRANCIS DE VRIES, TRUST, HEATHER FAYE DUNBAR DE VRIES,
TRUST, on behalf of themselves and all others similarly situated, DE VRIES FAMILY TRUST,
TRUST, on behalf of themselves and all others similarly situated,

*Plaintiffs,*

–v.–

TOWER SEMICONDUCTOR LTD., IDAN OFER, EHUD HILLMAN, ELI HARARI, N.D. REDDY, MIIN
WU, ISRAEL CORP., ISRAEL CORPORATION TECHNOLOGIES LTD., SANDISK CORPORATION,
MACRONIX INTERNATIONAL, ALLIANCE SEMICONDUCTOR CORPORATION, QUICKLOGIC
CORPORATION, CHALLENGE FUND-ETGAR II,

*Defendants-Appellees.*

_____

Before:
         MINER, WESLEY, *Circuit Judges*, and RAKOFF, *District Judge*.[1]

         Gregory Schiller appeals from a judgment of the United States District Court for the

_____

[1]The Honorable Jed S. Rakoff, United States District Judge for the Southern District of
New York, sitting by designation.

1      Southern District of New York (Wood, J.), granting defendants' motion to dismiss plaintiffs'
2      complaint on the ground that defendant Tower Semiconductor Ltd. is a foreign private issuer
3      exempt from Rule 14(a) of the Securities Exchange Act of 1934 by virtue of Exchange Act Rule
4      3a12-3(b).
5
6          AFFIRMED.
7
8                   _____
9
10             LAWRENCE D. LEVIT (Jeffrey S. Abraham, *on the brief*), Abraham, Fruchter &
11                  Twersky, LLP, New York, NY; Mark D. Stern, P.C. Somerville, MA, *for*
12                  *Plaintiff-Appellant*.
13
14             SCOTT MUSOFF (Jay B. Kasner, Scott D. Musoff, *on the brief*),
15                  Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, *for*
16                  *Defendants-Appellees Tower Semiconductor Ltd., Idan Ofer, Ehud*
17                  *Hillman, Eli Harari, N.D. Reddy, and Miin Wu*.
18
19             DANIEL L. CANTOR (Michael R. Patrick, *on the brief*), O'Melveny & Myers LLP,
20                  New York, NY, *for Defendants-Appellees Israel Corporation, Israel*
21                  *Corporation, Technologies Ltd., SanDisk Corporation and Alliance*
22                  *Semiconductor Corporation*.
23
24             DOUGLAS CLARK, Wilson, Sonsini Goodrich & Rosati, P.C., Palo Alto, CA, *for*
25                  *Defendant-Appellee QuickLogic Corporation*.
26                   _____
27
28      WESLEY, *Circuit Judge*:

29          This case pits an old law against a "novel" argument.[2]  Gregory Schiller ("Schiller")

30      individually appeals the dismissal of a shareholder class action complaint filed against Tower

31      Semiconductor Ltd. ("Tower"), its directors, and certain Tower investors.  The complaint alleges

32      that a Tower proxy statement issued by defendants was materially misleading and therefore

---

         [2]"Novel" is the adjective Judge Kimba Wood used to describe the issue that we are
presented with here on appeal in her order dismissing the appellant's claims.  *Philippe De Vries
v. Tower Semiconductor Ltd.*, No. 03-civ-4999 (S.D.N.Y. August 19, 2004).

1    violated §§ 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C.

2    §§ 78n(a), 78t, and certain regulations, including Rule 14a-9, 17 C.F.R. § 240.14a-9 (2004)

3    ("Rule 14a-9"). The United States District Court for the Southern District of New York (Wood,

4    J.) dismissed the complaint on the ground that Tower, an Israeli corporation, was a foreign

5    private issuer and therefore exempt from the strictures of § 14(a) by virtue of Exchange Act Rule

6    3a12-3, 17 C.F.R. § 240.3a12-3 (2004) ("Rule 3a12-3"). In so doing, the district court rejected

7    the plaintiffs' claim that the Securities Exchange Commission ("SEC" or "the Commission")

8    exceeded its authority in promulgating Rule 3a12-3. We affirm.

9                                            **Background**

10    As the facts of this case are not particularly relevant to the disposition of this appeal, we

11    offer only those necessary to provide context to Schiller's claims. In the year 2000, Tower began

12    to secure financing for the construction of a semiconductor fabrication facility ("Fab 2") in Israel.

13    To this end, Tower entered into agreements with two sets of companies (collectively "Fab 2

14    Investors"), which agreed to provide Tower with approximately $305 million in financing in

15    exchange for stock and credits toward the purchase of semiconductors. The agreements divided

16    the total promised financing into installments and conditioned the payment of each installment

17    upon the attainment of a different construction milestone. At the beginning of 2001, Tower

18    further contracted with two Israeli banks to borrow $550 million for the construction project.

19    This loan was conditioned on Tower's ability to comply with a timeline for raising $103 million

20    in additional financing.

21    On March 31, 2002, Tower distributed a proxy statement disclosing that it was currently

3

1    negotiating with the Israeli banks to reschedule the date by which it had to meet its next

2    financing obligation. The proxy statement sought shareholder approval of a plan under which the

3    Fab 2 Investors would accelerate certain installments of their $305 million commitment without

4    regard to the attainment of the corresponding construction milestones in return for seven million

5    shares of Tower stock. The proxy statement explained that once the installments were

6    accelerated, the banks would postpone the date by which Tower had to meet its next financing

7    obligation until the end of July 2002. Tower believed that the plan would "permit us to better

8    pursue our efforts to bring strategic investors and to raise other funding."

9    While the plan received the necessary votes for approval, not all Tower shareholders were

10   content with the arrangement. Schiller and others voiced their objection by filing a class action

11   in the district court. The complaint alleged that Tower's proxy statement was false and

12   misleading in violation of § 14(a) and Rule 14a-9 and that the Fab 2 Investors and certain

13   members of Tower's board of directors, as control persons, were liable under § 20(a) of the

14   Exchange Act, 15 U.S.C. § 78t. In particular, the complaint alleged that there was no need for

15   the Fab 2 Investors to accelerate the installments of its $305 million commitment because the

16   construction of Fab 2 was on schedule, and therefore it was expected that the construction

17   milestones, upon which the installment payments were conditioned, would be attained. Further,

18   Schiller and his fellow plaintiffs contended that "because the Fab 2 project was proceeding on

19   schedule, and because the [construction milestones] were going to be met in a timely manner, the

20   advancement of the payment date had no value and was not a reason for the [b]anks to defer the

21   dates by which additional financing needed to be obtained."

4

1        Defendants mounted a straightforward defense. They argued that Tower is a foreign

2   private issuer and therefore that Rule 3a12-3 removes them from the reach of § 14(a). While

3   plaintiffs contested defendants' characterization of Tower as a foreign private issuer, the district

4   court easily dismissed this argument by pointing out that Tower's capital is located in Israel and

5   that Tower's principal lenders are Israeli banks; the district court also relied on the fact that

6   Tower had filed with the Commission annual reports reserved solely for foreign private issuers.

7   As an alternative argument, plaintiffs challenged the validity of Rule 3a12-3, contending, as

8   Schiller does on appeal, that Rule 3a12-3 exceeds the Commission's exemptive authority under

9   the Exchange Act. The district court explained that "Congress has authorized the SEC to create

10  certain exemptions through rules and regulations, so long as those exemptions are in the public

11  interest and protect investors," and that it could not say that Rule 3a12-3 is "arbitrary,

12  capricious, or manifestly contrary to the statute." We agree.

13                                       **Discussion**

14       Section 14(a) of the Exchange Act bars the dissemination of proxy statements "in

15  contravention of such rules and regulations as the Commission may prescribe as necessary or

16  appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78n(a). Rule

17  14a-9 provides that proxy statements are not to be "false or misleading with respect to any

18  material fact." 17 C.F.R. § 240.14a-9(a). By its own terms, however, § 14(a) does not apply to

19  "exempted securit[ies]." Section 3(a)(12)(A)(vii) of the Exchange Act defines "exempted

20  securit[ies]" as including

21          such other securities . . . as the Commission may, by such rules and regulations as it
22          deems consistent with the public interest and the protection of investors, either

                                          5

1      unconditionally or upon specified terms and conditions or for stated periods, exempt
2      from the operation of any one or more provisions of this chapter which by their terms
3      do not apply to an "exempted security" or to "exempted securities."
4
5          The rule exempting foreign private issuers from § 14(a) is nearly as old as § 14(a) itself.

6    The Commission originally promulgated Rule 3a12-3 in 1935, one year after Congress enacted

7    the Exchange Act.[3] At that time, the only source for the SEC's authority to promulgate such a

8    rule was the combined force of § 14(a) and § 3(a)(12)(A)(vii). Thus, when the Commission

9    originally adopted Rule 3a12-3 in 1935, pursuant to its statutory mandate, it explicitly stated that

10   it "deem[ed] it necessary and appropriate in the public interest and for the protection of

11   investors" to adopt the exemption for foreign private issuers. SEC Rule AN 18, Exchange Act

12   Release No. 412 (Nov. 6, 1935), 1935 WL 29303, at *1. It explained that at that time "there

---

[3]The current version of Rule 3a12-3 provides that "[s]ecurities registered by a foreign private issuer, as defined in Rule 3b-4 (§ 240.3b-4 of this chapter), shall be exempt from section[] 14(a) . . . of the [Exchange] Act." 17 C.F.R. § 240.3a12-3(b). The term "foreign private issuer" is defined as

> any foreign issuer other than a foreign government except an issuer meeting the following conditions:
>
> (1) More than 50 percent of the issuer's outstanding voting securities are directly or indirectly held of record by residents of the United States; and
>
> (2) Any of the following:
>
> (i) The majority of the executive officers or directors are United States citizens or residents;
> (ii) More than 50 percent of the assets of the issuer are located in the United States; or
> (iii) The business of the issuer is administered principally in the United States.

17 C.F.R. § 240.3b-4(c) (2004).

1    [were] relatively few stock issues of foreign issuers listed on American exchanges" and that "a

2    realistic approach ha[d] led to the conclusion that the interests of American investors will be best

3    served by the continuance of these exemptions." SEC Rule AN 18, Exchange Act Release No.

4    412 (Nov. 6, 1935), 1935 WL 29303, at *1.

5          In 1964, Congress amended the Exchange Act by adding § 12(g), which extended

6    registration requirements to companies not listed on any exchange but whose assets and

7    shareholders exceed in number certain statutory limitations. *See* Securities Acts Amendments of

8    1964, Pub. L. No. 88-467, § 2, 78 Stat. 565, 566-68 (1964) (codified at 15 U.S.C. § 78*l*(g))

9    ("1964 Amendments"). At the same time, Congress enacted § 12(h), which authorizes the SEC

10   to create exemptions from a number of provisions of the Exchange Act, including § 14, "if the

11   Commission finds, by reason of the number of public investors, amount of trading interest in the

12   securities, the nature and extent of the activities of the issuer, income or assets of the issuer, or

13   otherwise, that such action is not inconsistent with the public interest or the protection of

14   investors." *Id.* at 568 (codified at 15 U.S.C. § 78*l*(h)).

15         In 1966, the SEC amended Rule 3a12-3. Although preserving much of the 1935 version

16   of the rule, the SEC withdrew the exemption from § 14 and § 16 for securities of foreign private

17   issuers with significant ties to the United States.[4] Registration of Foreign Securities, 30 Fed.

18   Reg. 14,737, 14,738-39 (Nov. 27, 1965). The SEC adopted this amended rule after conducting a

_____

[4]In particular, the exemption was made inapplicable "if more than 50 percent of the outstanding voting securities are held by United States residents and the business of the issuer is administered principally in the United States or 50 percent or more of the members of the Board of Directors are residents of the United States." Exemption of Certain Foreign Issuers, 31 Fed. Reg. 6705, 6705 (May 5, 1966).

7

1    study in which the Commission

2        [considered] the extent of the trading market for foreign securities in the United
3        States, the disclosure and reporting requirements and practices in many of the
4        countries whose issuers have securities traded in the United States, the requirements
5        of many leading foreign stock exchanges, and the nature of the information presently
6        furnished to the Commission by foreign issuers having securities registered under the
7        Securities Act of 1933, having securities listed on a national securities exchange, and
8        those for whose securities ADR's [American Depository Receipts] have been issued.
9

10   *Id.* The Commission has amended Rule 3a12-3 since 1966. *See, e.g.*, Exchange Act Release No.

11   16,371, 1979 WL 169934, at *10 (Nov. 29, 1979). Nevertheless, Schiller focuses on the 1966

12   version of the rule, which he characterizes as "the current version of the relevant exemption."[5]

13       As noted above, Schiller does not appeal the district court's determination that Tower is a

14   foreign private issuer for purposes of Rule 3a12-3 but rather challenges the validity of Rule 3a12-

15   3 itself. In our opinion, this challenge consists of both a substantive and procedural component.

16   Schiller argues that in light of § 12(h), the Commission was unable to justify Rule 3a12-3 —

17   what Schiller refers to as a "blanket exemption" from the proxy solicitation rules — because such

18   an exemption exceeds the Commission's authority. Schiller also argues that even if the

19   Commission could have provided an adequate justification for Rule 3a12-3, it did not.

_____

    [5]Presumably because Schiller assumes that the rule was last substantively amended in
1966, his brief makes only a passing reference to the "general exemptive authority" provision
that was added to the Exchange Act in 1996. National Securities Markets Improvement Act of
1996, Pub. L. No. 104-290, § 105(b), 110 Stat. 3416, 3424 (codified at 15 U.S.C. § 78mm(a)(1)).
Using language similar to that of the two other exemptive authority provisions, the general
exemptive authority provision authorizes the Commission to exempt by "rule, regulation, or
order, any person, security, or transaction, or any class or classes of persons, securities, or
transactions, from any provision or provisions of this title or of any rule or regulation thereunder,
to the extent that such exemption is necessary or appropriate in the public interest, and is
consistent with the protection of investors." *Id.*

8

1    Specifically, Schiller contends that the last time the rule was substantively amended, in 1966, the

2    Commission failed to comply with § 12(h)'s requirements, including the requirement that the

3    Commission make a finding that an exemption is not inconsistent with the protection of

4    investors.

5        I. Two Preliminary Issues

6        We begin our analysis of Schiller's claims by noting that our authority to review the

7    Commission's adoption of Rule 3a12-3 does not derive from the Securities Exchange Act but

8    rather from the Administrative Procedure Act ("APA"). To be sure, § 25 of the Exchange Act

9    provides for judicial review of rules promulgated pursuant to §§ 78f, 78i(h)(2), 78k, 78k-1,

10   78o(c)(5) or (6), 78o-3, 78q, 78q-1, or 78s of Title 15. 15 U.S.C. § 78y(b)(1). This judicial

11   review provision makes no mention, however, of rules promulgated pursuant to §

12   3(a)(12)(A)(vii) (codified at 15 U.S.C. § 78c) or § 12(h) (codified at 15 U.S.C. § 78*l*), the two

13   sections of the Exchange Act that authorize the Commission to create exemptions like Rule

14   3a12-3. Nevertheless, in the absence of authorization of "special statutory review" under the

15   Exchange Act, there is still "general statutory review" under the APA, *see generally* PETER L.

16   STRAUSS, TODD D. RAKOFF & CYNTHIA R. FARINA, ADMINISTRATIVE LAW 1101, 1104-06

17   (2003), which authorizes us to review "final agency action for which there is no other adequate

18   remedy in a court," 5 U.S.C. § 704. That our authority to review Rule 3a12-3 derives from the

19   APA and not the Exchange Act is relevant to our analysis of the Commission's arguments,

9

1    advanced in its amicus brief,[6] for why we should avoid reaching the merits of Schiller's claim.

2        A. *Statute of Limitations*

3          The Commission argues that, at its core, Schiller's claim amounts to nothing more than

4    an allegation of a procedural defect in the Commission's adoption of Rule 3a12-3 and that such

5    procedural challenges must be brought within the relevant statutory time period following

6    promulgation of the rule.[7] In support of its argument, the Commission relies upon a line of

7    precedent in the D.C. Circuit making the applicability of statutory limitation periods to claims

8    challenging agency action dependent upon whether the challenge is procedural or substantive in

9    nature. The D.C. Circuit has explained that while substantive challenges to agency action — for

10    example, claims that agency action is unconstitutional, that it exceeds the scope of the agency's

11    substantive authority, or that it is premised on an erroneous interpretation of a statutory term —

12    have no time bars, "challenges to the *procedural lineage of agency regulations*, whether raised

13    by direct appeal, by petition for amendment or rescission of the regulation or as a defense to an

14    agency enforcement proceeding, will not be entertained outside the [time] period provided by

---

[6]On January 10, 2006, responding to our request, the Commission filed an amicus brief in opposition to Schiller's position. On February 3, 2006, Schiller filed a reply to the Commission's amicus brief.

[7]Although the Commission does not specify what statute it thinks might impose a time bar in this case, we assume that it has in mind 28 U.S.C. § 2401(a), the six-year "catch-all statute of limitations for federal claims" that we have previously found applicable to procedural challenges to agency action brought under the APA. See *Polanco v. U.S. Drug Enforcement Admin.*, 158 F.3d 647, 652 (2d Cir. 1998). To be sure, § 25 of the Exchange Act also provides that review shall be conducted within "sixty days after the promulgation of the rule," 15 U.S.C. § 78y(b)(1); but that statute of limitations provision only applies if review is sought under § 25 itself, and for reasons already articulated, our review of Rule 3a12-3 must derive from the APA, not from § 25 of the Exchange Act.

1    statute." *JEM Broad. Co. v. FCC*, 22 F.3d 320, 325 (D.C. Cir. 1994). Underlying the statutory

2    limitations period is a concern for the agency's interest in prompt review and the public's settled

3    expectations regarding agency action. *Id.* While an agency's ultra vires or unconstitutional act

4    might outweigh these policy concerns and therefore justify reaching an otherwise time-barred

5    challenge to agency action, a mere procedural defect does not. *Id.* Accordingly, in *JEM*

6    *Broadcasting*, the D.C. Circuit found that the plaintiff was time-barred from asserting a claim,

7    brought outside of the statutory limitations period, that the FCC's promulgation of certain rules

8    failed to provide for notice and comment rulemaking in violation of the APA.

9        In the present case, Schiller asserts that his challenge should not be time-barred because it

10   is substantive, not procedural. As noted above, there does indeed seem to be a substantive

11   component to Schiller's claim. Schiller argues that § 12(h) does not authorize Rule 3a12-3,

12   which Schiller refers to as a "blanket exemption" from the proxy rules. However, Schiller's

13   principal argument — that "the SEC failed to comply with the statutory requirement of making a

14   finding" — appears to be inherently procedural. To be sure, Schiller focuses on procedures

15   created by the Exchange Act, not by the APA. But the policy concerns motivating the D.C.

16   Circuit's rule would appear to support barring procedural challenges regardless of what statute

17   creates the allegedly deficient procedure.

18       Ultimately, however, we are under no obligation to resolve the issue of whether Schiller's

19   claim is time-barred. Because defendants failed to include this statute-of-limitations defense in

20   their answer to the plaintiff's complaint, we at least have the discretion, and might even be

21   required under Federal Rule of Civil Procedure §§ 8(c), 12(b), and 15(a), to consider the

11

1    argument forfeited. *Cf. Day v. McDonough*, ___ U.S. ___, 126 S. Ct. 1675, 1684 (2006)

2    (holding, in the context of a habeas corpus petition, that it is within the discretion of the courts to

3    either raise a statute of limitations defense on their own motion or to declare such a defense

4    forfeited); *id.* at 1683 (noting that "[u]nder the Civil Procedure Rules, a defendant forfeits a

5    statute of limitations defense, *see* Fed. Rule Civ. Proc. 8(c), not asserted in its answer, *see* Rule

6    12(b), or an amendment thereto, *see* Rule 15(a)"). Although we requested that the Commission

7    submit an amicus brief concerning the merits of Schiller's challenge to Rule 3a12-3's validity,

8    we did not ask for briefing on the issue of whether Schiller's claim was time-barred, and what

9    briefing the parties did provide of their own accord regarding this issue is scant to say the least.

10    *See Concourse Rehab. & Nursing Ctr., Inc. v. DeBuono*, 179 F.3d 38, 47 (2d Cir. 1999)

11    (declining to address argument raised for the first time in an appellate amicus brief).

12    Accordingly, we decline to address this issue.

13        B. *Primary Jurisdiction*

14        The Commission also argues that the doctrine of primary jurisdiction requires Schiller to

15    have brought his challenge first to the Commission before proceeding to the district court. Even

16    assuming that the issue of primary jurisdiction is one that we can raise on our own motion, *see*

17    *Pharm. Research and Mfrs. of Am. v. Walsh*, 538 U.S. 644, 674 (2003) (Breyer, J., concurring),

18    we do not find the doctrine applicable here.

19        The Exchange Act does not contain a "primary jurisdiction" provision that would control

20    in this case, although it does provide that "[n]o objection to an order or rule of the Commission,

21    *for which review is sought under [§ 25 of the Exchange Act]*, may be considered by the court

1      unless it was urged before the Commission or there was reasonable ground for failure to do so."

2      15 U.S.C. § 78y(c)(1) (emphasis added). Once again, § 25 does not provide for judicial review

3      of rules promulgated pursuant to any of the Exchange Act sections authorizing the Commission

4      to create exemptions. Thus, cases that involve an organic statute requiring a litigant to bring his

5      claim first to the agency before filing a complaint in court are distinguishable. *See, e.g., City of*

6      *Peoria v. Gen. Elec. Cablevision Corp.*, 690 F.2d 116 (7th Cir. 1982).

7           Even when primary jurisdiction is not statutorily required, however, courts may still apply

8      the doctrine as a prudential matter. *See S. Utah Wilderness Alliance v. Bureau of Land Mgmt.*,

9      425 F.3d 735, 750 (10th Cir. 2005) ("Primary jurisdiction is a prudential doctrine designed to

10    allocate authority between courts and administrative agencies."). Although "[n]o fixed formula

11    exists for applying the doctrine of primary jurisdiction," *United States v. W. Pac. R.R. Co.*, 352

12    U.S. 59, 64 (1956), we have generally considered four factors:

13          (1) whether the question at issue is within the conventional experience of judges or
14          whether it involves technical or policy considerations within the agency's particular
15          field of expertise;
16          (2) whether the question at issue is particularly within the agency's discretion;
17          (3) whether there exists a substantial danger of inconsistent rulings; and
18          (4) whether a prior application to the agency has been made,
19
20    *Ellis v. Tribune Television Co.*, 443 F.3d 71, 82-83 (2d Cir. 2006) (citing *Nat'l Commc'ns Ass'n.,*

21    *Inc. v. AT&T Co.*, 46 F.3d 220, 222 (2d Cir. 1995)).

22         The question in the present case — whether the Commission complied with its statutory

23    mandate in promulgating Rule 3a12-3 — does not involve technical or policy considerations

24    within the agency's particular field of expertise but instead simply requires us to engage in an

25    activity — statutory interpretation — that is the daily fare of federal judges. *Cf. Baltimore &*

1    *Ohio Chicago Terminal R.R. Co. v. Wisconsin Cent. Ltd.*, 154 F.3d 404, 411 (7th Cir. 1998)

2    (stating that the doctrine of primary jurisdiction does not extend to pure issues of law). Further,

3    the question presented does not fall particularly within the agency's discretion. For obvious

4    reasons, whether an agency has ignored its statutory mandate is a question for the judiciary, not

5    the agency, to address; this remains true even though in answering the question presented, we

6    might defer to an agency's interpretation of the statute it administers. Because the Commission

7    would normally not be expected to rule on whether it had exceeded its own statutory authority,

8    we likewise do not have to worry about inconsistent rulings. Finally, we note that although the

9    party challenging the agency action (in this case, Schiller) made no prior application to the

10   agency, a fact that would normally weigh against primary jurisdiction, in this case such a fact

11   seems simply irrelevant, given that the question presented is not one that the Commission would

12   be expected to decide. Because three of the four factors weigh against primary jurisdiction in

13   this case — and the fourth turns out to be irrelevant — we conclude that this matter should not be

14   referred to the Commission.[8] We therefore turn to the merits and address Schiller's substantive

---

[8]We recognize that courts have on occasion observed that the agency itself must be joined as a proper party defendant in a judicial proceeding reviewing the validity of an agency rule. *See, e.g.*, *City of Peoria*, 690 F.2d at 119-21; *GTE South, Inc. v. Morrison*, 199 F.3d 733, 743 (4th Cir. 1999) ("Congress would not give a court the power to determine the validity of an agency's rules when the agency itself is not a party."). Nevertheless, we have in the past chosen to review the validity of agency rules — including Commission rules — without requiring the agency to be a party to the case. *See, e.g.*, *Feder v. Martin Marietta Corp.*, 406 F.2d 260, 268 (2d Cir. 1969); *B.T. Babbitt, Inc. v. Lachner*, 332 F.2d 255, 259 (2d Cir. 1964); *cf. United States v. Chestman*, 947 F.2d 551 (2d Cir. 1991) (en banc) (addressing whether the SEC exceeded its statutory authority in promulgating Rule 10b-5 even though the agency was not a party in the underlying federal criminal proceeding involving insider trading). We therefore do not think that the fact that the agency is not a party to the litigation prevents our consideration of the validity of Rule 3a12-3, especially where, as here, the Commission has taken the opportunity to submit an amicus

14

1    and procedural challenges to Rule 3a12-3.

2         II. The Merits

3         A. *Substantive Challenge*

4         Schiller's substantive challenge focuses on the common language used in the two

5    Exchange Act sections — § 12(h) and § 3(a)(12)(A)(vii) — granting the Commission authority

6    to create exemptions to § 14(a). Both contain language to the effect that any exemption that the

7    Commission adopts must be consistent with the public interest and the protection of investors.

8    Schiller insists that this language means that the Commission may not sacrifice *any* investor

9    protection, regardless of the public interest an exemption might serve. In essence, Schiller argues

10   that in order to adopt an exemption to the Exchange Act, the Commission must determine that

11   the exemption does not decrease the level of protection afforded investors in the absence of *any*

12   exemptions. Because Rule 3a12-3 decreases investor protection, Schiller argues, it exceeds the

13   Commission's exemptive authority.

14        Schiller's interpretation finds support in neither the text nor in basic principles of logic.

15   Nowhere does § 12(h) or § 3(a)(12)(A)(iii) purport to establish a minimum acceptable level of

16   investor protection, let alone a level equal to that imaginable in a parallel universe where the

17   securities laws and regulations exist in a form unadulterated by exemptions. Indeed, § 12(h)

18   explicitly provides that in deciding whether an exemption is appropriate, the Commission may

19   consider factors such as "the number of public investors, amount of trading interest in the

20   securities, the nature and extent of the activities of the issuer, [and] income or assets of the

brief defending its actions.

1    issuer." 15 U.S.C. § 78*l*(h). Had Congress intended to restrain the Commission from adopting

2    exemptions that would sacrifice any investor protection for the sake of other public-interest

3    considerations, then these factors, which clearly are proper considerations for the Commission to

4    take into account, would be entirely irrelevant. Moreover, the fact that § 12(h) provides a non-

5    exclusive list of the factors that might enter the Commission's calculus, as evidenced by the

6    phrase "or otherwise," *id.*, strongly suggests that rather than constrain the Commission's

7    exemptive authority, Congress intended to grant the Commission considerable regulatory

8    discretion in this area. Indeed, when it enacted § 12(h), Congress indicated its understanding that

9    the new section provided the Commission with both "flexibility" and "ample authority to modify,

10   and provide exemptions from, the statutory requirements [of the Exchange Act]." Federal

11   Securities Laws: Legislative History 1869 (Fed. Bar Assoc. Sec. Law Comm., 1983); *see also*

12   LOSS & SELIGMAN, SECURITIES REGULATION 1813 (3d ed. 1989) ("Perhaps of greatest

13   significance . . . is the fact that § 12(h), which Congress accepted just as the Commission drafted

14   it, reflects a recognition that it might be necessary to administer the [Exchange] Act with respect

15   to over-the-counter securities more flexibly than had been necessary for listed securities.").

16          Additionally, Schiller's reading of the two statutory provisions simply belies simple logic.

17   The practical effect of an exemption — which, after all, renders protections that would otherwise

18   be in force inapplicable with respect to a particular class of securities or issuers — is, everything

19   else being equal, a decrease in the net level of investor protection. Therefore, the prohibition of

20   any decrease in the level of investor protection would at the very least substantially curtail, if not

16

1    completely eviscerate, the Commission's exemptive authority.[9] Such an effect is clearly at odds

2    with the congressional intent to grant the Commission flexibility in adopting exemptions. We

3    therefore conclude that the most plausible reading of § 12(h), 15 U.S.C. § 78*l*(h), and §

4    3(a)(12)(A)(vii), 15 U.S.C. § 78c(a)(12)(A)(vii), is that the Commission can promulgate an

5    exemption once it has determined that the exemption serves the public interest while at the same

6    time leaving in place adequate investor protections.

7        B. *Procedural Challenge*

8        The gist of Schiller's procedural challenge is that in promulgating Rule 3a12-3, the

9    Commission failed to follow certain procedures required by § 12(h). In particular, Schiller

10   contends that the Commission was required to make a formal finding that the exemption was not

11   inconsistent with the public interest or the protection of investors. That an agency must engage

12   in reasoned decisionmaking is not by any means a novel proposition. With respect to informal

13   rulemakings — those, like the one that gave rise to Rule 3a12-3, that are not required by the

14   organic statute to be undertaken "on the record" — the APA requires that the agency

_____

        [9]Schiller suggests that his interpretation would only curtail — not eviscerate — the
Commission's exemptive authority because "there are some requirements of rules promulgated
under [§] 14 from which a foreign private issuer could be exempted without adversely impacting
the protections provided investors." As examples, Schiller points to rules regarding the type of
information to be furnished to shareholders or the presentation of the information in a proxy
statement. In light of the fact that the securities laws seek to protect investors through disclosure
of information, we fail to understand how one could limit the application of rules defining the
content and form of the information to be disclosed without altering the level of protection
afforded investors. But even assuming that one could carry out such an unlikely feat, the fact
remains that § 12(h) does not state that the Commission may only create exemptions to certain
rules promulgated pursuant to §§ 12(g), 13, 14, 15(d) and 16 but rather states that the
Commission may exempt issuers from the provisions of these sections themselves. *See* § 15
U.S.C. 78*l*(h) (citing 15 U.S.C. §§ 78*l*(g), 78m, 78n, 78o(d), and 78p).

1    "incorporate in the rules adopted a concise general statement of their basis and purpose." 5

2    U.S.C. § 553(c); *see also Indep. U.S. Tanker Owners Comm. v. Dole*, 809 F.2d 847, 852 (D.C.

3    Cir. 1987) ("Under the Administrative Procedure Act, when an agency initiates a rulemaking that

4    the governing statute does not require to be undertaken 'on the record,' the agency is nonetheless

5    bound to comply with the requirements for 'notice and comment' rulemaking set out in 5 U.S.C.

6    § 553 (1982)."). The agency must provide such a statement whenever it adopts "'new rules that

7    *work substantive changes*'" or, as the Commission did in the 1966 amendment to Rule 3a12-3,

8    adopt "'*major substantive legal addition[s]*' to prior regulations." *U.S. Telecom Ass'n v. FCC*,

9    400 F.3d 29, 34 (D.C. Cir. 2005) (quoting *Sprint Corp. v. FCC*, 315 F.3d 369, 374 (D.C. Cir.

10   2003) and *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1024 (D.C. Cir. 2000)) (brackets and

11   emphasis in *U.S. Telecom Ass'n*).[10] We have explained that the statement of basis and purpose

12   provision "does not require the agency to supply specific and detailed findings and conclusions

13   of the kind customarily associated with formal proceedings," but rather requires the agency to

14   "publish a statement of reasons that will be sufficiently detailed to permit judicial review." *Nat'l*

15   *Nutritional Foods Ass'n v. Weinberger*, 512 F.2d 688, 701 (2d Cir. 1975).

_____

[10]It is not clear whether an agency must follow APA procedures with respect to that part of an amended rule that does not undergo any change. *Cf. United States v. Garner*, 767 F.2d 104, 119 (5th Cir. 1985) (assuming for the sake of argument that a regulation merely reaffirming prior policy and practice need not conform strictly to § 553(c)'s requirement of a statement of basis and purpose). Nevertheless, we need not, and do not, address this argument because no party has raised it. We assume that when it adopted the 1966 amendment, the Commission did have to follow all APA procedural requirements — including the requirement that the Commission publish a statement of basis and purpose — even with respect to that portion of the foreign private issuer exemption that did not change from 1935 to 1966. Since the Commission prevails even under this assumption, there is no reason to decide whether an agency must follow APA procedures with respect to the reaffirmation of prior policy.

1    Nevertheless, Congress may require an even more detailed statement of basis and

2    purpose, and Schiller claims that Congress did precisely that in enacting § 12(h). Section 12(h)

3    provides:

4    The Commission may by rules and regulations, or upon application of an interested
5    person, by order, after notice and opportunity for hearing, exempt in whole or in part
6    any issuer or class of issuers from the provisions of subsection (g) of this section or
7    from Section 13, 14, or 15(d) of this title or may be exempt from Section 16 of this
8    title any officer, director, or beneficial owner of securities of any issuer, any security
9    of which is required to be registered pursuant to subsection (g) hereof, upon such
10   terms and conditions and for such period as it deems necessary or appropriate, *if the*
11   *Commission finds, by reason of the number of public investors, amount of trading*
12   *interest in the securities, the nature and extent of the activities of the issuer, income*
13   *or assets of the issuer, or otherwise, that such action is not inconsistent with the*
14   *public interest or the protection of investors*. The Commission may, for the purposes
15   of any of the above-mentioned sections or subsections of this chapter, classify issuers
16   and prescribe requirements appropriate for each such class.
17
18   *Id.* 78 Stat. at 568 (codified at 15 U.S.C. § 78*l*(h)) (emphasis added). As already noted, prior to

19   Congress's enactment of § 12(h), 15 U.S.C. § 78*l*(h), in 1964, the Commission's authority to

20   create exemptions to § 14(a), 15 U.S.C. § 78n(a), derived from the combined effect of § 14(a) —

21   the terms of which do not apply to an "exempted security" — and § 3(a)(12)(A)(vii), 15 U.S.C. §

22   78c(a)(12)(A)(vii), which defines "exempted security" as

23   such other securities . . . as the Commission may, by such rules and regulations as it
24   deems consistent with the public interest and the protection of investors, either
25   unconditionally or upon specified terms and conditions or for stated periods, exempt
26   from the operation of any one or more provisions of this chapter which by their terms
27   do not apply to an "exempted security" or to "exempted securities."
28
29   Section 12(h) enlarged upon the Commission's exemptive authority in § 3(a)(12)(A)(vii)

19

1   in two principal ways.[11] First, § 12(h) permitted the Commission to act by exemptive order on a

2   case-by-case basis rather than solely by rule or regulation.[12] Commentators have suggested that

3   this expansion of the method employed by the Commission to adopt exemptions is § 12(h)'s

4   "primary use." LOSS & SELIGMAN, *supra*, at 1814. Second, § 12(h) provided the Commission

5   with the authority to exempt issuers of listed securities from sections of the Exchange Act with

6   respect to which the Commission previously lacked any exemptive authority, regardless of the

7   method used. Prior to the passage of § 12(h), the sections of the Exchange Act that, by their

8   terms, did not apply to "exempted securities" included §§ 7(a), 7(c)(1), 9, 11(d), 12(a), 12(g),

9   14(a) and 16. *See* Richard M. Phillips & Morgan Shipman, *An Analysis of the Securities Acts*

10  *Amendments of 1964*, 1964 DUKE L. J. 706, 746 n.139 (1964). As noted above, §

11  3(a)(12)(A)(vii) delegated to the Commission the power to determine which securities would be

12  exempt from these provisions. But § 12(h) extended the Commission's exemptive authority with

13  respect to § 13 and the entirety of § 14. In addition, it removed any doubt concerning the

14  Commission's exemptive authority with respect to §§ 15(d) and 16(b).[13]

---

[11]A third obvious difference between the two sources of exemptive authority is that the authority in § 12(h) is to exempt *issuers* rather than *securities* as in § 3(a)(12)(A)(vii). However, this "seems of no particular significance" because any exemption with respect to securities can be recast as an exemption with respect to issuers and vice versa. LOSS & SELIGMAN, *supra*, at 1812.

[12]Some have argued that the Commission already possessed the authority to issue exemptive orders and that § 12(h) simply clarified this authority. *See, e.g.*, Richard M. Phillips & Morgan Shipman, *An Analysis of the Securities Acts Amendments of 1964*, 1964 DUKE L. J. 706, 746 n.140 (1964).

[13]*See* Phillips & Shipman, *supra*, at 747 n.141. Before the 1964 Amendments, § 15(d) by its own terms did not apply to "any other security which the Commission may by rules and

20

1        In drafting § 12(h), however, Congress did not distinguish between the new grant of

2    authority to act by exemptive order and the *expansion* of previously held exemptive authority to

3    act by rule or regulation. Instead, Congress stated that the Commission may act by *either* method

4    to create exemptions from the five listed Exchange Act sections. Because prior to passage of §

5    12(h) the Commission could already act by rule or regulation to create exemptions from § 14(a),

6    Congress created an overlap between the coverage of § 3(a)(12)(A)(vii) and § 12(h). It is

7    precisely this overlap that Schiller attempts to exploit to his advantage in this case.

8        Drawing our attention to the differences in language between § 3(a)(12)(A)(vii) and §

9    12(h), Schiller urges us to find that § 12(h) requires the Commission, when adopting exemptions

10   to § 14(a), to follow certain procedures that are absent from § 3(a)(12)(A)(vii). According to

11   Schiller, when read in conjunction with § 3(a)(12)(A)(vii), § 12(h) introduces three innovations.

12   First, Schiller contends that the omission of the term "unconditionally" in § 12(h) and the

13   retaining of the phrases "upon terms and conditions" and "for such period as the SEC deems

14   necessary or appropriate" authorizes only exemptions that expire after a stated, "reasonable[]"

15   time period. Second, Schiller argues that the added language in § 12(h) requires the SEC to

16   consider three factors: (i) the number of public investors; (ii) the amount of trading interest in the

17   securities; and (iii) the nature and extent of the activities of the issuer, income or assets of the

18   issuer. Finally, Schiller focuses most of his energy on the replacement of the word "deems" in §

19   3(a)(12)(A)(vii) with the word "finds" in § 12(h), a change that, according to Schiller, requires

---

regulations exempt as not comprehended within the purposes [of § 15(d)]." Securities Exchange Act of 1934, §3, Pub. L. No. 74-621, 49 Stat. 1375, 1379 (1936) (current version codified at 15 U.S.C. §78o(d) (2000)).

21

1    the Commission to make not simply a mental determination but rather a specific, published

2    finding that an exemption such as Rule 3a12-3 is not inconsistent with the protection of

3    investors.

4        Even if we were inclined to read § 12(h) in light of § 3(a)(12)(A)(vii), Schiller's reading

5    is not the most compelling interpretation available, let alone the only one. As Schiller himself

6    concedes, the phrase "and for such period that the Commission deems necessary or appropriate"

7    easily incorporates unlimited periods. The all-important phrase "or otherwise" signifies that the

8    three listed reasons for decision are at most merely non-exhaustive illustrations of the types of

9    considerations the Commission might, but is not required to, take into account. Finally, as the

10   Commission points out in its amicus brief, the word "finds" in § 12(h) easily admits of multiple

11   meanings, including not only "to declare" but also "to determine," BLACK'S LAW DICTIONARY

12   504 (4th ed. rev. 1968), which is one of the well-accepted meanings of the word "deems"

13   employed in § 3(a)(12)(A)(vii), BLACK'S LAW DICTIONARY 538 (3d ed. 1933).[14] Thus, the more

---

[14]We also note that, although Congress can certainly require an agency to follow
procedures in addition to those mandated by the APA, Congress generally seems to do so with
more specific language than that used in § 12(h). One instructive example is the Clean Air Act.
"In 1977, Congress — concerned that the Administrative Procedure Act (APA), 5 U.S.C. § 553,
did not provide procedures adequate for the complex scientific issues involved in EPA
rulemaking — created new procedures for most rulemaking under the Clean Air Act . . . ." *Small
Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 518 (D.C. Cir. 1983). Congress
required the EPA to provide in the rules adopted a "statement of basis and purpose," a phrase that
mirrors the language of § 553(c) but for the omission of the qualifiers "concise" and "general."
*Id.* at 519. Congress went on to require that this statement of basis and purpose include specific
items that also must be disclosed at the proposed rule stage as well as "'an explanation of the
reasons for any major changes in the promulgated rule from the proposed rule' and 'a response to
each of the significant comments, criticisms, and new data submitted . . . during the comment
period.'" *Id.* (quoting Clean Air Act § 307(d)(6) (codified at 42 U.S.C. § 7607(d)(6)) (alteration
in *Small Refiner Lead Phase-Down Task Force*)). Similarly, the Federal Trade Commission Act

1    plausible interpretation of § 12(h) is that it means precisely the same thing as § 3(a)(12)(A)(vii):

2    the Commission may create exemptions from § 14(a) unconditionally, provided that it determines

3    that such exemptions are not inconsistent with the public interest and the protection of investors.

4        More fundamentally, Schiller's reading of the statute reflects a misapplication of basic

5    principles of statutory construction. This is not a case where the more specific statute should

6    govern the more general, *see, e.g., Carr v. Marietta Corp.*, 211 F.3d 724, 734 (2d Cir. 2000), for

7    the simple reason that the differences in statutory language that Schiller highlights do not in any

8    meaningful way render § 12(h) more specific than § 3(a)(12)(A)(vii). Schiller's argument gains

9    relatively more traction in light of the rule "requiring a change in language to be read, if

10   possible, to have some effect," *Am. Nat'l Red Cross v. S.G.*, 505 U.S. 247, 263 (1992).

11   However, to make the argument that § 12(h) altered the language of § 3(a)(12)(A)(vii), one must

12   assume that § 12(h) impliedly repealed § 3(a)(12)(A)(vii), and the "'strong judicial policy

13   disfavoring the inference that a statute has been repealed *sub silentio* by subsequent legislation,'

14   *United States v. Shareef*, 634 F.2d 679, 680 (2d Cir. 1980), applies with equal force to claims of

15   implied amendment, *St. Martin Evangelical Lutheran Church v. South Dakota*, 451 U.S. 772,

---

requires that when the Federal Trade Commission promulgates certain rules, the agency's
statement of basis and purpose must include "(A) a statement as to the prevalence of the acts or
practices treated by the rule; (B) a statement as to the manner and context in which such acts or
practices are unfair or deceptive; and (C) a statement as to the economic effect of the rule, taking
into account the effect on small business and consumers." 15 U.S.C. § 57a(d)(1); *see also
Katharine Gibbs Sch. (Inc.) v. FTC*, 612 F.2d 658, 661 (2d Cir. 1979). Had Congress wished to
require the Commission to follow certain specific procedures unique to informal rulemakings
involving proposed exemptions to the Securities Exchange Act, we believe that it would have
done so with more clarity and specificity than that exhibited in Schiller's reading of § 12(h).

1    787-88 (1981)." *Regan v. Ross*, 691 F.2d 81, 87 (2d Cir. 1982). Indeed, "'[i]n the absence of

2    some affirmative showing of an intention to repeal [or to amend a statute], the only permissible

3    justification for a repeal [or amendment] by implication is when the earlier and later statutes are

4    irreconcilable.'" *St. Martin Evangelical Lutheran Church*, 451 U.S. at 788 (quoting *Morton v.*

5    *Mancari*, 417 U.S. 535, 550 (1974)). Because there is no evidence in the statute itself or in the

6    legislative history indicating Congress's intention to amend § 3(a)(12)(A)(vii), we would find

7    that § 12(h) amended that earlier section by implication only if the two provisions are

8    irreconcilable. They most certainly are not, as evidenced by the interpretation that we have

9    adopted.

10    Nor do we think that our reading of § 12(h) — that it authorizes the Commission to create

11    exemptions from § 14(a) unconditionally, provided that it determines that such exemptions are

12    not inconsistent with the public interest and the protection of investors — runs afoul of the canon

13    of statutory construction that "legislative enactments should not be construed to render their

14    provisions mere surplusage." *Dunn v. Commodity Futures Trading Comm'n*, 519 U.S. 465, 472

15    (1997). The Supreme Court has recognized that the "preference for avoiding surplusage

16    constructions is not absolute." *Lamie v. U.S. Tr.*, 540 U.S. 526, 536 (2004) (citing *Chickasaw*

17    *Nation v. United States*, 534 U.S. 84, 94 (2001)). In the present case, this canon of statutory

18    construction seems less significant because any surplusage created is not within a single statutory

19    provision but across statutory provisions located in completely different sections of a larger and

20    extraordinarily complex enactment.

21    In any event, other interpretive rules, where more convincing, can take precedence over

24

1    general principles of statutory construction. *Cf. Krause v. Titleserv, Inc.*, 402 F.3d 119, 128 (2d

2    Cir. 2005) (rejecting argument based on statutory canon of avoiding surplusage because this

3    canon "'should not take precedence over more convincing reasons'" (quoting *Hakala v. Deutsche*

4    *Bank AG*, 343 F.3d 111, 116 (2d Cir. 2003))). In the present case, the text of the statute strongly

5    suggests that Congress did not intend to amend § 3(a)(12)(A)(vii). In particular, § 12(g)(1),

6    which was added to the Exchange Act along with § 12(h) as part of the 1964 Amendments,

7    provides that its registration requirements do not apply to an "exempted security," that is to say, a

8    security exempted under § 3(a)(12)(A)(vii). *See* Securities Acts Amendments of 1964, Pub. L.

9    No. 88-467, § 2, 78 Stat. 565, 566-67 (1964) (codified at 15 U.S.C. §78*l*(g)). Yet, § 12(h) also

10    grants the Commission exemptive authority with respect to § 12(g). *Id.*, 78 Stat. at 568 (codified

11    at 15 U.S.C. § 78*l*(h)). If, as part of the 1964 Amendments, Congress had intended § 12(h) to

12    impliedly amend § 3(a)(12)(A)(vii), it would not have authorized the Commission to rely upon §

13    3(a)(12)(A)(vii) to create exemptions from one of the newly added provisions. We do not think

14    that the avoidance of surplusage should outweigh this  strong textual evidence of Congress's

15    contrary intent. We therefore conclude that § 12(h), 15 U.S.C. § 78*l*(h), does not require the

16    Commission to make a formal finding or follow the other procedures that Schiller advocates.

17          C. *Whether the Commission Provided Adequate Evidence of Reasoned Decisionmaking*

18          Although Schiller's brief is far from clear on the matter, Schiller seems to argue that even

19    if § 12(h) does not require a formal finding, the Commission still must provide reasons for its

20    determination that an exemption is not inconsistent with the public interest or the protection of

21    investors. As explained above, the agency's obligation to engage in reasoned decisionmaking, at

1    least in the context of informal rulemaking, is typically traced to the APA requirement that the

2    agency "incorporate in the rules adopted a concise general statement of their basis and purpose."

3    5 U.S.C. § 553(c). Instead of relying upon § 553, however, Schiller appears to invoke § 12(h) of

4    the Exchange Act as an independent source for the requirement that the agency articulate reasons

5    for its actions.[15] We have already determined that § 12(h) does not mandate a statement of

6    reasons any more detailed or specific than that required by § 553. Accordingly, we have no

7    reason to decide the precise contours of a reasoned decisionmaking requirement derived from §

8    12(h) if the Commission provided an adequate statement of basis and purpose under § 553. We

9    conclude that it did.

10      The adequacy of the Commission's statement in connection with its promulgation of Rule

11   3a12-3 depends in large part upon what we view as the Commission's statement and what level

12   of detail an adequate statement requires. The answer to the first question would seem to be

13   obvious. The plain language of the APA is clear that whatever the statement is, it must at least

14   be incorporated into the adopted rule. *See* 5 U.S.C. § 553(c) (requiring the agency to

15   "incorporate in the rules adopted a concise general statement of their basis and purpose").

16   Nevertheless, in defining the boundaries of what constitutes the statement, courts have taken a

17   functional approach and expressed a willingness to look beyond the four corners of the agency's

18   adopting release. Although post hoc rationalizations are never permitted, a court reviewing the

---

[15]Presumably Schiller chose not to rely on § 553 of the APA because it is an obviously procedural requirement that would be subject to the six-year statute of limitations. *See* Part I, *supra* (discussing the statute of limitations applicable to challenges to agency rules). Apparently, Schiller determined that his only chance of avoiding the statutory limitations period would be an argument based not on the APA but on the organic statute itself.

26

1    adequacy of an agency's statement may take into account "materials made public in the course of

2    rulemaking." *Citizens to Save Spencer County v. EPA*, 600 F.2d 844, 884 (D.C. Cir. 1979)

3    (citing *Automotive Parts & Accessories Ass'n v. Boyd*, 407 F.2d 330, 338 (D.C. Cir. 1968)

4    (finding that the statement of basis and purpose should be considered "in the light of the reasons

5    stated by the Administrator's denial of rehearing")); *see also Ala. Ass'n of Ins. Agents v. Bd. of

6    Governors of Fed. Reserve*, 533 F.2d 224, 236-37 (5th Cir. 1976) (stating that in considering the

7    adequacy of the statement of basis and purpose, the reviewing court should take into

8    consideration "extraneous material which may be available to explain the basis and purpose of

9    the agency action"), *as amended by Ala. Ass'n of Ins. Agents v. Bd. of Governors*, 558 F.2d 729

10   (5th Cir. 1977).

11         Courts have likewise adopted a functional approach for determining the level of detail

12   required in an adequate statement of basis and purpose. The D.C. Circuit has stated that "[a]t the

13   least, such a statement should indicate the major issues of policy that were raised in the

14   proceedings and explain why the agency decided to respond to these issues as it did, particularly

15   in light of the statutory objectives that the rule must serve." *Indep. U.S. Tanker Owners Comm.*,

16   809 F.2d at 852. At the same time, however, that same court has recognized that it "will 'uphold

17   a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Int'l Bhd.

18   of Teamsters, Chauffeurs, Warehousemen and Helpers of Am. v. United States*, 735 F.2d 1525,

19   1531 (D.C. Cir. 1984) (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S.

20   281, 286 (1974)).

21         Similarly, in the Second Circuit, we have upheld regulations accompanied by statements

27

1    of less than ideal clarity. *See N.Y. Foreign Freight Forwarders and Brokers Ass'n, Inc. v. Fed.*

2    *Maritime Comm'n*, 337 F.2d 289, 296 (2d Cir. 1964) (upholding a regulation where the statement

3    explained merely that the rules "have for their purpose the establishment of standards and criteria

4    to be observed and maintained by licensed independent ocean freight forwarders, ocean freight

5    brokers and oceangoing common carriers in the conduct of their business affairs"). And on at

6    least one occasion we have even upheld a regulation with no statement at all where the basis and

7    purpose was obvious. *See Hoving Corp. v. FTC*, 290 F.2d 803, 807 (2d Cir. 1961); *see also Ala.*

8    *Ass'n of Ins. Agents*, 533 F.2d at 236-37 (citing *Hoving* approvingly); *Tabor v. Joint Bd. for*

9    *Enrollment of Actuaries*, 566 F.2d 705, 710 (D.C. Cir. 1977) (citing *Alabama Ass'n of Insurance*

10   *Agents* approvingly for the same proposition); *Citizens to Save Spencer County*, 600 F.2d at 884

11   & n.201 (citing *Tabor* approvingly for the same proposition); *Cal-Almond, Inc. v. U.S. Dep't of*

12   *Agric.*, 14 F.3d 429, 443 (9th Cir. 1993) (citing *Citizens to Save Spencer County* approvingly for

13   the same proposition). Thus, the caselaw is clear that, taking into account the adopting release as

14   well as any materials or statements that the agency has made public in the course of the

15   rulemaking, we can find a statement adequate if the agency's path of reasoning can be reasonably

16   discerned. In the present case, these principles do not mean that the Commission must

17   demonstrate that Rule 3a12-3 would confer additional protections upon investors or even leave

18   investors with the same level of protection in the absence of the exemption. Rather, based on our

19   reading of the statute, *see* Part II, *supra* (discussing Schiller's substantive challenge), these

20   principles mean that at the most the Commission must indicate that the exemption serves some

21   interest and that it leaves in place adequate investor protections.

28

1    Although that requirement is not particularly onerous, the Commission does not give us

2    much to go on. The adopting release accompanying the 1966 Rule is, in the Commission's own

3    words, "fairly brief," and even that characterization is charitable. Nowhere in the adopting

4    release does the Commission provide any reason for adopting a foreign private issuer exemption

5    from § 14(a). The adopting release instead describes the rule that was previously in effect,

6    reports on the amendment adopted, and then explains why the Commission decided not to adopt

7    a sub-section of the amendment, as originally proposed. *See* Exemption of Certain Foreign

8    Issuers, 31 Fed. Reg. 6705, 6705 (May 5, 1966). We reject the Commission's invitation to read

9    the adopting release alongside statements in the legislative history of the 1964 Amendments that

10   purportedly justify the foreign private issuer exemption. As we have already stated, we will not

11   consider anything other than statements made by the Commission in the course of the

12   rulemaking.

13   But that does not leave us completely in the dark as to Rule 3a12-3's basis and purpose.

14   In 1965, the Commission issued a notice of proposed rulemaking announcing the proposed

15   amendments to Rule 3a12-3 that were adopted later that year. Registration of Foreign Securities,

16   30 Fed. Reg. 14,737, 14,737 (1965) ("1965 Notice"). The 1965 Notice includes the

17   Commission's underlying rationale for the proposed amendments.

18   As the 1965 Notice explains, the proposed amendments to Rule 3a12-3 were the

19   culmination of a study, conducted by the Commission, into the state of the foreign securities

20   markets:

21   [T]he Commission consulted with representatives of American brokers, dealers,
22   financial analysts, and the principal banks issuing American Depositary Receipts

29

1         (ADR's) who are interested in foreign securities, and received recommendations
2         from interested domestic and foreign groups.  The Commission also studied the
3         extent of the trading market for foreign securities in the United States, the disclosure
4         and reporting requirements and practices in many of the countries whose issuers have
5         securities traded in the United States, the requirements of many leading foreign stock
6         exchanges, and the nature of the information presently furnished to the Commission
7         by foreign issuers listed . . . on a national securities exchange . . . .

8     *Id.* at 14,738.  Importantly, the Commission explained in the 1965 Notice that "[t]he study

9     revealed continuing improvement in the reporting of financial and economic information by

10    foreign issuers." *Id.*  The Commission also explained that "[t]his improvement has resulted from

11    changes in foreign corporate laws, stock exchange requirements and increasing voluntary

12    disclosure by the companies themselves." *Id.*

13         Based on the 1965 Notice, we are easily able to discern the Commission's decision path.

14    In determining whether an exemption from § 14(a) was appropriate, the Commission took into

15    account the available protections for investors in foreign securities — the quality of foreign

16    corporate law, the nature of foreign stock exchange rules, and the amount of information

17    voluntarily disclosed by foreign issuers — which are certainly all relevant considerations.  Then,

18    the Commission determined that these protections were adequate in light of the important goal of

19    "maintaining [] existing markets in foreign securities," a goal the Commission recognized in the

20    1965 Notice and that Congress identified in adopting the Securities Acts Amendments of 1964.

21    *Id.*  Accordingly, the Commission must have concluded that Rule 3a12-3, 17 C.F.R. § 240.3a12-

22    3, was not inconsistent with the public interest or the protection of investors.[16] *Id.*

---

[16]Even if the Commission never made the underlying study public — and there is no
indication on appeal that it did — we do not think that § 553(c)'s requirements of a "concise
general statement of [] basis and purpose" would require this additional disclosure.  Omitting the

1

2                                        **Conclusion**

3

4          Although perhaps "novel," Schiller's argument is ultimately unpersuasive.  Rule 3a12-3

5    weathers this storm not because of its impressive longevity.  Rather, Rule 3a12-3 survives

6    Schiller's challenge because it was promulgated pursuant to the Commission's statutory

7    mandate.  Accordingly, we conclude that Rule 3a12-3 is a valid Commission rule and therefore

8    affirm the judgment of the district court.

---

underlying study would not hamper our ability to engage in judicial review, which is, once again, the principal purpose of the statement requirement, because the study would certainly be included in the record for review.  Moreover, this does not appear to be the type of case where the statement of basis and purpose "leave[s] vital questions, raised by comments which are of cogent materiality, completely unanswered."  *United States v. Nova Scotia Food Prods. Corp.*, 568 F.2d 240, 252 (2d Cir. 1977).  And finally, Schiller has never advanced the argument that the Commission's procedure withheld from "interested persons [the] opportunity to participate in the rulemaking."  5 U.S.C. §553(c).