

UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
100 F Street, N.E.
Washington, D.C. 20549

OFFICE OF THE
GENERAL COUNSEL

Jacob H. Stillman
Solicitor
Direct dial: 202-551-5017
Facsimile: 202-772-9260

January 10, 2006

**VIA FEDERAL EXPRESS**

Roseann B. MacKechnie, Esq.
Clerk, United States Court of Appeals for the Second Circuit
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, New York 10007

Re: *Schiller v. Tower Semiconductor Ltd., et al.,* Docket No. 04-5295-cv

Dear Ms. MacKechnie:

The Securities and Exchange Commission submits this *amicus curiae* brief in response to the Court's letter of October 6, 2005, inviting the Commission to address various issues concerning the validity of Rule 3a12-3, which exempts certain securities of foreign private issuers from (among other things) the proxy requirements of Section 14(a) of the Securities Exchange Act of 1934 and Rule 14a-9 thereunder. A panel of this Court (Circuit Judges Miner and Wesley, and District Judge Rakoff) heard oral argument in this appeal on September 19, 2005.

As demonstrated below,

- the Commission's exemptive authority under Section 3(a)(12) of the Exchange Act was not restricted by the subsequent enactment of Exchange Act Section 12(h);

- the foreign private issuer exemption in Rule 3a12-3 is supported by Congressional and Commission determinations that it is consistent with the public interest and the protection of investors; and

- the challenge to the validity of Rule 3a12-3 raised in this case is procedurally defective because it is time-barred or, alternatively, because, in accordance with the doctrine of primary jurisdiction, the Commission should have been given an opportunity by the district court to assess the rule's continuing validity prior to a court ruling on that issue.

## Background

### A. Overview and History of the Relevant Statutory Provisions and Rules

As originally enacted in 1934, the Exchange Act's registration, periodic reporting, proxy, and insider trading provisions applied only to securities listed on exchanges. *See* Richard M. Phillips & Morgan Shipman, *An Analysis of the Securities Acts Amendments of 1964*, 1964 DUKE L. J. 706, 712 (1964). Section 12(a) of the Act required that such listed securities be registered with the Commission, and Section 14(a) required that proxy solicitations related to any such securities comply with any "rules and regulations as the Commission may prescribe as necessary or appropriate or in the public interest or for the protection of investors." Under Section 3(a)(12), the Commission was authorized to promulgate rules exempting securities from these (and certain other) statutory provisions where the Commission "deem[ed]" an exemption "consistent with the public interest and the protection of investors."

In November 1935, the Commission promulgated Rule AN 18 (the forerunner of present Rule 3a12-3), stating in the adopting release that the Commission "deem[ed] it necessary and appropriate in the public interest and for the protection of investors" to exempt securities of foreign private issuers from Sections 14(a) and 16 of the Exchange Act. Exchange Act Release No. 412 (Class A) (Nov. 6, 1935). The Commission explained that the exemption was a "realistic approach" that, with regard to the exemption from Section 14(a), reflected the "fact that there [were] relatively few stock issues of foreign issuers listed on American exchanges * * *." Exchange Act Release No. 412 (Class B) (Nov. 6, 1935).

In 1963, following a comprehensive study of the securities markets, the Commission proposed legislation that would, among other things, extend the registration, periodic reporting, proxy, and insider trading provisions of Sections 12, 13, 14 and 16 of the Exchange Act to larger over-the-counter (OTC) companies. Phillips & Shipman, *supra*, at 706-07. In addition to providing (in what became Section 12(g) of the Act) for the registration of the securities of such companies, the proposed legislation included a provision that subsequently was enacted without material alteration as Section 12(h), which provides in relevant part as follows:

> The Commission may by rules and regulations, or upon application of an interested person, by order, after notice and opportunity for hearing, exempt in whole or in part any issuer or class of issuers from the provisions of subsection (g) of this section or from section 13, 14, or 15(d) or may exempt from section 16 any officer, director, or beneficial owner of securities of any issuer, any security of which is required to be registered pursuant to subsection (g) hereof, upon such terms and conditions and for such period as it deems necessary or appropriate, if the Commission finds, by reason of the number of public investors, amount of trading interest in the securities, the nature and extent of the activities of the issuer, income or assets of the issuer, or otherwise, that such action is not inconsistent with the public interest or the protection of investors.

During the deliberations over the proposed amendments to the Exchange Act (the "1964 Amendments"), members in both the Senate and the House expressed concern about the regulation of securities of foreign private issuers. Those deliberations make clear that Congress recognized both that, as a practical matter, the securities of foreign private issuers cannot be regulated to the same degree that domestic securities are regulated, and that OTC-traded securities of foreign private issuers should be accorded at least as broad an exemption as the Commission had provided (under Rule 3a12-3) for listed securities of such issuers. Addressing these issues, the Senate Committee that considered the bill explained the practical limits to imposing the same set of regulatory requirements on foreign issuers as are applied to domestic issuers *and* the harm to United States investors that would occur in the absence of the sort of exemptive relief that the Commission had provided in Rule 3a12-3 for foreign issuers of listed securities:

> [The] committee recognized that, in principle, U.S. investors in foreign securities ought to be afforded the same protections as are provided for investors in domestic securities. As a practical matter, however, enforcement of the registration and reporting requirements of [the bill] against foreign issuers outside the jurisdiction of the United States who do not voluntarily seek funds in the American capital markets or listing on an exchange would present serious difficulties. To prevent the securities of such issuers from being traded in the U.S. markets would seriously affect American holders of millions of dollars of such foreign securities. Indeed, even in the case of listed securities, the Commission has found it necessary to provide an exemption from the proxy and insider trading provisions of sections 14 and 16 for foreign issuers * * *.

S. Rep. No. 88-379, at 29 (1963). *See also, e.g.*, 110 Cong. Rec. S17799 (daily ed. Aug. 6, 1964) (statement of Senator Javits expressing concern "that great harm would come to investors from disruption of trading in foreign securities, that foreign traders would be disinclined to trade if foreign securities were under the same requirements as applied to domestic securities, and that the tendency would be to do their trading abroad with better markets and greater activity, and with resulting disadvantage to American holders"); 110 Cong. Rec. H17325 (daily ed. Aug. 4, 1964) (statement of Congressman Farbstein expressing the same concern). *Cf.* 110 Cong. Rec. H17325 (memorandum of the Commission to Congress stating "[t]he foreign securities area poses delicate and hard questions, especially in obtaining jurisdiction over and compliance from foreign issuers").

In light of these acknowledged impediments to the regulation of foreign private issuers and the harm that investors would suffer if foreign securities were not traded in United States markets, both the Senate and the House expressed an intent to give "the Commission broad exemptive authority and [to] empower[] it to deal flexibly with the problem." *See* H.R. Rep. No. 88-1418, at 11 (1964) ("[U]nder the House version, the SEC is granted broad exemptive powers and is authorized to deal very flexibly with the foreign securities problem."); S. Rep. No. 88-379, at 30 (the legislation "permits the Commission to deal flexibly with the application of disclosure

requirements in the context" of foreign issuers); *id.* at 69 (referring to "new section 12(h)" as a "broad exemptive authority").

The Senate Committee made clear that the Commission should, at a minimum, provide the same sort of exemption for OTC-traded securities of foreign private issuers as existed (in Rule 3a12-3) with respect to listed securities of such issuers:

> As already noted, the Commission has administered the Exchange Act so as to avoid undue interference with the trading markets for foreign securities in the United States. It is assumed that the Commission will treat over-the-counter foreign issuers in essentially the same way. Should the Commission deem that a total exemption [from Section 12(g)(1)] is unwarranted for a class or classes of foreign securities, it could still exempt any such security from one or more of the provisions of the bill and make appropriate modification of other disclosure requirements as it has done with respect to foreign securities listed on national securities exchanges.

S. Rep. No. 88-379, at 30.

Following the passage of the 1964 Amendments, the Commission undertook a study of "how best to bring foreign securities under the provisions of the new Section 12(g)," giving particular consideration to the Congressional "concern[]"—as expressed during the legislative deliberations on the 1964 Amendments—"with maintaining the existing markets in foreign securities." Exchange Act Release No. 7746, 1965 WL 87201, at *1 (Nov. 16, 1965). Based on the results of that study, the Commission proposed, among other things, to narrow the scope of Rule 3a12-3 by excluding the securities of a foreign private issuer "if more than 50 per cent of the outstanding voting securities of the issuer are held by United States residents or the principal business of the issuer is conducted in the United States." *Id.* at *3. The Commission also sought comment on a proposal to limit the Rule 3a12-3 exemption from the proxy rules to solicitations in which the person soliciting the proxy did no more than distribute or publish a notice of a meeting of security holders of the issuer and inform the security holders of a source from which they might obtain a form of proxy for the meeting.

In April 1966, the Commission adopted the proposed amendment to Rule 3a12-3 that removed the exemption from Sections 14(a) and 16 for securities of issuers which, though formed abroad, are domestically owned or operated. However, the Commission decided against adopting the proposed amendment that "would have under certain circumstances subjected solicitations in the United States by foreign issuers to the proxy rules under Section 14(a)." Exchange Act Release No. 7868, 1966 WL 85501, at *1 (Apr. 21, 1966). Coming on the heels of Congress's recent and repeated statements about the importance of maintaining the market for foreign securities and the anticipation that the Commission would extend the foreign private issuer exemption to OTC securities of such issuers, the adopting release was brief.

The Commission reconsidered the scope of Rule 3a12-3 again between 1977 and 1979, and amended the rule in November 1979 to "make clear that the Commission never intended th[e] [foreign private issuer] exemption to extend beyond the proxy solicitation, information statement and insider trading provisions of Sections 14 and 16 of the Exchange Act." Exchange Act Release No. 14128, 1977 WL 190179, at *3 (Nov. 2, 1977). The release adopting that amendment explained that because Rule 3a12-3 had not been amended when provisions pertaining to acquisitions of and tender offers for securities were added to Section 14 in 1968, Rule 3a12-3 (at least technically) exempted foreign private issuers from those provisions as well. The Commission stated that it was "of the view that an exemption from these latter provisions for the securities of foreign issuers registered under Section 12 is contrary to the public interest and the protection of United States investors as well as the interests of foreign issuers of such securities." In making this determination, the Commission specifically distinguished "the proxy solicitation provisions of Section 14 from which these foreign issuers remain exempt." Exchange Act Release No. 16371, 1979 WL 169934, at *13 n.16 (Nov. 29, 1979).

**B. <u>This Litigation</u>**

This appeal arises from an order of Judge Kimba Wood (S.D.N.Y.) granting a motion to dismiss the complaint of a putative class of shareholders alleging that defendant Tower Semiconductor Ltd. ("Tower")—an Israeli corporation whose shares are registered pursuant to Section 12(g) of the Exchange Act and traded on the NASDAQ—had violated Section 14(a) of the Exchange Act and Rule 14a-9 thereunder by issuing a false and misleading proxy statement. Plaintiffs charge that the allegedly false and misleading statements and omissions in the proxy materials were designed to induce the shareholders to authorize certain proposed amendments that had the effect of unnecessarily diluting their shares of Tower. The defendants filed motions to dismiss the complaint, arguing in relevant part that because Tower is a foreign private issuer as defined by Rule 3b-4, its securities are exempted by Rule 3a12-3 from the requirements of Section 14(a) and Rule 14a-9. The plaintiffs responded by arguing (among other things) that the foreign private issuer exemption of Rule 3a12-3 is invalid because the Commission has never made the required finding that the rule is consistent with the protection of investors and, therefore, the Commission exceeded its authority in promulgating the exemption.

The district court dismissed the suit, including the Section 14(a) claims, concluding that there was no merit to the "novel" argument that the Commission had exceeded its authority in promulgating Rule 3a12-3. After reviewing the origin and subsequent amendments of the foreign private issuer exemption, the court concluded that the "history of the exemption, and Congress's reaffirmation [in 1964] of the SEC's authority to make such exemptions to Section 14(a) of the Exchange Act, provide strong support for the conclusion that the rule is not arbitrary, capricious, or manifestly contrary to the statute." (JA 373 (citations and quotation marks omitted)). The court also observed that "the exemption is just one part of the SEC's overarching goal of providing American investors with a wide range of foreign investment opportunities, while not sacrificing too greatly the protections that investors have come to expect." (JA 374).

On appeal, plaintiff-appellant Gregory Schiller challenges the validity of Rule 3a12-3, arguing that in promulgating Rule 3a12-3 and later amending it, the Commission never "deemed" or "found" it consistent with the protection of investors for foreign private issuers to be exempt from Section 14(a) and, in particular, Rule 14a-9 thereunder. [1]

**Analysis**

A. **The Commission's Exemptive Authority Under Exchange Act Section 3(a)(12) Was Not Restricted by the Subsequent Enactment of Exchange Act Section 12(h).**

The Commission's longstanding exemptive authority under Section 3(a)(12) remains a valid source of authority for the foreign private issuer exemption of Rule 3a12-3, and was not "preempt[ed]" by Section 12(h). It is well established that repeal by implication is disfavored, *see, e.g., Cook County v. United States ex rel. Chandler*, 538 U.S. 119, 132 (2003), and nothing in the language of the provisions added by the 1964 Amendments or in the legislative history states that Section 12(h) was intended to invalidate existing sources of Commission authority (such as Section 3(a)(12)) to create exemptions from the provisions enumerated in Section 12(h) (Sections 12(g), 13, 14, 15(d), and 16). [2]

Indeed, the text and legislative history indicate that Congress's purpose in enacting Section 12(h) in 1964 was to augment—rather than to supersede—the Commission's Section 3(a)(12) exemptive powers. *First*, Section 12(g)(1), which was added to the Exchange Act at the same time as Section 12(h), provides that it does not apply to an "exempted security"—which is a security exempted under Section 3(a)(12). This explicit reference to the Commission's

---

1/ In support of this contention, Schiller argues that although the Westlaw version of the 1935 release adopting what was later renumbered as Rule 3a12-3 contains a statement that the Commission deemed the exception granted by the rule to be consistent with the public interest and the protection of investors, the LEXIS version of the release does not, and, therefore, it is not clear that the Commission made such a determination. Schiller also argues that (1) when the Commission amended Rule 3a12-3 in 1966, the Commission's exemptive authority was limited by Section 12(h), which "requires" the Commission to consider certain enumerated factors and to set a specific time limit on any exemption granted—neither of which the Commission has done; and (2) the Commission has never explained how it can be consistent with the protection of investors to relieve foreign private issuers from Rule 14a-9's prohibition on making false or misleading statements in proxy materials.

2/ Notably, during the Senate Committee's hearings on the 1964 Amendments, the Committee asked and was specifically told that the Commission could rely on its existing statutory authority—*i.e.*, Section 3(a)(12)—to apply Rule 3a12-3 to OTC trades in foreign private securities. *SEC Legislation, 1963: Hearing Before the Subcomm. on Banking and Currency,* 88th Cong. 74 (1963).

exemptive power under Section 3(a)(12) demonstrates conclusively that when, in Section 12(h), Congress gave the Commission authority to exempt securities from Section 12(g), Congress intended to *preserve* the Commission's separate exemptive authority under Section 3(a)(12). There is no reason to believe that Congress intended any different result with regard to the other sections enumerated in Section 12(h)—including Section 14(a), which also expressly authorizes exemptions for "exempted securit[ies]." *See* Phillips & Shipman, *supra*, at 743.

*Second*, as the foregoing discussion of the legislative history makes clear, Congress understood the 1964 Amendments (and Section 12(h) in particular) as expanding rather than limiting the Commission's existing options in granting exemptive relief. *See id.* at 746-47. Of course, this is not surprising given that it was the Commission that drafted and proposed Section 12(h) as part of the 1964 Amendments, and that the Commission's principal concern at that time was ensuring that it had all the necessary tools to properly regulate the OTC securities market. 4 LOUIS LOSS & JOEL SELIGMAN, SECURITIES REGULATION 1811 (3d ed. 1989) ("Perhaps of greatest significance * * * is the fact that § 12(h), which Congress accepted just as the Commission drafted it, reflects a recognition that it might be necessary to administer the [Exchange] Act with respect to over-the-counter securities *more flexibly* than had been necessary for listed securities.") (emphasis supplied). *See generally* Phillips & Shipman, *supra*, at 707-08. Indeed, Congress and the Commission intended that the "primary use" of Section 12(h) would be to do something that the Commission could not do under Section 3(a)(12)—issue exemptive *orders* "to modulate the new registration requirement in Section 12(g) in light of the infinite variety of peculiar circumstances that might arise." LOSS & SELIGMAN, *supra*, at 1813.

Furthermore, contrary to Schiller's contention, it is far from clear that Section 12(h) is "more specific" than Section 3(a)(12) with regard to the Commission's power to fashion an exemption from Section 14(a). Although Section 12(h) identifies Section 14 as one of the provisions from which the Commission is authorized to exempt issuers, Section 14(a) on its face contains the term "exempted security" and, therefore, expressly allows the Commission to utilize its exemptive authority under Section 3(a)(12)(A)(vii) to remove securities from the proxy requirements of Section 14(a). But even supposing that Section 12(h) could be seen as more "specific" than Section 3(a)(12), any presumption that Section 12(h) therefore supersedes the Commission's authority under Section 3(a)(12) to exempt securities from Section 14(a) is rebutted by the language of those provisions and the legislative history leading to their enactment, which make clear that Congress did *not* intend to supersede or restrict the Commission's existing exemptive authority. *See Block v. Community Nutrition Institute*, 467 U.S. 340, 349 (1984) (stating that "all presumptions used in interpreting statutes[] may be overcome by * * * specific legislative history that is a reliable indicator of congressional intent" and instructing that "[t]he congressional intent necessary to overcome the presumption may also be inferred from * * * [the] collective import of legislative and judicial history behind a particular statute").

In any event, the Commission's exemptive authority under Section 12(h) is no more circumscribed than it is under Section 3(a)(12), as Judge Wood found when she stated that the

central determination for ascertaining the propriety of an exemption is essentially the same in both sections. (JA 373, n.7). Section 3(a)(12)(A)(vii) provides that an exemption is appropriate where the Commission deems it to be "consistent with the public interest and the protection of investors," and Section 12(h) provides that an exemption is appropriate where the Commission finds it to be "not inconsistent with the public interest or the protection of investors"—a materially indistinguishable inquiry.

None of the other minor differences in the language of Section 12(h) and Section 3(a)(12) supports Schiller's argument that the Commission has less discretion to grant an exemption under Section 12(h) than it does under Section 3(a)(12). There is no indication that Congress understood the word "finds" in Section 12(h) to be any more restrictive than the word "deems" in Section 3(a)(12). The accepted meanings of "find" and "deem" in legal usage are very similar. *See* BLACK'S LAW DICTIONARY 538 (3[d] ed. 1933) (defining "deem" as "to hold; consider; adjudge; condemn; determine; treat as if; construe"); *id.* at 780 (defining "find" as "to discover; to determine; to ascertain and declare"); BLACK'S LAW DICTIONARY 504, 758 (4th ed. rev. 1968) (same). As relevant here, both definitions include "determine," which, in context, appears the most suitable description of what the Commission is directed to do in both Section 3(a)(12) and Section 12(h). We are aware of no case holding that "finds" should be read as any more demanding or restrictive than "deems." Likewise, contrary to appellant Schiller's argument, there is no discernible difference between the provision in Section 12(h) that the Commission may exempt issuers "upon such terms and conditions and for such period as it deems necessary or appropriate" and the parallel statement in Section 3(a)(12)(A)(vii) that the Commission has the authority to exempt securities "either unconditionally or upon specified terms and conditions or for stated periods * * *." Both provisions *permit* the Commission to limit the scope and duration of exemptions, and neither provision *requires* the Commission to impose conditions or a specific time limit. Similarly, although Section 12(h) includes a variety of possible bases for an exemption, it also provides that the Commission may exempt any issuer if it finds that such an exemption is "otherwise" not inconsistent with the public interest or the protection of investors —which gives the Commission as much discretion as it has under Section 3(a)(12).

## B. <u>The Foreign Private Issuer Exemption in Rule 3a12-3 Is Supported by Congressional and Commission Determinations That It Is Consistent with the Public Interest and the Protection of Investors.</u>

Contrary to Schiller's contention, the Commission has determined that exempting such foreign private issuers from the proxy rules is consistent with the protection of investors. The Commission made such a determination when it first adopted the rule in 1935. Then, after the exemption had been in existence for nearly 30 years, Congress itself found that the Commission's practice of exempting foreign private issuers under Rule 3a12-3 was necessary to maintain the markets in foreign securities and to protect United States investors in such securities. At the same time, Congress also made clear that it expected the Commission to afford at least as broad an exemption to OTC-traded securities of foreign issuers—precisely the type of securities at issue in this case.

From the time it adopted the original version of Rule 3a12-3 in 1935, the Commission has made it clear that it "deem[s] it necessary and appropriate in the public interest and for the protection of investors" to exempt securities of foreign private issuers from Sections 14(a) and 16 of the Exchange Act. Exchange Act Release No. 412 (Class A) (Nov. 6, 1935). Schiller's erroneous view that the Commission had not made such a determination (Appellant's Br. at 28 n.21; Reply Br. at 4 n.8) results from his apparent unawareness of the fact that, as was common at the time, the Commission issued two forms of release announcing the adoption of the rule. (Attached at Tabs A and B). The formal "Class A" release contains the official statement of the action, including the "public interest/protection of investors" language of Section 3(a)(12). The "Class B" release explains the action in a less technical way and contains a brief discussion of factors that the Commission considered in promulgating the rule. The electronic version of the release on which Schiller relies (1935 LEXIS 423) reproduces only the text contained in the Class B version of Release No. 412 and omits the Class A text, including the "protection of investors" determination that Schiller mistakenly asserts the Commission never made.

The next substantial consideration and explanation of the rationale for exempting foreign private issuers came during the proceedings leading to the passage of the 1964 Amendments to the Exchange Act. As demonstrated above, when Congress enacted those amendments, it did so with a clear understanding of the Commission's existing practice regarding the exemption of listed securities of foreign private issuers. The legislative history of the 1964 Amendments reflects Congress's view that the Commission had properly dealt with such securities in Rule 3a12-3 and that there was at least as strong a basis for the Commission to provide a comparable exemption for securities of foreign issuers traded over the counter. *See* S. Rep. No. 88-379, at 29 ("Indeed, *even in the case of listed securities*, the Commission has found it necessary to provide an exemption from the proxy and insider trading provisions of sections 14 and 16 for foreign issuers * * *.") (emphasis supplied); *id.* at 30 ("[T]he Commission has administered the Exchange Act so as to avoid undue interference with the trading markets for foreign securities in the United States. It is assumed that the Commission will treat over-the-counter foreign issuers in essentially the same way.").

Critically, in reaching that conclusion, the Senate Committee acknowledged that although extending the protections of Sections 14(a) and 16 to all United States investors in foreign securities would be desirable in the abstract, real world conditions made this *both* impractical due to "serious difficulties" with enforcing those requirements *and* dangerous because of the risk of harm to United States investors "holding millions of dollars of such foreign securities" if they were not "traded in the U.S. markets." *Id.* at 29. The Commission's then-Chairman also testified to the same effect before the House Committee that likewise endorsed the Commission's use of broad exemptive powers to address the special enforcement problems and other risks presented by the securities of foreign issuers. *See Investor Protection: Hearing Before the Subcomm. on Interstate and Foreign Commerce*, 88th Cong. 1287 (1964) ("[B]ecause of the tremendous enforcement problems that have been involved, the Commission has had on the books for longer than I can remember a provision which exempts many of these listed companies from sections 14 and 16 of the 1934 act."); *id.* ("There is a real problem in enforcing these protections as against

issuers and insiders in foreign countries who * * * may have little interest in the Commission's requirements. It was for this reason the Commission felt that the existing interest of American investors in an untold number of foreign countries and the markets for those securities[] should not be jeopardized * * *."). [3]

Those statements are significant for two reasons. *First*, they constitute an express recognition that the foreign private issuer exemption was justified and "necessary" to protect investors from the harm that would follow from the absence of such exemptive relief—the absence of United States trading markets for the securities of foreign issuers. *Second*, they reflect an awareness and acknowledgment that—contrary to appellant Schiller's view—an exemption can be consistent with the protection of investors even when it deprives those investors of certain statutory or regulatory protections that would apply in the absence of the exemption. In other words, as the Commission and Congress have long understood, in order to obtain certain protections for investors it is sometimes necessary and appropriate to forgo others through exemptive relief. [4]

When, after the 1964 Amendments were enacted, the Commission undertook the further study of how best to bring foreign securities under the provisions of the new Section 12(g) and thereafter proposed amendments to Rule 3a12-3, it was aware of Congress's intent that the Commission continue to use its exemptive authority to avoid undue interference with the trading markets for foreign securities in the United States. *See* Exchange Act Release No. 7746, 1965 WL 87201, at * 1 (Nov. 16, 1965) ("Congress made clear in adopting the Securities Acts Amendments of 1964 that it was concerned with maintaining the existing markets in foreign securities."). The amended Rule 3a12-3 that the Commission adopted in 1966 reflects a careful and balanced response to what it learned during its study of foreign securities and to Congress's clear directions during the proceedings leading to adoption of the 1964 Amendments. The amended rule preserved the exemption that Congress endorsed as a necessary response to the problems with the securities of foreign issuers discussed above while, at the same time, ensuring that the exemption was available only to those issuers that were truly "foreign" in terms of ownership and operation—and thus presumably presented the problems and risks that Congress and the Commission felt the exemption was necessary to address. *See* Felicia H. Kung, *The Rationalization of Regulatory Internationalization*, 33 LAW & POL'Y INT'L BUS. 443, 450-51

---

3/ Such public statements "in the course of rulemaking may be considered by a court in evaluating the adequacy of a rule's statement of basis and purpose." *Citizens to Save Spencer County v. EPA*, 600 F.2d 844, 884 (D.C. Cir. 1979).

4/ Contrary to Schiller's suggestion, however, the exemption of foreign issuers from Section 14(a) and Rule 14a-9 does not mean that such issuers may issue false or misleading proxy materials with impunity. Such issuers remain subject to other anti-fraud statutory provisions and rules, including, where applicable, the anti-fraud provisions in Rule 10b-5. Further, such issuers remain subject to applicable disclosure requirements, which provide additional protection to investors. *See, e.g.*, Exchange Act Section 13, Rules 13a-1, 13a-16.

(2002) (noting that the Commission's study "underscored the importance of continuing to exempt foreign companies from the proxy rules," and that the 1966 amendment reflected "more sophisticated distinctions between issuers incorporated abroad, but essentially indistinguishable from U.S. companies, and 'true' foreign companies" and thereby "narrow[ed] the availability of the exemption to the types of foreign issuers that really needed this relief").

Although the April 1966 adopting release is fairly brief, the justification for the amended rule is readily discernible from the proposing release and, more significantly, from the statements in the legislative history discussed above regarding the need for retaining the existing exemption of the listed securities of foreign private issuers from Section 14(a) and extending it to OTC-traded securities of such issuers. Those statements are directly applicable—and remedy any arguable deficiency in the Commission's explanation of the basis for the rule—because the amended Rule 3a12-3 embodied an exemption from the proxy rules that Congress itself recently had endorsed as an appropriate response to both the serious practical difficulties with enforcing such rules against foreign issuers and the risk of harm to United States investors that would occur in the absence of such an exemption. *See Hoving Corp. v. FTC*, 290 F.2d 803, 807 (2[d] Cir. 1961) (holding that the absence of an agency explanation of the basis and purpose of a rule does not invalidate the rule where "[b]oth the basis and purpose are obvious from the specific governing legislation"); *Cal-Almond, Inc. v. Dept. of Agriculture*, 14 F.3d 429, 443 (9th Cir. 1993) ("regulations with no statement of basis and purpose have been upheld where the basis and purpose was considered obvious"); *Citizens to Save Spencer County v. EPA*, 600 F.2d 844, 884 (D.C. Cir. 1979) (same). Simply put, because the amended rule accorded with the clearly expressed Congressional views about why the Commission should act as it did, it was unnecessary for the Commission to separately offer a comprehensive explanation of the basis for its action. Indeed, a fuller explanation would have been necessary only in the event that the Commission had disagreed with that clear Congressional directive and had elected to take a different regulatory course.

Further, the Commission subsequently has considered whether Rule 3a12-3 is consistent with the public interest and the protection of investors and has narrowed the rule to make sure that it continues to meet those statutory requirements. When it amended Rule 3a12-3 in 1979 to eliminate the unintended exemption of the securities of foreign private issuers from provisions relating to acquisitions and tender offers, the Commission explained that extending the exemption *beyond* the proxy solicitation, information statement and insider trading provisions of Sections 14 and 16 to tender offer and acquisition provisions was "contrary to the public interest and the protection of United States investors * * * as well as the interests of the foreign issuers of such securities." Exchange Act Release No. 16371, 1979 WL 169934, at * 9 (Nov. 29, 1979). Critically, the Commission simultaneously reaffirmed the continuing exemption of the securities of foreign private issuers from the proxy rules (including Section 14(a)), *see id.* at *9 n.16, making clear, in context, the Commission's view that such an exemption is consistent with the public interest and the protection of investors. By acting to limit the scope of Rule 3a12-3 as it did in 1966 and again in 1979, the Commission also demonstrated that it would act where necessary to ensure that the exemption remains within those statutory bounds.

C. **There Are Significant Policy and Procedural Grounds for Refusing To Consider in This Lawsuit a Challenge to the Validity of Rule 3a12-3.**

The foregoing analysis demonstrates that the district court properly rejected the argument that Rule 3a12-3 is invalid. As we explain below, however, the better course would have been for the district court to decline to entertain that invalidity argument, either because it is time-barred under settled law or, alternatively, because the challenge should have been brought to the Commission in the first instance under longstanding principles of primary jurisdiction. Nonetheless, inasmuch as this case is already in the Court of Appeals and the Commission has filed an *amicus* brief providing detailed arguments in support of the exemption, [5] it may be in the interest of justice at this juncture, if the Court agrees that the invalidity argument is meritless and/or time-barred, simply to affirm the district court's dismissal. *See National Communications Association, Inc. v. AT&T*, 46 F.3d 220, 223 (2d Cir. 1995). Given the substantial policy implications of a decision invalidating the longstanding foreign private issuer rule, however, if the Court has any uncertainty about Rule 3a12-3's continuing validity, it should allow the Commission an opportunity to address that issue in the first instance in the manner discussed below.

The core of Schiller's argument is that, in 1935 or 1966 or both, the Commission failed to supply a sufficient statement of its determination that Rule 3a12-3 is consistent with (or "not inconsistent with") the protection of investors. Though packaged as an "authority" challenge, what he is actually alleging is a procedural defect in the rulemaking. *See, e.g., Citizens to Save Spencer County*, 600 F.2d at 886 (omission of a statement of basis and purpose is a "procedural error," and not "substantive arbitrariness"); *Hoving Corp.*, 290 F.2d at 807 (omission of a statement of basis and purpose is a "purely technical flaw"). In light of the fundamental need for predictability in the legal framework within which regulated entities operate, courts have held that this sort of challenge may not be brought after the expiration of the period provided for seeking review of a rule after it is promulgated. *See, e.g., JEM Broadcasting Co. v. FCC*, 22 F.3d 320, 325 (D.C. Cir. 1994) ("[C]hallenges to the procedural lineage of agency regulations, whether raised by direct appeal, by petition for amendment or rescission of the regulation or as a defense to an agency enforcement proceeding, will not be entertained outside the 60-day period provided by statute."); *Sacramento Municipal Utility Dist. v. FERC*, 428 F.3d 294, 298-99 (D.C.

---

5/ The opportunity to participate as *amicus* is not ordinarily an adequate substitute for an agency's consideration of matters under the exercise of primary jurisdiction, particularly where—as in this case—the issues raised involve policy judgments embodied in agency rules of general applicability or implicate the agency's specialized expertise. *See TCG New York, Inc. v. City of White Plains*, 305 F.3d 67, 73-75 (2d Cir. 2002); *see also Tassy v. Brunswick Hospital Center, Inc.*, 296 F.3d 65 (2d Cir. 2002); *MFS Securities Corp. v. NYSE, Inc.*, 277 F.3d 613, 620-22 (2d Cir. 2002). Additionally, reliance on *amicus* participation alone is unsatisfactory because there is no guarantee that the agency would receive notice of private actions implicating matters within its purview, because an *amicus* lacks the right to appeal, and because participating as an *amicus* does not allow for development of an administrative record.

Cir. 2005) (same); *Independent Community Bankers of Am. v. Bd. of Governors of the Federal Reserve Sys.*, 195 F.3d 28, 34 (D.C. Cir. 1999) (same). In this case, Schiller's argument that the Commission did not adequately explain why it "deemed" or "found" the exemption consistent with the protection of investors comes at least 40 years too late and should be rejected as time-barred.

Even if Schiller's argument could be construed as a "substantive" challenge to the validity of Rule 3a12-3 on the ground that there is no evidence that the exemption as promulgated was (or continues to be) consistent with the protection of investors (Reply Br. at 5-6; Opening Br. at 13 n.7), the district court nonetheless should have refused to entertain that challenge in the first instance. Applying the doctrine of primary jurisdiction, courts have declined to consider similar challenges to agency rules by plaintiffs in private actions. For example, in *City of Peoria v. GECCO*, the Seventh Circuit held that a district court should have refused to consider, in the first instance, a plaintiff's challenge to an FCC rule in a private lawsuit, holding that the "proper party" in judicial review proceedings of an agency rule is "not a private company," but the responsible government agency and, even then, only after the agency is allowed "to pass on that challenge in the first instance" in proceedings before the agency. 690 F.2d 116, 119, 120-21 (7th Cir. 1982). As the court explained, requiring a party challenging a rule to first go to the government agency and only then proceed to court "enable[es] the agency to make a record and a decision on a matter before the courts put their oar in." *Id.* at 121. Likewise, in *GTE South, Inc. v. Morrison*, 199 F.3d 733, 743 (4th Cir. 1999), the Fourth Circuit refused to consider a challenge to various FCC pricing rules that plaintiff GTE claimed were "contrary" to the underlying statute. The court held that a challenge to an agency rulemaking may be brought only in a proceeding against the agency—not a purely private litigation—because "surely Congress would not give a court the power to determine the validity of an agency's rules when the agency itself is not a party." *Id.* at 743. Similarly, in *CF Industries, Inc. v. Transcontinental Gas Pipe Line Corp.*, 614 F.2d 33, 34, 36 (4th Cir. 1980), the court ruled that where a plaintiff's breach of contract action implicated "a number of issues falling within the expertise of the [FERC] and having an impact upon its regulatory responsibility," the case should be held in abeyance pending the FERC's "investigation and determination" of those issues. The Second Circuit likewise has recognized that the doctrine of primary jurisdiction "allows a federal court to refer a matter extending beyond the 'conventional experiences of judges' or 'falling within the realm of administrative discretion' to an administrative agency with more specialized experience, expertise and insight.' " *National Communications Association*, 46 F.3d at 222-23 (quoting *Far East Conference v. United States*, 342 U.S. 570, 574 (1952)). The *National Communications* decision further explained that "[s]pecifically, courts apply primary jurisdiction to cases involving technical and intricate questions of fact and policy that Congress has assigned to a specific agency." [6] *Id.* at 223.

---

6/ Although a determination by the Commission that Rule 3a12-3 is invalid presumably would have only prospective effect and, thus, would not in itself entitle Schiller to the damages he is seeking in this case, there are strong arguments for following this procedure. *First*,

(continued...)

The primary jurisdiction argument has particular force here, where Schiller is seeking to overturn a rule on which foreign issuers have relied for 70 years and which, as discussed above, both Congress and the Commission have recognized is necessary to protect the markets in foreign securities and the interests of United States investors in those securities. The potential impact of invalidating that longstanding rule is undeniably substantial. Foreign private issuers that have qualified for the exemption—and presumably have factored its availability into the business judgment about whether to participate in United States markets—would become subject to a different set of laws and regulations with, at best, uncertain additional risks. That uncertainty is likely to be particularly acute because this case arises in the midst of the still-evolving regulatory framework created by the Sarbanes-Oxley legislation. *See, e.g.*, Maria Camilla, *Regulation Without Borders: The Impact of Sarbanes-Oxley on European Companies*, 27 FORDHAM INT'L L. J. 785, 791-92 (2004) (discussing the regulatory requirements Sarbanes-Oxley placed on foreign issuers and stating that Sarbanes-Oxley marks a change in the "attitude of the United States towards foreign issuers").

Moreover, the invalidation of Rule 3a12-3 would have the potential to substantially undermine foreign issuers' willingness to participate in United States capital markets, the very risk that Congress intended the Commission to curb through continuing use of its exemptive powers. Because of this, the judgment about the continuing validity of Rule 3a12-3 should be made in the first instance by the Commission, at the conclusion of the Congressionally mandated process for altering existing regulations. The requirements of that process reflect Congress's appreciation of the need for predictability in the legal regime to which regulated entities are subject and the accompanying obligation to protect those who conform their conduct to, and make business decisions in accordance with, existing regulations. Indeed, that principle is embedded at the heart of the Exchange Act provision granting the Commission general

---

6/(...continued)
irrespective of the precise remedy sought, the court is called upon to determine the underlying validity of the rule, and the interest in giving an agency the "first crack" at reviewing a validity challenge to one of its rules is the same even where the party raising the challenge is seeking money damages from another party. Indeed, courts have followed this procedure in cases where the plaintiff is seeking damages or other relief that could not be provided by the agency with primary jurisdiction. *See CF Industries*, 614 F.2d at 35-36; *Carter v. AT&T*, 365 F.2d 486 (5th Cir. 1966). *Second*, this approach would not foreclose Schiller's ability to recover damages. Instead, as in *CF Industries*, the court of appeals could remand the case to the district court with instructions to hold the damages suit in abeyance pending the Commission's action on a petition for rulemaking. *See* 614 F.2d at 36; *see also Penny v. Southwestern Bell Telephone Co.*, 906 F.2d 183, 187 (5th Cir. 1990). After the Commission has responded to the challenge, in such a petition, to the rule's continuing validity, the district court could then rely on the Commission's analysis and findings to address the validity issue in the damages action.

rulemaking authority, *see* Exchange Act Section 23(a)(1), [7] and strongly supports requiring Schiller to petition the Commission to modify or rescind Rule 3a12-3 *before* being permitted to challenge its validity in this private case. [8] Accordingly, the district court should have refused to consider Schiller's validity challenge in the first instance and instead should have required Schiller to file with the Commission a petition to modify or rescind Rule 3a12-3 as a prerequisite to raising that argument as part of this private action.

**Conclusion**

For the foregoing reasons, Schiller's challenge to the validity of Rule 3a12-3 should be rejected as lacking merit, or, alternatively, the Court should decline to entertain his challenge.

Respectfully yours,

Jacob H. Stillman
Solicitor

Attachments: Exchange Act Release No. 412 (Class A) (Nov. 6, 1935)
Exchange Act Release No. 412 (Class B) (Nov. 6, 1935)

---

7/ Section 23(a)(1) provides, in relevant part, that no provision of the Exchange Act "imposing any liability shall apply to any act done or omitted in good faith in conformity with a rule, regulation, or order of the Commission * * * notwithstanding that such rule, regulation or order may thereafter be amended or rescinded or determined by judicial or other authority to be invalid for any reason."

8/ Two Second Circuit decisions have relied on a district court decision invalidating a portion of a Commission rule in private litigation. *See Perlman v. Timberlake*, 172 F. Supp. 246 (S.D.N.Y. 1959) (invalidating a portion of former Rule X-16-3). *See also Greene v. Dietz*, 247 F.2d 689 (2d Cir. 1957) (questioning the authority of the Commission to adopt former Rule X-16-3); *B.T. Babbitt, Inc. v. Lachner*, 332 F.2d 255 (2d Cir. 1964) (recognizing *Timberlake*'s holding that part of exemptive Rule X-16-3 was invalid). However, none of these opinions operates as precedent to support invalidating a Commission rule in private litigation, because the "primary jurisdiction" issue was not actually raised or addressed in those cases. *See, e.g., United States v. LA Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952) (jurisdictional issue not "raised in [the] briefs or argument nor discussed in the opinion of the Court" is not "binding precedent on this point").

For IMMEDIATE Release in MORNING Newspapers of Wednesday, November 6, 1935.

SECURITIES AND EXCHANGE COMMISSION
Washington

*SECURITIES EXCHANGE ACT OF 1934*
*Release No. 412 (Class A)*

The Securities and Exchange Commission, deeming it necessary and appropriate in the public interest and for the protection of investors to exempt from the provisions hereinafter mentioned of the Securities Exchange Act of 1934 the following securities, pursuant to authority conferred upon it by the Securities Exchange Act of 1934, particularly Sections 3(a)(12) and 23(a) thereof, hereby adopts the following Rule:

Rule AN18. Securities for which the filing of applications on Form 18, 19, 20 or 21 is authorized shall be exempt from the operation of Sections 14(a) and 16.

The above Rule shall become effective November 6, 1935.

---oOo---

Case 1:06-cv-00269-RMU    Document 16-2    Filed 06/16/2006    Page 18 of 19

For IMMEDIATE Release in MORNING Newspapers of Wednesday, Nov. 6, 1935.

# SECURITIES AND EXCHANGE COMMISSION
Washington

SECURITIES EXCHANGE ACT OF 1934
Release No. 412 (Class B)

The Securities and Exchange Commission has adopted a rule providing for the continuance, after permanent registration, of the exemption of securities of certain foreign issuers from the operation of the provisions of the Securities Exchange Act which deal with trading by officers and directors. The rule also exempts such securities from the provision dealing with the solicitation of proxies and consents. The specific sections affected by the exemption are 14(a) and 16. In announcing this rule, the Commission made the following statement:

"The new rule, AN18, applies to foreign issuers whose securities have been exempted from registration until March 31, 1936.

"Section 16 deals with trading by officers and directors in securities of their companies, and reports as to their holdings. Reports by officers and directors have not been required as to such securities since the Act went into effect, and the form for the registration of foreign securities does not require information as to their holdings. The purpose of the present rule is to provide that, after registration, the exemption as to the necessity of filing reports and meeting the other provisions of this section shall continue.

"The provisions of Section 16 could have but a very limited field of application to the securities of foreign issuers inasmuch as the section applies principally to stock, and comparatively few foreign corporations have stock listed on American exchanges, and even in such cases the principal market is rarely in this country.

"The fact that there are relatively few stock issues of foreign issuers listed on American exchanges also influenced the exemption with respect to the solicitation of proxies. So far as the solicitation of consents and authorizations in respect of listed foreign securities is concerned, registration under the Securities Act of 1933 is required if the consent or authorization makes any important change in the security and if remuneration is paid in connection with the solicitation of such consent.

In the light of the circumstances noted above, a realistic approach has led to the conclusion that the interests of American investors will be best served by the continuance of these exemptions".

---oOo---